UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

WILLIAM POLHAMUS,

                            Plaintiff,

                                                                9:23-CV-1570
v.                                                              (LEK/ML)

BETHANY BRINKEROFF, RN,

                            Defendant.
_____

APPEARANCES:                                          OF COUNSEL:

WILLIAM POLHAMUS
  *Pro Se* Plaintiff
549 State Highway Route 235
Harpursville, New York 13787

HANCOCK ESTABROOK, LLP                      FRANK W. MILLER, ESQ.
  Counsel for Defendant
1800 AXA Tower I
100 Madison Street
Syracuse, New York 13202


MIROSLAV LOVRIC, United States Magistrate Judge

## REPORT and RECOMMENDATION

     Currently before the Court, in this civil rights action filed by William Polhamus

("Plaintiff") against defendant Bethany Brinkeroff ("Defendant"), is Defendant's unopposed

motion for summary judgment pursuant to Fed. R. Civ. P. 56, and in the alternative, motion to

dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  (Dkt. No. 19.)  For the reasons set forth below, I

recommend that Defendant's motion for summary judgment be granted.

## I.     RELEVANT BACKGROUND

### A.     Plaintiff's Claims

At this procedural posture, Plaintiff asserts a claim of medical indifference against Defendant pursuant to the Eighth Amendment and 42 U.S.C. § 1983.[1]  (Dkt. No. 10 at 13; *see generally* Dkt. No. 1.)

### B.     Procedural History

Defendant filed a motion for summary judgment and motion to dismiss on April 29, 2024, which included a notification of consequences of failing to respond.  (Dkt. No. 19; Dkt. No. 19, Attach. 8.)  Plaintiff's deadline to respond to the motion was May 20, 2024.  (Dkt. Nos. 20, 21.)  On May 31, 2024, after not having received a response to the pending motion, the undersigned *sua sponte* extended the deadline for Plaintiff to respond until July 1, 2024.  (Dkt. No. 24.)  On July 11, 2024, after again not receiving a response to the pending motion, the undersigned *sua sponte* extended the deadline for Plaintiff to respond until August 12, 2024. (Dkt. No. 25.)  The Court cautioned Plaintiff that failure to file a response "may result in the motion being granted because the Court will not have the benefit of Plaintiff's response to consider in making its decision."  (*Id.*)

On August 19, 2024, Defendant filed a letter brief in further support of her motion.  (Dkt. No. 26.)  Defendant also filed an affidavit of service for her letter brief.  (Dkt. No. 27.)

To date, the Court has not received an opposition from Plaintiff.  (*See generally* docket sheet.)

---

[1]     Senior District Judge Lawrence E. Kahn construed Plaintiff's claim as one pursuant to the Fourteenth Amendment.  (Dkt. No. 10 at 3, 5-6.)  However, that was based on the Court's assumption, for purposes of initial review, that Plaintiff was a pretrial detainee.  (Dkt. No. 10 at 2 n.3.)  The contents of Defendant's motion make clear that at the time relevant to the Complaint, Plaintiff was a convicted and sentenced incarcerated individual.  (Dkt. No. 19, Attach. 7 at ¶ 1.) As a result, Plaintiff's medical indifference claim is pursuant to the Eighth Amendment.

**C.    Defendant's Statement of Undisputed Material Facts**

Unless otherwise noted, the following facts were asserted and supported by Defendant in her Statement of Material Facts and not denied by Plaintiff in a response.  (Dkt. No. 19, Attach. 7.)

1.    Plaintiff (age 34 at the time) was admitted and incarcerated at the Delaware County Correctional Facility ("Delaware CCF") on July 4, 2023, following his conviction of acting in a manner injurious to a child under the age of seventeen.[2]

2.    Plaintiff was sentenced to a jail term of 384 days of which, he served 241 days, before being released from Delaware CCF on March 1, 2024.

3.    Upon admission to the Delaware CCF, Plaintiff was given a copy of the Inmate Handbook, which contained the jail grievance procedure.  Plaintiff signed a document that acknowledged receipt of the Inmate Handbook on July 4, 2023.  Plaintiff was expected to adhere to the rules of conduct, including those regarding the filing of grievances.[3]

4.    On October 24, 2023, Plaintiff was allegedly involved in an altercation with another inmate.  Plaintiff alleges that as a result of that altercation, he needed medical attention.

5.    Plaintiff alleges that he believed his nose was injured or broken and he wished to have X-rays performed after the altercation.

6.    The Complaint does not allege that Plaintiff filed a grievance of any type against Delaware CCF or Defendant Brinkerhoff.

---

[2]    Although Defendant fails to include a citation to the record to support this assertion, support is found at Dkt. No. 19, Attach. 4 at 2-3.

[3]    Although Defendant cites to the affidavit of John DeMeo ¶ 17 in support of this fact, Mr. DeMeo's affidavit only contains paragraphs numbered 1-8.  (Dkt. No. 19, Attach. 7 ¶ 3; *see generally* Dkt. No. 19, Attach. 3.)  Notwithstanding, support for this fact is included in Mr. DeMeo's affidavit at Dkt. No. 19, Attach. 3 ¶¶ 5-6.

7.      Plaintiff, at various times before and after the incident of October 24, 2023, filed grievances through the inmate grievance procedure contained in the Inmate Handbook.  The grievance procedure was known by Plaintiff and used by him during the relevant period.

8.      The Complaint does not allege that Plaintiff complied with the exhaustion of his administrative remedies related to the incident of October 24, 2023.

9.      The Complaint does not provide an explanation for the failure to file a grievance.

10.     The Complaint alleges that Plaintiff was released from Delaware CCF on March 1, 2024, with the relevant incident taking place in October of 2023.

11.     The condition about which Plaintiff complains relates to prison conditions; thus, an inmate grievance had to be filed before commencing an action.

12.     Plaintiff alleges that he sustained a broken nose from another inmate and there was a delay in Defendant's treatment of that claimed injury.

13.     Plaintiff does not allege that Defendant caused his broken nose.  In addition, the Complaint does not allege that Plaintiff sustained a serious physical injury from the broken nose.

14.     The Complaint does not ascribe any specific acts or omissions to Defendant. Instead, the Complaint alleges that Defendant "ignored" Plaintiff's complaints, "intentionally treated [him] incorrectly," and similar conclusory statements.

### D.      Parties' Briefing on the Motion for Summary Judgment

#### 1.      Defendant's Motion for Summary Judgment

Generally, in support of her motion for summary judgment and, in the alternative to dismiss, Defendant argues that (1) Plaintiff failed to properly exhaust his administrative remedies before commencing this action; and (2) Plaintiff failed to state a claim upon which relief may be granted.  (*See generally* Dkt. No. 19, Attach. 1.)

With respect to her first argument, Defendant asserts that Plaintiff filed no grievance with respect to deficient or inadequate medical care at Delaware CCF. (Dkt. No. 19, Attach. 1 at 6-10.) Defendant argues the denial of medical care is a prison condition for which an inmate grievance must be filed. (*Id*.) Defendant argues that the grievance process did not operate as a dead end, it was accessible to Plaintiff, and Plaintiff has offered no explanation for his failure to comply with exhaustion of his administrative remedies. (*Id*.)

With respect to her second argument, Defendant asserts that the delay in treating a broken nose is not analogous to an unusually brutal or egregious beating and thus, cannot plausibly state a claim of medical indifference pursuant to the Eighth Amendment. (Dkt. No. 19, Attach. 1 at 10.)

### 2. Defendant's Reply in Support

After the deadline for Plaintiff to respond was extended on two separate occasions and he failed to file a response in opposition, Defendant filed a reply in further support. (Dkt. No. 26.) Defendant's reply in support states that defense counsel has not received an opposition to the pending motion and requests that Defendant's motion be granted, and the Complaint be dismissed. (*Id*.)

## II. RELEVANT LEGAL STANDARDS

### A. Standard Governing A Motion For Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).[4]  As for the materiality requirement, a dispute of fact is

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual

disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of the . . . [record] which it believes

demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S.

317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must

come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ.

P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant

willfully fails to respond to a motion for summary judgment, a district court has no duty to

perform an independent review of the record to find proof of a factual dispute–even if that non-

movant is proceeding *pro se*.[5]  (This is because the Court extends special solicitude to the *pro se*

litigant largely by ensuring that he or she has received notice of the consequences of failing to

properly respond to the motion for summary judgment.)[6]  As has often been recognized by both

---

[4]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to
create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation
omitted).  As the Supreme Court has explained, "[The non-movant] must do more than simply
show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.
Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[5]    *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.)
(citing cases).

[6]    *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's

procedural rules.[7]

Of course, when a non-movant willfully fails to respond to a motion for summary

judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that

the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Rather, as indicated above, the Court must assure itself that, based on the undisputed material

facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v.*

*Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.);

N.D.N.Y. L.R. 56.1.  What the non-movant's failure to respond to the motion does is lighten the

movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set

forth in a movant's statement of material facts to be admitted, where (1) those facts are supported

by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that

statement[8]–even when the non-movant was proceeding *pro se*.[9]

Similarly, in this District, where a non-movant has willfully failed to respond to a

movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed

to have "consented" to the legal arguments contained in that memorandum of law under Local

---

[7]    *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

[8]    Among other things, Local Rule 56.1 (previously contained in Local Rule 7.1(a)(3))
requires that the non-movant file a response to the movant's Statement of Material Facts, which
admits or denies each of the movant's factual assertions in matching numbered paragraphs, and
supports any denials with a specific citation to the record where the factual issue arises.
N.D.N.Y. L. R. 56.1.

[9]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*,
253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to
"perform an independent review of the record to find proof of a factual dispute.").

Rule 7.1(a)(3).[10]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B.    Standard Governing Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016) ("The [PLRA] mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions.").  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516,

---

[10]    *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3) (previously Local Rule 7.1(b)(3)); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

532 (2002). "There is no question that exhaustion is mandatory under the PLRA and that

unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the

administrative review process applicable to the institution in which an inmate is confined and

doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see*

*also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (quoting *Woodford*, 548 U.S. at 90)

(exhaustion necessitates "'using all steps that the [government] agency holds out, and doing so

properly'").

In Delaware CCF, there is a well-established two-step incarcerated grievance procedure:

(1) the incarcerated individual must file a formal grievance, form SCOC-7032-1 with the

Grievance Coordinator within five days of the date of the incident giving rise to the grievance,

and (2) the incarcerated individual must then appeal an adverse decision by the Grievance

Coordinator, to the Chief Administrative Officer or his designee.[11] (Delaware CCF Handbook at

48-49.)

The Chief Administrative Officer (or his designee) is responsible for ensuring that each

grievance filed at Delaware CCF is investigated to fullest extent by an impartial person who was

not involved in the circumstances giving rise to the grievance. (Delaware CCF Handbook at 49.)

---

[11]    In the future, defense counsel is urged to provide the Court with a copy of the appropriate
grievance procedure. Although Mr. DeMeo's affidavit included instructions for navigating to the
Inmate Handbook on the internet, the instructions appeared outdated. Notwithstanding, the
Court was able to locate the Delaware County Jail "Incarcerated Individual Rulebook 2025."
("Delaware CCF Handbook") (https://www.delawarecountysheriffny.gov/correctionalFacility,
last accessed February 17, 2025). Within that document, the undersigned located IRB 7032.0
Grievance Procedure, which has an effective date of "8 July 2022." As a result, it is reasonable
to infer that this was the procedure in place at the relevant time of this action. For the
convenience of the assigned district judge and the parties, the Delaware CCF Handbook is
attached to this Report and Recommendation as Appendix A.

Each grievance investigation "shall include gathering and assessing . . . (1) a description of the facts and issues underlying the circumstances of the grievance; (2) summaries of all interviews held with the grievant and with all parties involved in the grievance; (3) copies of pertinent documents; and (4) any additional relevant information."  (*Id.*)

Within five business days of the receipt of a grievance, the Grievance Coordinator shall issue a written determination which shall specify the facts and reasons underlying the Coordinator's determination.  (*Id.*)  A copy of the determination is to be provided to the incarcerated grievant.  (*Id.*)  Within two business days after the incarcerated grievant receives the Grievance Coordinator's determination, the incarcerated grievant may appeal to the Chief Administrative Officer or his designee.  (*Id.*)

Within five business days after receipt of the grievance appeal, the Chief Administrative Officer shall issue a determination on the grievance appeal and provide a copy of the determination to the incarcerated grievant.  (*Id.*)

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion."  *Ross*, 136 S. Ct. at 1858.  More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]") (quotation marks and citations omitted).  In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of."  *Ross*, 136 S. Ct. at 1859 (quotation marks and citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *Mena v. City of New York*, 13-CV-2430, 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216. The plaintiff must then establish the grievance procedure was unavailable to him under *Ross*. *Id.*

## III.    ANALYSIS

After carefully considering the matter, I recommend that Defendant's motion for summary judgment be granted based on Plaintiff's failure to exhaust his administrative remedies.

As Defendant set forth, Plaintiff failed to file any grievance related to the claims in his Complaint. (Dkt. No. 19, Attach. 1 at 6-10; Dkt. No. 19, Attach. 3 at ¶ 6.) Plaintiff has not opposed Defendant's motion and therefore has not put forth any argument or evidence suggesting that he did in fact exhaust his administrative remedies or that such remedies were

11

somehow unavailable to him.  Considering the record, the undersigned concludes that there is no genuine dispute of material fact whether Plaintiff failed to exhaust available administrative remedies: he did not.[12]

As a result, I recommend that Defendant's motion for summary judgment be granted.[13]

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 19) seeking dismissal based on Plaintiff's failure to exhaust his administrative remedies be **GRANTED**; and it is further respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be **DISMISSED** in its entirety; and it is further

---

[12]     The undersigned rejects Defendant's argument seeking dismissal because "Mr. Polhamus did not allege in the complaint any compliance with any aspect of the grievance procedure." (Dkt. No. 19, Attach. 1 at 9.)  The Second Circuit has clearly held that "[f]ailure to exhaust administrative remedies is an affirmative defense under the PLRA, not a pleading requirement," *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016), and for that reason "inmates are not required to specifically plead or demonstrate exhaustion in their complaints," *Williams*, 829 F.3d at 122 (quoting *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

[13]     Because the undersigned has determined that Plaintiff failed to comply with the PLRA's exhaustion requirement before filing this action in federal court, I have not addressed the merits of Plaintiff's claims. *See, e.g.*, *Edwards v. Arocho*, 125 F.4th 336, 350 (2d Cir. 2024) ("Having concluding that [the plaintiff]'s failure to protect claims faltered on exhaustion grounds, the District Court understandably declined to address the merits of that claim."); *Velez v. Lassiter*, 23-CV-4758, 2024 WL 4979409, at *5 n.4 (S.D.N.Y. Dec. 4, 2024) (citing *Siler v. Walden*, 20-CV-5794, 2023 WL 3871999, at *6 n.6 (S.D.N.Y. June 7, 2023); *Johnson v. Koenigsmann*, 16-CV-6523, 2018 WL 3145762, at *1 n.2 (W.D.N.Y. June 27, 2018)) ("Given my conclusion that summary judgment is proper based on Plaintiff's failure to exhaust, I need not address Defendant's arguments concerning excessive force or qualified immunity."); *Vidro v. Erfe*, 18-CV-567, 2019 WL 4738896, at *9 (D. Conn. Sept. 26, 2019) (the merits of the plaintiff's claim were "not reached" because the court had already granted summary judgment for the defendants on the basis of the plaintiff's failure to exhaust the administrative remedies available to him).  If the assigned District Judge disagrees with the recommendation contained herein, it is requested that the matter be returned for the issuance of a Report and Recommendation on Defendant's argument related to the merits of Plaintiff's claim.

**ORDERED** that the Clerk of the Court shall file a copy of this Report and Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[14]

**NOTICE**: Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[15]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated: February 20, 2025
       Binghamton, New York


Miroslav Lovric
U.S. Magistrate Judge

---

[14]     The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[15]     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  FED. R. CIV. P. 6(a)(1)(C).

# APPENDIX A

**DELAWARE COUNTY**
**JAIL**



**INCARCERATED INDIVIDUAL RULES**
**AND REGULATIONS**

**CRAIG S. DUMOND**
**SHERIFF**

**KIM S. SMITH**
**UNDERSHERIFF**

This book and its contents are the property of the Delaware County Sheriff's Office

**INCARCERATED INDIVIDUAL RULE BOOK**

**THIS PAGE INTENTIONALLY
LEFT BLANK**

This book and its contents are the property of the Delaware County Sheriff's Office

**DELAWARE COUNTY JAIL**

**INCARCERATED INDIVIDUAL RULE BOOK**
**INDEX**

| POLICY # | TITLE | PAGE |
|---|---|---|
| NA | Introduction | 4 |
| NA | SUICIDE IDEATION REPORTING | 5 |
| IRB 7002.0 | Personal Property | 6-7 |
| IRB 7004.0 | Correspondence | 7-16 |
| IRB 7004.2 | Indigence | 9-10 |
| IRB 7004.6 | Contraband | 12-14 |
| IRB 7004.7 | Procedure for handling money/check sent to Incarcerated Individuals | 14 |
| IRB 7025.0 | Packages | 15-16 |
| IRB 7005.0 | Hygiene, Laundry & Personal Clothing | 16-19 |
| IRB 7005.11 | Cell Inspections, Maintenance | 19-21 |
| IRB 7006.0 | Disciplinary procedures, violations, sanctions | 21-26 |
| IRB 7006.3 | Conduct | 26-29 |
| IRB 7007.0 | Good Behavior Allowances and Jail Time | 29 |
| IRB 8006.0 | Intermittent Incarcerated Individuals | 30 |
| IRB 8000.0 | Bond and Bail | 30-31 |
| IRB 8010.0 | Release Times | 31 |
| IRB 8001.0 | Conditional Release Program | 31-32 |
| IRB 7008.0 | Visitation | 32-35 |
| IRB 7051.0 | Funeral Visits | 32-36 |
| IRB 7009.0 | Meals | 36-38 |
| IRB 7016.0 | Commissary | 38-41 |
| IRB 8002.0 | Court Surcharges | 41 |
| IRB 7010.0 | Health Care | 41-42 |
| IRB 7013.0 | Classification | 42-43 |
| IRB 7019.0 | Gifts and Gratuities | 43 |
| IRB 7023.0 | Access to Media | 44 |
| IRB 7024.0 | Religious Services | 44-45 |
| IRB 7028.0 | Exercise | 45-46 |
| IRB 7031.0 | Legal Services and References | 46-47 |
| IRB 7032.0 | Grievance Procedure | 47-48 |
| IRB 7039.0 | Fire Safety | 50 |
| IRB 7064.0 | Human Immunodeficiency Virus and AIDS Related Information /Confidentiality HIV/AIDS | 50 |
| IRB 7070.0 | Educational Services | 50-51 |
| IRB 8003.0 | Hostage Policy | 51 |
| IRB 8004.0 | Human Services | 51-53 |
| IRB 8005.0 | Incarcerated Individual Worker Program | 53 |
| IRB 8009.0 | Programs (A-A, GED, Bible Study) | 53-54 |
| IRB 8011.0 | Sex Offender Registry | 54 |
| IRB 8012.0 | Telephone Services | 55 |
| IRB 8025.0 | Tablet Usage | 55-56 |
| IRB 8013.0 | PREA (Prison Rape Elimination Act) | 56 |
| IRB 8014.0 | PREA BROCHURE | 57-58 |
| IRB 611 | Notification of Corrections Law 611 Rights | 59-60 |
| | Law Library Index | 61-80 |

**DELAWARE COUNTY JAIL**
**280 Phoebe Lane**
**Suite 6**
**Delhi, New York 13753**
**(607) 832-5863**

**INTRODUCTION**

**FACILITY RULES AND INFORMATION**

This handbook will help you understand the day-to-day operations and programs of the Delaware County Jail. It contains information about some of the services available to you and what is expected of you. The term Incarcerated Individual shall be used for inmates, prisoners, detainees, and convicts, and may appear as II in the rule rook provided.

It also contains important rules and disciplinary measures. These rules must be followed to ensure a smooth-running operation. Failure to follow facility rules may result in a loss of privileges, loss of "good time", disciplinary isolation, sanctions, or a change of housing location, or any combination there of.

You are being held in custody as a result of court action or arrest. Please keep in mind that the jail staff did not cause you to be incarcerated. You are expected to act in a courteous manner and we will do likewise as we fulfill our legal responsibility for your safekeeping.

Neither the Sheriff nor the members of the staff have the power to release you before the date arrived at by process of law.

The facility officials are responsible for safeguarding your confinement until you are released. They are responsible for maintaining sanitary and healthful living conditions, for giving fair and equal treatment, and for providing you with the opportunities, in as far as possible, for improving yourself while in this facility. You are expected to follow all orders from the staff to make this possible.

You are being provided a copy of the Incarcerated Individual (II) Rules and must return it upon your release. Any destruction or mutilation of this rule book may result in charges being filed against you. Remember, this rulebook as well as all county property does not belong to you.

Please read and attempt to understand these regulations. If you do not understand any part of it, the Corrections Officer in your housing unit will assist you.

This book was designed to help you understand what is expected of you but in no way limits the staff to its contents. **Anything you are told to do, or told not to do is to be considered a lawful order and must be adhered to.** It does not have to be written in the II Rule Book. Noncompliance to any lawful order will be dealt with according to the policies and procedures of the Delaware County Jail and the laws of New York State.

No II in this facility will be subject to any form of discrimination based on charges, race, religion, national origin, sex or political belief. All programs or administrative decisions are made without prejudice or discrimination.

This book and its contents are the property of the Delaware County Sheriff's Office.

PLEASE READ THIS IMPORTANT INFORMATION

For

Family Members, Visitors & Incarcerated Individuals (IIs)


If an II informs you directly that he or she is thinking of self-harm, or suicide, in any letters, telephone calls, during a visit, during any conversation, or if you indirectly "overhear" an II talking of suicide, PLEASE notify jail staff immediately. Jail staff can have the II evaluated to determine what assistance is needed for him or her to deal with the specific problem.

YOUR INFORMATION CAN SAVE
SOMEONE'S LIFE

**RULES, REGULATIONS, PROCEDURES FOR INCARCERATED INDIVIDUALS**

**IRB 7002.0 PERSONAL PROPERTY**                    **REV 19 DECEMBER 2024**
**NYS Min. Std. 7002   Admissions**
**DCSO PPM 7002.0   Property Confiscation**

Personal items such as wallets, ID cards, licenses, watches, money, necklaces, belts, piercings, jewelry (rings, bracelets, etc.) are not allowed in your possession while you are in jail. Plain metal wedding bands may be worn if you are married. We may require verification that you are married before you keep your wedding band. Upon admission, all personal items will be listed on the proper form, placed in a property envelope and stored in the personal storage area.  This form will be jointly signed by you and the Booking Officer and you will receive a copy of it.

When you are released from jail (time served, bailed out, release order from the court, transferred to another facility, etc.) all personal property, clothing, and a check for funds remaining in your assigned account will be made out to you. If you anticipate receiving a state prison sentence all of your property must be released prior to your transfer. You must arrange to have someone pick up all of your remaining property.

Upon your release, or if transferred to another facility, you or your designee must claim and take possession of any of your property that was placed in storage during your incarceration at the Delaware County Jail. You must designate a person to receive your property with their phone number and address, and you must contact them notifying them of the property to be received. Any incarcerated individual property remaining after 90 days of the incarcerated individual's release or transfer will be considered to have been refused to be accepted by the designee and destroyed if the designated person does not notify the jail of an intent to receive the property.

The jail must provide due diligence in notifying the property recipient. Three attempts to contact the recipient must be made and documented on three separate days. Property destruction shall follow guidelines set forth in NYS Minimum Standards 7002.4 (h). Any abandoned sensitive items including but not limited to: social security card, driver's license or ID, jewelry, cellular device shall be mailed to the names recipient's address at facility expense. Clothing, books, or commissary, or any other non-sensitive item will not be mailed at facility expense.

You may release personal property that was in your possession at booking by filling out a daily request form. You must itemize what you are releasing, list the name, and a contact information of the person you are releasing the property to.

Religious medals may be kept in your cell after verification from your minister and/or the Jail Chaplain. A chain **IS NOT** a religious medal. If any item is considered to be of more than 1 ½ inches, or worth more than $20.00 it will not be allowed. Medals/talismans with stones are not allowed. Other religious articles allowed but not limited to are Prayer rug, Kufi, Bible, Quran.

The wearing of piercings is strictly prohibited. IIs who have piercing holes in their skin will not place any foreign objects in these orifices in order to prevent closure. IIs who insert foreign objects into their skin will be subject to disciplinary sanctions.

**Authorized Personal property:**

Each II is authorized to possess in their cell the following:

| | |
|---|---|
| Soap | 2 bars |
| Deodorant | 1 |
| Shampoo | 1 |
| Conditioner | 1 |
| Lotion | 1 |
| Hair Food | 1 |
| Pen, Blue | 2 |
| Pen, Black | 2 |
| Comb | 1 |
| Brush, hair | 1 |
| Bowl, food | 1 |
| Paper, drawing pad, white | 1 |
| Paper, writing, white, lined | 1 |
| Cards, playing, deck of 52 | 1 |
| Cards, Pinochle, deck of 48 | 1 |
| Commissary Envelopes, postage paid | 10 |
| Photographs | Unlimited |
| Calendar | 1 (non-spiral binding) |
| magazines, publications, newspapers and/or books (Not including Torah, Bible, or Quran) | 6 |
| Legal mail | Unlimited |
| Personal mail | Unlimited |

Food items purchased from commissary and marked with CHN (combined with above items, not to exceed $110.00 in total value)

Religious items are not included in the above quantities.

NOTE: IIs are limited to no more than $110.00 in total value of commissary items, (not including religious items), in their cell, including hygiene and food items.

Any item that exceeds the limits may be placed in the II's property and requested on the appropriate days. It is the II's responsibility to ensure that they are not in violation of facility limitations.

NOTE: Incoming bank checks and money orders will be deposited in the IIs account but will have a 10-day hold placed on each instrument deposited to ensure sufficient funds are available.

---

**IRB 7004.0 CORRESPONDENCE & MAIL          REV 26 December 2024**
**NYS Min. Std.7004.0**

Subject to the limitations of this policy, IIs are entitled to correspond with any person unless prohibited by an Order of Protection, or other instrument prohibiting contact with any person as specified by a court, judge or legal entity.

**LIMITATIONS**:

(a) There shall be no restriction upon incoming or outgoing II correspondence based upon:
     (1) the amount of correspondence sent or received; or
     (2) the language in which such correspondence is written.

(b) If an II is unable to read or write, they may receive assistance with their correspondence from other persons designated by the chief administrative officer, including but not limited to facility employees and IIs at times not unduly disruptive of the facility routine.

(c) Paper or correspondence written on paper other than white in color is considered contraband.

(d) Nothing contained in this Part shall be deemed to prevent the chief administrative officer from establishing a list of correspondents whom IIs shall be prohibited from corresponding with or receiving mail from.

## 7004.2 OUTGOING INCARCERATED INDIVIDUAL CORRESPONDENCE

(a) The Delaware County Jail shall make available to indigent IIs, at facility expense, four (4) sheets of white paper and two (2) envelopes for correspondence each week the II is on indigent status. Indigent IIs will be supplied a black pen for correspondence purposes. Postage for indigent IIs will be paid by the jail for a maximum of two 1-ounce letters per week. The indigent II is authorized to turn in a maximum of two (2) properly addressed and sealed indigent envelopes per week for mailing at county expense.

    i.    Staff will mark Indigent envelopes on the front bottom left hand corner of the envelope with the indigent II's criminal history number, and date, in red ink, when envelopes are issued to the II.

    ii.    Requests for indigent status must go in each Sunday and will be reviewed by the Jail Administrator or their designee. See definitions in section 7004.2A.

    iii.    Additional letters may be written at the II's expense by purchasing pads of paper, pens, prepaid envelopes through commissary once they receive funds.

(b) Outgoing II correspondence shall bear the following information of the sender on the upper left-hand corner of the envelope (The facility full address)

    II's Name, CHN
    Delaware County Jail
    280 Phoebe Lane
    Suite 6
    Delhi, NY 13753

NOTE: If any other markings are on the envelope (i.e. writing, drawing, pictures...etc.) it will not be processed and will be returned to the II.

(c) Outgoing II correspondence shall be sealed by the II and immediately surrendered to the housing unit officer.

(d) All outgoing II correspondence shall be collected and forwarded to the United States Postal Service at least once each business day

(e) Outgoing II non-privileged correspondence shall not be opened or read except when the chief administrative officer or designee determines there is reasonable suspicion to believe that the contents of such correspondence endanger or threaten the safety or security of the facility or the safety, security or health of another person.

(f) An II shall be notified in writing when their outgoing non-privileged correspondence is opened pursuant to this section.

(g) An II shall be present when their outgoing non-privileged correspondence is read pursuant to this section.

(h) The chief administrative officer or designee may delay notifying the II regarding the specific facts and reasons when such notification would endanger the safety, security and good order of the facility. As soon as the danger no longer exists, the chief administrative officer or designee shall immediately notify the II.

NOTE: There shall be further limitations on the facility's right to open and read mail when such mail is considered privileged correspondence. (7004.4 sub.2)


**7004.2A DEFINITIONS & PROCEDURES PERTAINING TO INDIGENCE DESIGNATION AND MAIL**

    a.  Indigence: lacking food, clothing, and other necessities of life because of poverty; needy; poor; impoverished. (http://www.dictionary.com/browse/indigent)

    b.  DCSO Jail considers II indigence to mean that the II has no money in their account, has no external financial support or means to purchase basic items such as postage and paper to maintain communication with their family.

    c.  IIs that have money (equal to or greater than the amount needed to purchase a stamped envelope) in their commissary account will not be considered indigent and will not receive free envelopes and paper.

    d.  If the II depletes the funds in their commissary account, it does not mean that the II will qualify for indigent status that week. Having no money in the IIs account at some given time does not automatically mean that the II is to be given an indigent designation.

e. IIs will not be denied indigent designation solely because they at one time had funds in their account but do not now. The decision will be based on how long it has been since they had money in their account (21 days), how much and how often they receive money and whether or not they made an effort to purchase postage when they did have money.

f. New IIs that do not have any money at booking and do not have money brought in to them may request indigent status and request indigent paper and pre-paid envelopes on the first Sunday after their booking.

g. Any IIs requesting and receiving a facility designation of indigence may be furnished with four (4) sheets of paper and up to two (2) envelopes, mailed at the facility expense) to write two (2) one-ounce letters per week. <u>This benefit is not cumulative</u>. Indigent IIs will be supplied a black pen for correspondence purposes. As long as the II meets the requirements as specified in section PPM 7004.2A sections b, d, e, and f.  The II meeting the requirements of indigence must put in a request for such **each** Sunday. If you do not put in the request you do not receive indigence status for that week.  This designation may be lost when money is placed into your account.

h. This facility designation of indigence may apply towards any other area of Minimum Standards where it dictates indigent IIs be provided something at facility expense. This status is not automatically applied to anyone; you must put in a request to receive it.

## 7004.3 INCOMING INCARCERATED INDIVIDUAL CORRESPONDENCE

a)      Incoming II correspondence other than privileged correspondence may be opened and inspected outside the presence of the intended II recipient. Such correspondence may be opened and inspected solely to ensure the absence of contraband.

(1) A copy of any order made pursuant to this subdivision shall be forwarded by the chief administrative officer or designee to:
(i) the intended II recipient; and
(ii) the sender of the correspondence at issue.

NOTE: Any correspondence read per this section, must be done within 5 business days after receipt into the facility.

(2) A written record of correspondence read pursuant to this subdivision shall be maintained. Such record shall include:

(i)      the name of the sender;
(ii)     the name of the intended II recipient;
(iii)    the date the correspondence was read; and
(iv)    the name of the reader.

NOTES:

1. Incoming mail addressed to IIs must have a return address indicating the name of the sender, a complete address and zip code.
2. All incoming II mail is brought to Intake for inspection and logging in the mail log on the Sally Port System.
3. Incoming II mail is transferred to each unit, after processing, for distribution to the IIs.
4. All incoming II mail that is not considered contraband will be delivered to the IIs within 24 hours of its receipt
5. Paper or correspondence written on paper other than white in color is considered contraband.

## 7004.4 PRIVILEGED INCOMING AND OUTGOING CORRESPONDENCE

**DEFINITIONS**

1. LEGAL PRIVILEGED CORRESPONDENCE - shall mean correspondence to or from:
   a) Attorneys and individuals under the direct supervision of attorneys;
   b) Legal assistance agencies and individuals under direct supervision of legal supervision agencies;
   c) and courts.

2. GENERAL PRIVILEGED CORRESPONDENCE - shall mean correspondence to and from:
   a) State Commission of Correction;
   b) Other Correctional officials;
   c) Local, State and Federal law enforcement agencies;
   d) and the media.

(a) As used in this Part, legal privileged correspondence shall mean correspondence to or from attorneys and individuals under the direct supervision of attorneys, legal assistance agencies and individuals under the direct supervision of legal assistance agencies, and courts. General privileged correspondence shall mean correspondence to and from the State Commission of Correction and other correctional officials, local, State and Federal law enforcement agencies, and the media.

(b) Incoming general and legal privileged correspondence shall not be opened and inspected for contraband except in the presence of the recipient II.

(c) Outgoing general and legal privileged correspondence shall not be opened and inspected for contraband except where the chief administrative officer determines there is reasonable suspicion to believe that the contents of such privileged correspondence threaten the safety or security of the facility or the safety and security of another person. An II shall be present when their outgoing general or legal privileged correspondence is opened pursuant to this subdivision.

(d) Incoming or outgoing II legal privileged correspondence shall not be read except pursuant to a lawful search warrant. Such warrant shall be obtained within twenty-four (24) hours of the

facility's receipt of such correspondence and shall be enforced immediately after its issuance. An II shall be present when their privileged correspondence is read pursuant to this subdivision.

(e) Incoming and outgoing general privileged correspondence shall not be read except where the chief administrative officer determines there is reasonable suspicion to believe that the contents of such general privileged correspondence endanger or threaten the safety or security of the facility or the safety and security of another person. When the chief administrative officer or designee makes such a determination, he shall issue a written order which shall state the specific facts and reasons why such action is necessary to maintain the safety and security of the facility or the safety and security of another person. The recipient II shall be present when his incoming and outgoing general privileged correspondence is read pursuant to this subdivision.

## 7004.5 RESTRICTIONS ON CORRESPONDENCE, PHYSICAL CONTENT

Nothing contained in this Part shall be deemed to prevent the chief administrative officer or designee from establishing a list of correspondents whom IIs shall be prohibited from corresponding with.
LIMITATIONS ON PHYSICAL CONTENTS/MATERIALS:

1. Photographs: Only commercially processed and printed photographs are authorized for II possession. If the photograph does not have a stamp from the store that printed it out, it must be accompanied by its original receipt.
2. Greeting cards: only commercially printed greeting cards **without** the following are authorized; appliques, glitter, ribbon, extensions, additions, multiple layers of paper, glued attachments or laminations, or aftermarket modifications.
3. Lipstick, foreign substances, chemicals, residues, crayon, stickers etc. may be restricted based on health, safety or medical conditions.
4. Perfumes or substances that emit any type of odor may be may restricted based on health, safety or medical conditions. The Shift Supervisor will forward any items emitting an odor to the Chief Administrative Officer for approval.
5. Correspondence, books, letters, paper items that have discoloration, obliterated writing, highlighting, smudges, stains, etc. on or in the paper are not allowed.

## 7004.6 CONTRABAND FOUND IN INCOMING INCARCERATED INDIVIDUAL CORRESPONDENCE

(a) As used in this Part, the term contraband shall include all items which constitute a threat to the safety, security or good order of a facility. Any foreign substance or anything not allowed by the facility is also considered contraband. Paper or correspondence written on paper other than white in color is considered contraband. Anything used for something other than it's intended purpose will be considered contraband.

(b) Incoming II correspondence that is found to contain contraband shall be forwarded to the chief administrative officer or designee for disposition.

(1) Contraband that may involve a criminal offense shall be forwarded by the chief administrative officer to the appropriate law enforcement authority.

(2) Contraband that does not involve a criminal offense shall be retained with the II's secured property for return upon the II's release depending on the CAO's decision. A photocopy of the correspondence (written portion) that has been deemed contraband shall be made for the II at no cost to the II.

(3) Contraband that presents a threat to facility sanitation or health may, upon order of the chief administrative officer, be destroyed.

(4) Cash shall be deposited in the intended II recipient's facility account or delivered to the chief administrative officer or designee for disposition in accordance with facility rules and regulations. The II shall be notified of all amounts received and the disposition of such.

(5) Incoming checks and money orders will be deposited in the IIs account but will have a 10-day hold placed on each instrument deposited to ensure sufficient funds are available. If no name, or address is listed on the money order, the money order may be returned to sender, or placed in property if no sender is listed. An incomplete document cannot be processed.

(c) The chief administrative officer or designee shall give written notice to the intended II recipient of any determination made pursuant to this section. This written notice shall include:

(1) the name and address of the sender;

(2) the nature of the contraband; and

(3) a statement of the specific facts and reasons underlying the determination.

(d) Subsequent to any determination made pursuant to this section, the chief administrative officer or designee shall, upon removal of the contraband contained in the correspondence, forward such correspondence to the intended II recipient, except when such action may interfere with any pending criminal investigation of the matter.

PROCEDURE FOR HANDLING CONTRABAND FOUND IN MAIL
1.)    Incoming II correspondence that is found to contain contraband shall be forwarded to the chief administrative officer or designee for disposition. If after removal of the contraband, the correspondence no longer is considered a threat to the safety, security or good working order of the facility, the correspondence is to be forwarded to the II.

2.)	Contraband that does not involve a criminal offense may be held in the II's property envelope until their release upon determination by the chief administrative officer.

a) The intended II recipient, who has had contraband returned, or placed in the II's property envelope is to be notified of such. Notification will be made using form CD-142 which contains the following information:

1. Name and address of sender
2. Nature of the contraband
3. Statement of the specific facts and reason underlying the determination.

If any correspondence that does not involve a criminal offense; i.e. letters, drawings, written messages is deemed contraband, one photocopy shall be made of the contraband and forwarded to the II at no cost to the II. All steps of this process shall be scanned into the sally port system for documentation purposes.

## 7004.7 PROCEDURE FOR HANDLING MONEY, CHECKS ETC. SENT TO INCARCERATED INDIVIDUAL & PRE-PAID ENVELOPS FROM GOVERNMENT AGENCIES

1.	Cash, checks or money orders delivered to the local facility shall be deposited in the personal account of the intended II recipient. The II shall be notified of all amounts received and the disposition of such.

   NOTE: Incoming checks and money orders will be deposited in the IIs account but will have a 10-day hold placed on each instrument deposited to ensure sufficient funds are available. (See IRB 7002.0, IRB 7004.0, IRB 7016.0 & IRB 7025. PPM 7002.0, PPM 7004.0, PPM 7016.0 and PPM 7025.0)

2.	Any cash, money orders or checks delivered to this facility or sent in the mail is to be entered in the commissary computer and credited to the II's account. The receipt is to be clipped to the front of the money; or secured in an envelope with the amount, II's name and CHN; and placed in the secure property storage, B107, in the money box. The IIs must be notified of the amount received.

3.	If an II receives a pre-paid envelope from a government agency, to be used to facilitate correspondence or the transmittal of official paperwork to that agency, the pre-paid envelope will be placed in the II's property until such time that the II has filled out the government form or letter and is ready to return said paperwork or correspondence to the agency that sent the pre-paid envelope. The II will fill out a request form to have the paperwork placed in the envelope and mailed. The IIs name, CHN and DCSO Correctional Facility address will be placed on the upper left-hand corner of the envelope. The envelope will be sealed by the II in the presence of the shift supervisor in intake.

## 7004.8 INCARCERATED INDIVIDUAL MAILING PROCEDURE

1. All outgoing mail is to be deposited in the mail receptacle in each housing unit and picked up by 2300 hours by the outgoing housing officer.

This mail will be brought to Intake for documentation and logging on the A-line shift. All outgoing mail is to be stamped "Inmate Correspondence". This mail will go out on the next business day.

---

**IRB 7025.0 MAIL & PACKAGES**                                    **15 February 2024**
**NYS Min. Std.7025.0 Packages**

**CONTRABAND:**
        The term contraband shall mean any item in an incoming II package which constitutes a threat to the safety, security or good order of a facility, or the health of any individual, or any item not permitted or any item which may constitute a criminal offense or may be the fruits or instruments of a crime.
        All IIs are allowed to send or receive packages from a company whose ordinary business includes the sale and shipping of such items (e.g. Amazon, Barnes & Noble, etc.). Incoming packages will be limited to the list below. Any other items that are allowed must be obtained through commissary.

**Authorized items**
        Books- Soft cover or paper back (hardcover books are not allowed).
        Magazines and Religious materials (Check with jail staff first)
        Photographs: commercially produced photos only. No Polaroid or home-produced photos allowed.

**INCOMING INCARCERATED INDIVIDUAL PACKAGES**
        The Jail Administrator requires that the contents of any incoming II package be purchased from, and mailed to the facility by, a company whose ordinary business includes the sale and shipping of such items.

        The Delaware County Jail is not responsible for any personal property kept in the cell area or for damage to your personal property.

**OUTGOING INCARCERATED INDIVIDUAL PACKAGES**
        Any items which an II sends from a facility shall be packaged in the presence of the II and under the supervision of facility staff.
        The costs incurred in sending any outgoing II packages shall be the responsibility of the II.

**INSPECTION OF INCOMING INCARCERATED INDIVIDUAL PACKAGES**
        All incoming II packages may be inspected to ensure that they contain no contraband. Any contraband found in an incoming II package shall be forwarded to the chief administrative officer for the following disposition:

If the contraband found may involve a criminal offense, it shall be forwarded to the Criminal Investigations Division, or other appropriate law enforcement agency.

If the contraband does not involve a potential criminal offense, it shall be returned to the sender or retained with the II's secured property for return upon the II's departure.

Cash, certified bank checks or money orders delivered to the local facility shall be deposited in the personal cash account of the intended II recipient or delivered to the chief administrative officer for disposition in accordance with facility rules and regulations. The II shall be notified of all amounts received and the disposition of such. All certified bank checks and money orders must be completely filled out or it will not be accepted and will be returned to the sender.

**NOTE:** Incoming checks and money orders will be deposited in the IIs account but will have a 10-day hold placed on each instrument deposited to ensure sufficient funds are available. (See IRB 7002.0, IRB 7004.0, IRB 7016.0 & IRB 7025. PPM 7002.0, PPM 7004.0, PPM 7016.0 and PPM 7025.0).

---

## IRB 7005.0 HYGIENE                                         Effective 15 February 2024

### NYS Min. Std.7005   INCARCERATED INDIVIDUAL PERSONAL HYGIENE

All IIs are expected to keep themselves clean; this includes their clothing, linen and cell area. Showers are available for use on a daily basis, at the housing unit officer's discretion, once you have filled out a request form for a shower. Showers are to be utilized for personal hygiene; washing of the body, and hair only.

If you are in Classification Status or Administrative Segregation you will be let out to use the shower, daily upon request on a daily request form, between the hours of 0800 and 2200. You will not be permitted to shower at any other time, unless circumstances prevent this, such as being out of the facility for court.

If you are in Punitive Segregation (Pun/Seg) you will be let out for 8 hours per day per Minimum Standards 7075, and 7076 during this time you are required to take your shower. You will not be permitted to shower at any other time, unless circumstances prevent this, such as being out of the facility for court.

Any II who by the act of refusing to shower, bathe or maintain reasonable standards of II personal hygiene may be ordered by the facility physician or their designee to shower in order to maintain such standard.

Shaving equipment, and other hygiene articles are available if requested on a facility request form, the razors will be handed out after morning cleanup. To obtain a replacement for an item that is completely used up, broken or worn out, you must return the original item or empty

container, the toilet paper tube or the sliver of soap for exchange. If this procedure is not followed, then you can make the request the next morning. Emergency situations will be addressed as needed. All IIs are required to shower at least every other day.

Cells and day areas will be cleaned after each meal by sweeping, mopping, and vacuuming.  Sinks and toilets will be cleaned every morning with equipment supplied by the Housing Unit Officer. All personal property will be stored in a neat and orderly manner. Everything must come up from the floor during morning cleanup in order to sweep and mop. NO EXCEPTIONS.

**HAIRCUTS:** The Delaware County Jail will provide electric hair clippers for II use.

Haircuts will be performed by an II approved by the Chief Administrative Officer, who has the necessary skills to perform this task or by the II on themselves, utilizing facility provided barber tools. Barber tools will be provided by the Jail. Disinfectant will be used to sanitize the clippers after each II uses clippers. Haircuts will be completed in the unit general day activities area unless on Pun/Seg status. Pun/Seg IIs will cut their own hair in their cell. Haircuts will be performed on the first Friday and 3rd Friday of the month between 1700-2200 hrs. IIs must request a haircut by the designated person on a daily request form.

IIs are not allowed to braid or style or touch another II's hair. The II using clippers to cut another II's hair is permitted contact necessary to provide the service.

**FINGERNAILS:** For safety reasons, II fingernails may not extend past the end of the fingertips at any time. IIs will request nail clippers in order to maintain the appropriate length of fingernails.

**LAUNDRY AND PERSONAL CLOTHING**
All IIs will be given facility issued clothing consisting of 2 jumpsuits, 1 jacket, 1 pair footwear, 3 underwear, 3 t-shirts, 3 pair of socks, and a winter hat. Female IIs will have three bras, white only, issued to them.

We do allow IIs to have one set of personal clothing, only for court appearances in front of a jury.  All clothing must be easily washable. We are not responsible for damage to personal clothing. All personal clothing will be kept in personal property storage.

All IIs in this facility will, initially, be issued the following clothing for classification:

a) 1 pair of footwear          d) 2 classification jumpsuits          g) winter hat
b) 3 T-shirts                        e) 3 pairs of socks                          h) 3 bras, (females)
c) 3 pairs of underwear         f) jacket
Bedding: All IIs will be issued 1 sheet, and two blankets. Each cell is furnished with a mattress with pillow attached.

Laundry Exchange: IIs are required to exchange, for sanitary reasons, the following items on scheduled laundry days: Sheets, jump suits or shirts and trousers, underclothes, socks, blankets and jackets. IIs shall ensure that they turn in a minimum of 2 pairs of socks, 2 T shirts, 2 undershorts, 1 jump suit or shirt and pants, 1 sheet. Female IIs shall also turn in 2 bras.

IIs will be locked in during laundry and clothing exchange in order to maintain accountability of clothing and bedding.

Laundry will be done according to the schedule. All other clothing and linens get exchanged according to the schedule. Jumpsuits are washed on designated laundry days after they are inspected for damage.

IIs are responsible for inspecting all clothing items that they have received in exchange for dirty clothing/linen. Immediately report any discrepancies to the Housing Unit officer. Female IIs will be issued the same clothing.

If an II requires special clothing for a work assignment, that clothing will be provided to the II by the facility at no cost to the II.

Note: Schedule is subject to change
**Laundry and clothing exchange schedule**: (Socks, Underwear, T-Shirts, and Towels) – Morning                                (Jumpsuits) - Afternoon

| | |
|---|---|
| Housing Unit A | Monday and Thursday |
| Housing Unit B | Tuesday and Friday |
| Housing Unit C | Monday and Thursday |
| Housing Unit D | Tuesday and Friday |

**Linens**: (Sheets with jumpsuit in afternoon)

| | |
|---|---|
| Housing Unit A | Monday |
| Housing Unit B | Tuesday |
| Housing Unit C | Thursday |
| Housing Unit D | Friday |

**Blankets**: (C-Line Shift 1500-2300 hours)

| | |
|---|---|
| Housing Unit A | 1st Monday of the Month |
| Housing Unit B | 2nd Monday of the Month |
| Housing Unit C | 3rd Monday of the Month |
| Housing Unit D | 4th Monday of the Month |

**Hats and Jackets**: (C-Line Shift 1500-2300 hours)

| | |
|---|---|
| Housing Unit A | 1st Saturday of the Month |
| Housing Unit B | 2nd Saturday of the Month |
| Housing Unit C | 3rd Saturday of the Month |
| Housing Unit D | 4th Saturday of the Month |

The Housing Officer will see that all IIs put their clothing in the laundry bin after inspecting it for damages. Only one jumpsuit can be exchanged at a time. If any Officer sees that any item is beyond use and needs replacement, the officer should see that it gets taken care of. When laundry comes back to the housing unit it is to be handed out by the Housing Unit Officer or Rover. The IIs are to go through it at that time and report any missing or damaged items immediately.

No II is to launder any items in their cell, showers or sinks. All II clothing items will be washed/dried in facility washing machines and dryers.

---

**IRB 7005.11 HOUSING, CELL INSPECTIONS, Effective 19 DECEMBER 2024**
**MAINTENANCE**
**NYS Min. Std. §7005.11 Housing Area Maintenance**
**NYS Min. Std. §7013.8 Assignment to Facility Housing Areas**

You will be assigned to a housing unit in accordance with our classification procedure. You and a Housing Unit Officer, together, will inventory your assigned cell before you take occupancy of it for any defects of any facility property. When doing the pre-inventory, take notice of any defects. Once the cell has been assigned to you, you will be responsible for the condition of the cell and must keep it clean and orderly. On the day you are released, or assigned to another cell, you and a housing unit Officer will take a post inventory before your release. If any facility property is either defaced or damaged during your occupancy of your assigned cell, you will be either charged criminally for defacing or damaging the property, or restitution for the damage and restoring or both. Each cell you are assigned to will be inspected upon your arrival and prior to your release for any damages to the cell or its furnishings. Any damage found may result in one or more of the following actions being taken:

1. Deduction of reported costs from your commissary account
2. Loss of good time
3. Restitution as part of Probation
4. Criminal charges filed against you.

The Officer's station in each housing unit has a red line around it. IIs will not cross that line in any way unless directed to do so by the housing unit officer.

| | | |
|---|---|---|
| Lights On | Approx. | 0630 |
| Cells Unlocked | Approx. | 0700 |
| Lock-In for head count | Approx. | 1430 |
| Lock up & Lights out | Approx. | 2200 |

There are additionally various lock in times for facility functions such as laundry exchange, facility maintenance, medication pass, or other reasons. If you are told to lock in you must do so immediately for proper facility function. **Lock in drills are performed periodically. You must lock in when directed**. **Do so immediately regardless of whether an emergency or drill.**

All IIs will keep their clothing, bedding, cells and living area neat, and clean in accordance with facility policy. No articles of any kind shall be discarded on the day room or cell floors. Only food items purchased through commissary may be kept in the cell. You may not keep any food or drink items from a facility provided meal.

When you are not in your bed and under your covers, your bed will be neatly made. The Head portion of the mattress must be kept facing the opposite direction of the cells table. The mattress must stay on the bunk. All IIs will get up and out of their cells prior to morning cleanup. Your entire cell must be kept neat in the manner depicted in the photos posted in each housing unit program window. If you are assigned a cell with a second bunk installed, you are not permitted to store your property on it, this must be kept clean and empty if unassigned to a second individual. When you are the only person assigned to a cell that has two bunks, you are required to use the bottom bunk only.

Cleanup in the housing units on weekdays will be done after the morning meal and evening meal. Everything must be picked up from the floor during cleanup so that the entire cell area can be swept and mopped. During cleanup, after breakfast, IIs will clean their own cells; there will be no bartering for this purpose. IIs will sweep and mop walkways, day areas and clean all showers and toilets. On weekends, housing unit cleanup is done after the evening meal.

Any II refusing to participate in cleanup will be locked in administratively until the end of that shift and will be subject to disciplinary action.

Nothing will be attached to the walls, fixtures, doors, windows, or anywhere by any means. Do not cover your vent. This will interfere with the systems ability to perform properly. Do not cover or block your door with anything that may obstruct any Officer's view, including towels, mattress, bedding, clothing, or any other item, this will be addressed immediately, and may result in disciplinary action.

There will be no limit on personal letters. If it is believed that the amount of correspondence is excessive you may be asked to place some of it in your personal property, though it is not required, to reduce a risk of fire hazard. Any correspondence placed in property may be requested out of personals Monday – Friday.

All Housing Units will be cleaned on a daily basis. Other cleaning in the housing unit is to be done on a regular basis. Whenever any II requests cleaning supplies at a time other than scheduled cleanups, a reasonable effort should be made to make these supplies available. Cleaning any areas or cells at a time other than specified by the cleanup schedule does not exempt an II from conducting scheduled cleanups.

**Monday-Friday**
- **Morning Clean Up (after breakfast) the entire unit gets cleaned**: Mopping, Sweeping, Counter/Sink, Garbage, Tabletops, Water Fountain, Vacuuming, Kiosk, Phones, Hallways, TV Chairs, Table Chairs, Kiosks, General Bathroom, Stairs, Door Handles, Railings, Windows, Sally port, Recreation area, Showers, and _All Cells._
- **Afternoon Clean Up (after lunch):** Only Tabletops, Garbage, and Counter/Sink.
- **Evening Clean Up (after dinner):** Mopping, Sweeping, Tabletops, Garbage, and Counter/Sink.

**Saturday & Sunday**

- **Morning Clean Up (after breakfast):**
  Mopping, Sweeping, Tabletops, Garbage, and Counter/Sink.
- **Afternoon Clean Up (after lunch):** Only Tabletops, Garbage, and Counter/Sink.
- **Evening Clean Up (after dinner)
  the entire unit gets cleaned:**
  Mopping, Sweeping, Counter/Sink, Garbage, Tabletops, Water Fountain,
  Vacuuming, Phones, Hallways, TV Chairs, Table Chairs, Kiosks, General
  Bathroom, Stairs, Door Handles, Railings, Windows, Sally port, Recreation area,
  Showers, and *All Cells.*

**You must keep all of your personal items, items signed out to you (ie. tablets), and commissary items in your assigned cells, with the exception of religious items during times of worship.**

---

**IRB 7006.0 DISCIPLINARY PROCEDURES,          Effective 15 February 2024
VIOLATIONS, SANCTIONS
NYS Min. Std. 7006.0**

If you commit an act which violates jail rules, you may be charged with a violation. You may be locked in until the end of the current shift.  You may also be immediately confined to your cell if the Officer has reasonable grounds to believe that your action represents a threat to the safety, security, or the good order of the facility. MIN STD 7006 describes in detail the disciplinary process. There is a copy of Minimum Standards in every housing unit for your use.

The officer will send a report to the shift supervisor and hearing officers who shall review the Incident Report, sign it, and turn it over to the Hearing Board. The Hearing Board Sergeant may assign an officer to investigate the incident further or assign a Hearing Officer to start the procedure.  You may be immediately confined to your cell if the incident warrants such action and you may be kept in Administrative Segregation (Ad/Seg) throughout the hearing process. All administrative segregation as well as punitive segregation shall be in compliance with section 7075, and 7076 of NYS minimum standards.

If you are placed in administrative segregation you have the right to appeal this decision. You may request an administrative segregation appeal form if you feel this decision to place you under these sanctions is not warranted, you will remain in administrative segregation pending the results of this review. This form must be submitted within 24 hours of receiving a copy of the administrative segregation order. Any time out of your cell and away from your sleeping area shall be credited towards your allotted 7 hours out of your cell per NYS minimum standards 7075, and 7076. You may not be entitled to 7 hours out of your cell and away from your sleeping area if it has been determined that a threat to the safety, security, and good order of the facility is standing.

Administrative segregation shall be used for the purpose of providing care and close supervision. Administrative segregation may be imposed for medical reasons, deviant behavior or if the officer has reasonable grounds to believe that the II represents a danger to themselves, to other IIs, to property or constitutes a threat to the safety, security, or good order of the jail, and will be reviewed approximately every 7 days by the Jail Administrator.

If you should be charged with a violation, you are entitled to a hearing concerning the

charges. Within a reasonable amount of time, no sooner than 24 hours prior to the hearing, you will be presented with a written copy of the Incident Report listing the charges against you. You will also receive written notice of your rights to a hearing and the process will be explained fully.

You may, at this time, if appropriate come up with an agreeable plea bargain with the Hearing Officer and accept any sanctions discussed. If your incident goes directly to a hearing and you are found guilty, sanctions will be imposed by the Hearing Officer.

If the incident goes to a hearing and you are found guilty of partial or all charges, the Hearing Officer has the authority to impose sanctions. It will be the responsibility of the Hearing Officer to come up with a determination of guilt or innocence. If you are found guilty, you will no longer be able to negotiate with the Hearing Officer, a surcharge of up to $25 will be deducted from your commissary account for any incident report resulting in a guilty verdict and sanctions will be imposed by the Hearing Officer.

The hearing will take place no sooner than 24 hours after you receive your notification, but as soon thereafter as possible. You have the right to waive, in writing, this time limit and/or any portion of the hearing process.

Whenever possible, the hearing will be conducted by an individual or a group of individuals, designated by the Jail Administrator, who were not involved in the incident. You have the right to call witnesses and present evidence in your defense to the charges placed against you. Any adverse decision or penalty imposed may be appealed to the Jail Administrator who will then respond in writing to any such appeal. Your appeal should contain facts and reasons for the appeal. Your appeal must be submitted within 2 business days from receipt of decision. Sanctions and surcharges will be applied until the appeal is accepted. If you accept a plea bargain, the sanctions discussed and imposed cannot be appealed.

IIs have the right to remain silent and should an II exercise that right at a hearing, such silence will not be used against the II in making a determination. If you are found guilty of the charges brought against you, one or all of the following sanctions could be imposed based on your attitude, overall adjustment to the institution, and the facts and circumstances of the incident. When the Hearing Investigator or Officer speaks to you, or reads you your rights, this is the best time to request witnesses. If you do not waive your right to 24 Hour notice, the hearing officer will not speak to you during that time. Use this time to prepare your case. Only witnesses will be interviewed. Do not wait until a guilty decision is made to argue your case or ask for witnesses. Once a guilty decision has been made it must go to an appeal if you are unsatisfied with the hearing:

1. Reprimand (shall be made part of your Pre-Sentence Investigation (P.S.I.).) All disciplinary records per section 7210.7 shall be provided to **any receiving facility.** For example, if you are sentenced to state prison, **they will receive a copy of your misbehavior reports for their classification purposes. If you misbehave here, it will affect you there.**
2. Loss of one or more specified privileges for a specified period of time. Such privileges may include, but are not limited to: Commissary, Tablet, Personal Phone Calls, E-mails, attending extra programs or II worker status.
3. Loss of, or limitation of visitation.
4. Punitive Segregation confining you to your cell for a certain number of days or during certain hours for a specified period of time.
5. Confinement to a cell for a specified period of time.

6.   Restitution for damage to any property, public or private.
7.   Loss of a specified portion of "good time." If you are un-sentenced, your "good time" may be taken contingent upon your sentence.
8.   Loss of one hour of visitation per week.
9.   All Punitive Segregation sanctions include the loss of all privileges and confiscation and storage in personal property of all commissary items in your cell except for hygiene   items.

If you should lose commissary privileges as part of your sanctions that means that you are no longer allowed to purchase commissary items except for hygiene and writing articles until your sanctions have been lifted. This also means that no one else is allowed to purchase items from commissary on your behalf. If you purchase items for any II that has lost privileges, you will be written up and charged. If you have lost privileges and accept commissary items from another II your cell will be stripped of all non-consumable commissary items to ensure that the sanctions imposed are enforced.

## CLASS "A" VIOLATIONS

- Upon Guilty Verdict: Up to 3 consecutive days Punitive Segregation, but no more than 6 days of punitive segregation in a 30 day period, and loss of any or all listed privileges (Tablet usage, consumable commissary, e-mails restricted, program attendance, Loss of 1 hour of visitation per week, restitution for lost or damaged property, restitution for up to $100.00 for facility medical expenses related to staff treatment, Loss of a specified period of "good time" credit on sentence) as well as a sanction surcharge not to exceed $25.00. Any infraction that is a threat to the safety, security, or good working order of the facility shall be accompanied by an Administrative Segregation Order form CD-113. Alternative assignments may be issued at the discretion of the hearing officer in lieu of or in addition sanctions as part of an abeyance, or as part of a request for sanction suspension by the Chief Administrative Officer.

- Note: restitution for medical expenses shall only be implemented if facility staff seeks medical attention and provides documentation.

| | |
|---|---|
| A1 | Assault, fighting or inciting others to fight. |
| A2 | Rioting or encouraging any riot or group demonstration |
| A3 | Escape, either attempting or planning |
| A4 | Starting, attempting to start, or threatening to start, a fire |
| A5 | Any violation of NYS law or penal code. |
| A6 | Threatening another with bodily harm or offenses against his person, family or property. |
| A7 | Possession of, or introduction of, dangerous contraband; i.e. weapon, chemicals, drugs, or other items that pose a threat to the safety and security of the jail, officers or IIs. |
| A8 | Engaging in or attempting to engage in sexual acts, sexual threats, or sexual propositions. |
| A9 | Tampering with, or obstruction of, any locking device |
| A10 | Extortion, blackmail, offering a bribe or accepting a bribe. |
| A11 | Harassment, bullying, intimidation, coercion of other IIs. |

A12    Destroying, altering or damaging any property of the facility.
A13    Refusal to obey an order from any staff member
A14    Possessing any facility keys or equipment
A15    Absconding or attempting to abscond
A16    Any misuse of medication or possession of same
A17    Violation of Honor Line


## CLASS "B" VIOLATIONS

 - Incident Report, and upon Guilty Verdict: Loss of any listed privileges (Tablet usage, consumable commissary, e-mails restricted, program attendance, Loss of 1 hour of visitation per week, restitution for lost or damaged property, restitution for up to $100.00 for facility medical expenses related to staff treatment, Loss of a specified period of "good time" credit on sentence) as well as a sanction surcharge not to exceed $25.00. Alternative assignments may be issued at the discretion of the hearing officer in lieu of or in addition sanctions as part of an abeyance, or as part of a request for sanction suspension by the Chief Administrative Officer.

- Note restitution for medical expenses shall only be implemented if facility staff seeks medical attention and provides documentation.

B1    Possession of, or introduction of, contraband
B2    Improper conduct during visitation or use of telephone/kiosk/tablet
B3    Improper conduct to, from or in exercise yard
B4    Misuse of a Criminal History Number (CHN) or PIN
B5    Disrespectful conduct or statements towards facility staff and or other
         IIs
B6    Misuse of email/kiosk/tablet, sharing email/kiosk/tablet, or the use of
         email/kiosk/tablet to commit, or attempt to commit a crime.
B7    Borrowing, trading of commissary or other personal items.
B8    Obliteration of Criminal History Number on commissary items.
B9    Possession of commissary items without a Criminal History Number marking.
B10   Possession of commissary items marked with a Criminal History Number not of
         the II that possesses the items.
B11   Misuse of any privilege, right, property or equipment.
B12   Disrupting the Facility Routine.
B13   Disorderly conduct/hindering good order of facility.
B14   Creating any unnecessary expense to the County.
B15   Violation of any general health, hygiene or safety rule.
B16   Faking any illness that creates expense to the county.
B17   Being disruptive or causing unrest to the housing unit.
B18   Being disruptive after lights out.
B19   Disrupting any program in any way.
B20   Any unauthorized contacts with the public.
B21   Covering yourself completely or being under your blankets when not permitted.

B22    Attempting to argue with a staff member.
B23    Attempting to manipulate any aspect of the facility.
B24    Failure to comply.
B25    Throwing any food or any other item.
B26    Use of foul language in any program or common area.
B27    Failure to maintain an orderly cell.
B28    Refusing to cleanup during normal cleanup times.
B29    Stockpiling any item.
B30    Entering another cell without authorization from staff.
B31    Affixing any items to cell walls, fixtures, or anywhere.
B32    Communication across subdivisions, doors, partitions, or fences.
B33    Interfering with any security counts.
B34    Spitting at another person, or spitting on the floors, walls, etc.
B35    Tattooing or any self-mutilation.
B36    Making or drinking any intoxicants or alcoholic beverages.
B37    Theft of any kind.

No II known by security, health, or mental health personnel to be 21 years of age or younger, 55 years of age or older, pregnant, within eight weeks of delivery or pregnancy outcome, having a mental or physical disability, or having a serious mental illness shall be confined in special housing, or may a special population be **sanctioned** to segregated confinement. If you believe you fall into this category you must notify the hearing officer of your diagnosis. You may be asked to sign a medical release for verification purposes. Though you may not be sanctioned to segregated confinement, you may be subject to Administrative Segregation if it is believed you pose a threat to the safety, security, or good order of the facility.

Any individual that is subject to administrative segregation must have a hearing within five (5) business days while they are on administrative segregation. Once released from administrative segregation the five (5) day time frame no longer applies.

Self-discipline is the best practice. Govern yourself and your behavior. Remember we do not always have control over what happens to us, but we can control how we react to it. "Self-discipline is the bridge between goals and success." – Jim Rohn

**POST RELEASE/RE-INCARCERATION, SANCTIONS/DEBT COLLECTION; INCARCERATED INDIVIDUAL OBLIGATIONS**

**Disciplinary Sanctions**:
    IIs who have accrued disciplinary sanctions that place them in Punitive Segregation (PUNSEG) status (locked in) will retain the remainder of any PUN/SEG disciplinary sanction remaining upon their release. If the II is re-incarcerated in the Delaware County Jail within 24 months of their release date from the Delaware County Jail, the remainder of their PUN/SEG sanction(s) will remain in effect and implemented during their new period of custody. Upon re-incarceration, the II will resume PUN/SEG status and will fulfill the remaining time of their sanctions.

**Debts incurred during incarceration:**

IIs who have incurred a debt for damages or surcharges to the Delaware County Jail have a financial obligation to pay their debts upon release from the Delaware County Jail. The Delaware County Jail will recoup any debts from the IIs account prior to the IIs discharge from the Delaware County Jail.

Any II debt to the Delaware County Jail that is not paid upon release due to lack of funds will remain as a negative balance in that IIs account. If the II is re-incarcerated in the Delaware County Jail, the II will be obligated to pay the balance of any debt from a previous period of incarceration. The Delaware County Jail will recover any unpaid balance as soon as funds are available in the IIs account. There is no time limit to this obligation.

---

**IRB 7006.3 CONDUCT**                                    **Effective 15 February 2024**
**NYS Min. Std. 7006.0 Discipline**

All rules, regulations, and procedures concerning IIs committed to the custody of the Sheriff are in compliance with the standards of the N.Y. State Commission of Correction. All IIs will comply with these rules which have been set forth for the protection of all concerned. The Delaware County Sheriff's Office has developed a system of inmate discipline which was designed to encourage appropriate behavior, encourage self-control and accountability, and punish misbehavior fairly, impartially, and consistently.

Remember there are many individuals in this facility that are going through their own individual problems. These include legal issues, family problems, medical concerns, mental health issues, and behavioral disorders. You may not get along with everyone you are incarcerated with, do not take problems into your own hands. This will almost always result in further problems for you including disciplinary sanctions and/or additional criminal charges. Remember that if your behavior affects another person in a negative way, you should reevaluate how you are interacting with them. You can control how you react, the choice is yours alone to not engage in negative behavior. As Muhammad Ali said "Don't count the days, make the days count." Take advantage of the time you have now to develop a plan for future success.

All IIs must address officers by Officer Rank when appropriate: CO, Corporal, Sergeant, First Sergeant, Lieutenant and the officer's last name. IIs are expected to be on their best behavior at all times and address problems with the Housing unit officer. Officers are not here to be friends with IIs or engage in relationships with IIs. Attempts to engage the officers in conversation, or distract them from their duties will result in disciplinary sanctions.

If you are unsure of facility rules ask the officer, do not do what you can get away with. Testing your limits will only lead to disciplinary action and create further problems for yourself.

Any II charged with a violation of these rules will be subject to the prescribed disciplinary procedures of the facility. In addition, acts which violate the laws of the State of New York may be prosecuted in Criminal Court as prescribed by law. Disruptive behavior in any housing unit will lead to disciplinary action and possible loss of privileges.

Security counts are taken at various times throughout the day. Cooperation with staff

members is a MUST. The Corrections Officers must be able to visually see you at all times, and confirm signs of life; this includes designated times of rest. You must be visible at all times, not just the outline of your person. If you are completely covered with a blanket, or partially covered with a blanket and jacket the officer will not be able to confirm you are there and that you are presenting signs of life. The officer must still be able to see you, and that you are breathing.

At no time should an II completely cover themselves with blankets, sheets, or anything else. From 2100 until 0645 is the only time any II can be on their bunk under the covers. Even during that time no II can completely cover themselves so the staff cannot see them. Any violation of these rules may result in disciplinary action.

Formal head counts are taken at specified times. You will be required to be in your own cell, standing by the cell door facing the day area, while this is being done. Any interference or disruption in this process is a violation of facility rules and will be dealt with immediately.

Corrections Officers are in the housing units all day long. If you lift a hand toward, or put a hand on any Officer, it may be perceived as an attempted assault, and immediate action will be taken.

There is an Officer assigned to each housing unit every day. That is the Officer you are to direct all questions, concerns or problems to. While the Shift Supervisor is conducting their rounds, you must gain your Housing Unit Officer's permission to speak with the Shift Supervisor. The Shift Supervisor, will not address anything with you unless the Housing Unit Officer requests them to do so, nor will the Officer in charge overrule a decision made by the Housing Unit Officer because you do not like the decision. You cannot demand to see the Sergeant. We do not accept demands from any II. Do as directed and follow the orders of the Housing Unit Officer.

Any II purposely hiding from staff for any reason will be dealt with accordingly through our disciplinary procedures. This could result in sanctions, new charges, and/or a loss of good time.

When in the hallways IIs will travel in single file, and must travel with their right foot on or following the black line. When there is no black line on the floor IIs shall remain on the right side and in the approximate area the black line is normally found. There will be no talking in the hallway and hands must be at your side. There is a red line around the Officers station in all housing units. You will not cross that line for any reason. It is a class A violation to cross the red line at the officer's desk. Do not reach over the red line to take any item, equipment, or supplies. The officer will bring any item you may need to you. You may not possess any keys, proximity cards, or officer equipment that may be stored behind the officer desk. Do not pull any fire alarms or hit any buttons behind the officer desk station. Do not press any buttons on the walls.

In general, if you do as you are told, follow the facility rules, and do not cause any problems, you will not be subject to disciplinary procedures or sanctions. All direct orders from the Correctional staff must be followed, you may not agree with the orders, but compliance is required. You can bring up your complaints through requests of informal resolutions up to filing a grievance if you believe your rights are being compromised. You may not find all the rules printed in this book. If you are given a direct order, whether it is printed in this book or not, you must comply. If the order given does not appear in the rule book, the act of the failure to comply, or refusal of that order, is a violation of II rules.

TVs, Phones, and Kiosk will be turned off at approximately 2145. Any requests must be made on the daily request form which is provided to all IIs at 0600 hours each morning and handed back in at approximately 0700 hours. If you have questions that are not of immediate

importance utilize the request form, do not distract the officers from performing their duties with requests that you have not placed on the request form. If it is something that cannot wait then ask the housing unit officer. When utilizing any area or service provided by the jail that area or service is to be used for its intended purpose only.

If you are given an order, follow it immediately. You may be immediately locked in for various reasons. When told to lock in, you will proceed immediately to your cell and sit on your bunk unless directed to do otherwise, waiting for staff to unlock the door. Do as you are told; we do not have to give any II a warning before they are locked in.

IIs will conduct themselves in a respectful manner at all times. Any language, writing, or other material of a profane, vulgar, obscene, disrespectful, insulting or inciting nature directed toward a fellow II or the jail staff will be dealt with accordingly and may result in disciplinary action.

Disorderly behavior, fighting, threatening, extortion, inciting and criminal conspiracy are violations of the law and are strictly forbidden. IIs who act alone or with others to conspire and/or incite a disruption among other IIs of the facility are in violation of the law and may face additional charges.

IIs acting in concert with one another to avoid having the staff get to the root of an incident, may all be charged with the violation, can all be found culpable at a hearing and can all have sanctions imposed upon them. If the administration sees that this is occurring in any situation the Hearing Officer will be directed to hold all involved IIs found guilty accountable.

There are voice screens in some cell doors and between some subdivisions. There will be no communications of any kind between IIs in these areas. There will be no climbing on, leaning on or communicating through any subdivision fence, or partition. No II is allowed to enter another occupied cell unless both are assigned to the same cell under double bunking circumstances. IIs can clean an empty cell with only one individual allowed in the empty cell at a time.

Any attempt by an II to cause another II to perform or to participate in any sexual act is strictly forbidden. No II is allowed to enter another II's cell for the purpose of committing a sexual act or criminal act.

All orders from any staff member must be promptly obeyed. Cooperate with the staff at all times.  Shouting, throwing any item, or communicating or attempting to communicate through the cell vents is not permitted.

All televisions and conversations within each housing unit will remain at a normal volume. Housing units will be kept at this level at all times. If the housing unit Officer can hear your conversations or the television from the officer station, you will be told to keep the volume level down. If you do not comply, you may be subject to disciplinary action. If at any time the level gets to a point where the housing unit Officer misses any radio transmission you will be locked in, and disciplinary action will be taken. The housing unit will be kept at a quiet level at all times. You are not permitted to touch the television, rotate the television mount posts, or possess the television remote.

There will be no loitering on the mezzanine level or stairways for any purpose. All IIs are to have their jumpsuits completely on and snapped when out of the cell including when going to and from the shower. Shower shoes shall not be worn to and from the shower. Towels will be carried and not worn on the head going to and from the shower.

At no time are IIs allowed to place a hand or arm on anyone, go hand in hand, or have any type of physical contact with any other person, whether sitting, standing, walking around or

any other time. Exceptions may be made such as when IIs cut each other's hair. Clipper cut only, no braiding, no styling, no shaving with razor.
No commissary food or drinks are to be consumed outside of your cell.
Other prohibitions:
    No gambling
    No trading, passing or exchanging of meal items
The II Rule book: Defacing, destroying, modifying the rule book will subject you to disciplinary sanctions and charges.

---

**IRB 7007.0 GOOD BEHAVIOR ALLOWANCES**                    **REV 7 JULY 2022**
**NYS Min. Std. 7007  Good Behavior Allowances Against Definite Sentence and Certain Civil Commitments**

    Every person in the Delaware County Jail who is serving a definite sentence may receive "good time" as a <u>discretionary</u> reduction of their term of sentence as provided by law. In some civil cases where an II may purge themselves from the matter, good time laws do not apply. What this basically means is that if the Judge sentences you to a definite period of time OR until you fulfill an obligation, (such as paying any back monies to the Support Collection Unit), you do not receive any Good Time Allowances. Records are kept on all eligible IIs.

    When IIs begin a definite sentence, they will receive a statement of allowances with their conditional release date and maximum release date. Individuals in custody of the Delaware County Sheriff will be held to standards of good behavior. This will be expected both in pre-sentence commitments as well as post-sentence. <u>Good time is calculated but not awarded</u>. IIs are given a time calculation sheet and can see what their earliest release date can be **IF** good time is awarded. You will be required to sign a copy for facility files and will receive a copy. Once an II is within three (3) weeks of their earliest release date they may submit a request for good time to be recalculated. Their request will be review by a shift supervisor.

    The shift supervisor will look at and consider all of the requesting IIs disciplinary records for both pre-sentence and post sentence time on the current charge, any programs that the inmate has participated in to better themselves, Inmate worker status and the duration of that status. Corrections Officers involved in any incident may be contacted for input.

    After the shift supervisor has done an evaluation they will decide if good time should be awarded to the requesting II, and if so, how much time they shall be credited. A recommendation will be submitted to the Chief Administrative Officer for review, and forwarded for a final approval by the Sheriff. Case Law supports this process for determining if good time should be awarded. (People ex rel Brown v. Stoddard, and People ex rel. McNeil v New York State Bd. of Parole) as well as grievances submitted to NYSCOC (Grievance #160022 Ronald Kurts v Livingston County).

    Per Corrections Law 804 good time shall not exceed one third (1/3) of the term imposed by court. One third (1/3) of your term shall be the maximum amount of good time you may earn. This will not automatically be afforded to you, you are not entitled to this time, as good time is discretionary. You may earn this time with good behavior. Negative behavior on your part will prevent you from earning the maximum amount of good time available to be earned. Whether you get out on your minimum release date ultimately resides on you and your behavior. The Sheriff has developed rules to encourage good behavior and self-control, please take advantage

of this by following the rules outline in the rulebook and treating others respectfully.

The term "month" is defined by General Construction Law section 31 to mean a calendar month, not necessarily meaning 30 days. For example, one month from April 15th would be May 14th per the guidelines set forth in the General Construction Law.

If good time is not granted, forfeited, canceled or restored, these changes will be noted on the II's good time record. Section 804 of the Correction Law, and sections 70.30, and 85.00 of NYS Penal law explains all this in detail.

Jail time is the time you spend in jail prior to sentencing. If you get sentenced and you feel that the facility has not credited you with the proper amount of time, you must inform the Jail staff on a daily request form, who will forward the information to a Sergeant who will look into the matter and get back to you.

---

## IRB 8006.0 INTERMITTENT INCARCERATED INDIVIDUALS
## NYS Min. Std. NA

All intermittent IIs are to show up at their scheduled time and they must be sober. If you are late, not sober, appear intoxicated, or violate any facility rules, a written report will be filed with the Court requesting your sentence be revoked and you be re sentenced to straight time as allowed in Penal Law 85.05(c). These requests from the administration are usually honored by the Courts.

Do not bring anything in with you. Commissary may be available to you if you have money. Buy what you want from commissary for the following week. These items will be given back to you when you come back in. If you bring in any money, the balance (if any) will be returned to you only the first week. From that point on, any money you bring in will be placed in the commissary account. Upon your written request, a check may be drawn in advance for you on your final day of incarceration. If not, it will be mailed to you.

PL 85.00 – 3. Duration of sentence.   A sentence of intermittent imprisonment may be for any term that could be imposed as a definite sentence of imprisonment for the offense for which such sentence is imposed.   The term of the sentence shall commence on the day it is imposed and shall be calculated upon the basis of the duration of its term, rather than upon the basis of the days spent in confinement, so that no person shall be subject to any such sentence for a period that is longer than a period that commences on the date the sentence is imposed and ends on the date the term of the longest definite sentence for the offense would have expired, after deducting the credit that would have been applicable to a definite sentence for jail time **but without regard to any credit authorized to be allowed against the term of a definite sentence for good behavior**.   The provisions of section five hundred-*l* of the correction law shall not be applicable to a sentence of intermittent imprisonment.

This means you shall receive jail time credit, but not good time credit on intermittent sentences.

---

## IRB 8000.0 BOND AND BAIL
## NYS Min. Std. NA

Keep in mind that if you do enter into an agreement with a Bondsman, that all paperwork

is to go through the Court. We do not accept the bond or any related paperwork here. The Bondsman is to get a release order from the Judge.

 Delaware County Sheriff's Office cannot endorse any business or recommend bond agencies. If you are looking for bail bond information request this on your daily request form.

You may pay your bail with cash or a credit card only, nothing else. It can be paid here at any time. All paperwork for a Bond must go to the Judge.

---

## IRB 8010.0 RELEASE TIMES
**NYS Min. Std. NA**

Normal release times for IIs whose sentence has expired will be after morning cleanup, at 0800, but keep in mind that you can be released at any time during the day. You must make prior arrangements to have someone come pick you up once you confirm your release date.

Note: An order of protection cannot be in place with the person receiving you.

---

## IRB 8001.0 CONDITIONAL RELEASE PROGRAM                    8 JULY 2022
**NYS Min. Std. NA**

Delaware County has a conditional release program. If you feel that you qualify, you are to put in a request for the forms. If you qualify, the forms will be given to you and explained at that time. If you put in a request and do not qualify, the reasons will be explained to you.

**WHAT IS A CONDITIONAL RELEASE?**
An II serving a definite sentence in a local facility can be released before serving the full sentence.  This is called a Conditional Release. Anyone receiving a conditional release is under the legal custody of the Division of Parole and is supervised in the community by the Division of Parole.

**WHO IS ELIGIBLE?**
You are eligible if you have received a definite sentence of more than 90 days and have served a minimum period of 30 days. If you are granted a Conditional Release, you will be released only after you have served a minimum of 60 days. IIs committed to definite terms by the Family Court, those serving an intermittent sentence or those who have received a split sentence (jail and probation) are not eligible for consideration in the conditional release program. If you are eligible, put in a request for the forms to the housing unit officer.

During the time you are on conditional release in the community, you will be under immediate supervision of a Parole Officer. If you have any further questions that cannot be answered by the staff, direct them to:
NYS Division of Parole
97 Central Ave.

Albany, New York 12206
Attn: Conditional Release Commission

## PERIOD OF SUPERVISION

Any individual who is conditionally released to the legal custody of the Local Conditional Release Commission shall be under parole supervision for a period of one year from the date of release.

---

**IRB 7008.0 VISITATION**                                      **Effective 15 February 2024**
**NYS Min. Std. 7008.0 Visitation**

All incarcerated individuals (II) confined in the Delaware County Jail are entitled to receive periodic visits. Consistent with the requirements of Section 7008 of the NYS Minimum Standards, visits shall be permitted upon the request of an II or a prospective visitor with the II's consent on the dates and times outlined in this section.

Visitation schedule will be on following days/times:

|                      | Saturday      | Sunday        |
|----------------------|---------------|---------------|
| Housing Unit "A"     | 0800 - 0900   | 1215 - 1315   |
| Housing Unit "B"     | 1215 - 1315   | 0800- -0900   |
| Housing Unit "C"     | 0930 - 1030   | 1400 – 1500   |
| Housing Unit "D"     | 1400 - 1500   | 0930 – 1030   |

Consistent with the requirements of NYS Minimum Standards section 7008.5(c), any properly identified person shall, with the II's consent, be permitted to visit that II. As used in this section, the term properly identified person shall mean a person who presents adequate proof as to their identity. All visitors must provide a valid Driver's License, or state issued non-driver's ID card upon each visit. All visitors under the age of 18 must be accompanied by a parent or guardian and provide proof of identification and age; an original or certified copy of birth certificate, this birth certificate must match by name the parent who is present, who also provides photo ID, showing that their names match upon each visit. Any minor who is in the custody of a guardian will be allowed to visit provided they furnish court documents showing proof of custody and identification upon each visit. Any special circumstances outside the parameters of this section may be addressed by the Jail Administrator. A prospective visitor who is under 18 years of age may be restricted from visiting an II if they are not accompanied by a parent or legal guardian, the chief administrative officer requires a prospective visitor under 18 years of age, not accompanied by a parent or legal guardian, to provide written permission from a parent or legal guardian approving such visit. A prospective visitor under 18 years of age shall be required to provide the following information to facility staff, in addition to the information required by the following section:
1. his/her age; and
2. the name, address and telephone number of his/her parents or legal guardian.

Each visitor shall be required to provide the following information to facility staff:
1. their name;
2. their address;
3. the date;
4. the time of entry;
5. the name of the II or IIs to be visited; and
6. the time of exit.


The visiting area allows physical contact between IIs and their visitors at the beginning and end of each visit. This procedure outlines how the physical contact will be obtained and supervised.
1. All visitors are to be checked in half an hour before their actual designated visitation times and must remain in the visitation lobby, visitors cannot go back outside.
2. After everyone is checked in, the Shift Supervisor will call the unit and inform the officer which IIs have a visit and how to line them up coming into the visitation booth.
3. After the IIs are pat searched they are then brought out of their assigned housing unit to the visitation booth, they shall be held up in a line in the strip search area.
4. The Shift Supervisor will then run all the visitors through the metal detector and bring them into the facility holding them up in the hallway outside the visitation booth. All searches are voluntary, any visitor who does not wish to be subject to a search may leave at any time prior to going through the metal detector. Any person who is found to have any non-allowable items once inside the facility will be denied visit per section 7008.8 and may be subject to legal action.
5. At this point the B-Pod Rover is stationed inside the visitation booth where the IIs enter the booth by door B-131 and the A-Pod Rover where the visitors sit under the camera.
6. The Shift Supervisor will then communicate with the officers in the booth verifying which II is up for their initial embrace.
7. The shift supervisor will then check the visitor's mouth with a flashlight, have them turn their pockets inside out, and open their hands, then send them in the booth to where the II is by the door for their initial embrace. If the visitor refuses a search they can either leave voluntarily, or have a non-contact visit per section 7008.8 of this policy.
8. After the kiss and hug the C-Pod Rover will then inform the II and visitor where to sit for their visit. All hands and other bodily parts will remain on each person's side of the booth.
9. No children or infants are to be passed over the partition. As with all visitors, children will be allowed only to kiss and embrace the II they are visiting at the designated time and location. There will be no prolonged contact at all between II and visitors.
10. This then gets done one person at a time until everyone has completed their initial embrace.
11. The same process is done in reverse at the end of the visit.

Our visiting area is designed to allow 2 visitors to visit an II at a time with the exception of one small child, per adult visitor, able to sit on the lap of the adult visitor. If the child is too large to sit on the lap of the adult visitor then they must split the visit as all other visitors are required to do.

After visitation has started the incarcerated individuals and the visitors must remain seated. All hands and body parts will remain on the proper side of the partition. The partition is approximately 8 inches high and runs the full length of the counter.

Physical contact at the beginning and end of each visit shall be permitted between an II and his/her visitors. A hug and a kiss are permitted. All kisses must be straight on, if the II or visitor turns their head and conceals their mouth from the guard's view, it may be cause for restricted visits in the future outlined in section 7008.8 of this policy. Nothing will be allowed to be passed between the visitor and the II. Kissing is limited to a closed mouth kiss.

IIs and their visitors are be required to conduct themselves in a manner consistent with reasonable standards of public decency. No foul, or obscene language will be tolerated.

Visitors will be provided lockers to secure any valuables or other items which are not allowed in the jail. A token to operate the lockers Will be provided by the visitation Officer to operate the locker. ALL property, (purse, money, wallets, watches, hair bands, and all contents of pockets) will be placed in the lockers prior to being searched, screened, or scanned with a metal detector wand for visitation. Visitors will not be allowed to access their locker once they have been cleared for the visit until after the visit has been completed.

No food or beverages of any kind including chewing gum or breath mints will be allowed into the visitation booth. This includes all baby items except a small infant blanket and pacifier after inspection by the officer. There will be no smoking or chewing of any substance by anyone. No E cigarettes, electronic vaporizing devices, no tobacco products. ALL jewelry including piercings or objects attached to the body will be removed and placed in the locker. If jewelry cannot come off, the visitor will be restricted to non-contact visitation following section 7008.8(B) of NYS Minimum Standards. The exception will be a single wedding band with no stones.

No jackets, outerwear, gloves, scarfs or hats are allowed in the visitation booth. Visitors will be appropriately dressed including footwear. No bare feet allowed. Any clothing deemed to be inappropriate will disqualify that person from visiting following section 7008.8. Low cut shirts, bikini tops or bottoms, sleeveless shirts, see though clothing is not permitted. Visitors and IIs will go into the booth with no property and exit with no property. IIs will be fully dressed in a jumpsuit, t-shirt, underwear, socks, issued footwear. No shower shoes, coats, sweatshirts or any other clothing items are allowed during visitation.

All property releases must be arranged with the staff PRIOR to visitation. These items can then be picked up by the visitor at the end of visiting when the visitors are exiting the building. If an II is moved from one housing unit to another it is their responsibility to inform their visitors. Any visitor showing up to visit an II at the wrong time will be turned away.

If there are more than two visitors waiting to visit an II, they must decide among themselves as to how long each will stay to visit. Once a visitor leaves the booth, he/she will not be allowed back in with the exception of a parent who breast feed an infant; upon request to a Visitation Officer, will be escorted to the jail lobby restroom in order to breast feed their infant in private.

The officer will inspect the restroom prior to the individual that must breast feed the infant entering with the infant and after the individual and infant have vacated the restroom. Once the breastfeeding is complete, the visitor and infant will be re-screened as per procedure and return to the visitation area. Other than this exception if a visitor leaves the visitation booth, their visit is now over and they will be required to leave the facility. Regardless of the number of visitors the IIs visit remains 1 hour.

There will be no talking between IIs in the booth or any cross visiting between visitors and IIs the visitors have not been registered to see.

Consistent with the requirements of NYS Minimum Standards, the visitation of an II with a particular visitor may be denied, revoked or limited only when it is determined that such visitation would cause a threat to the safety, security or good order of the facility or the facility or the safety, security or health of the IIs. Contact visits as provided for in section 7008.6 of NYS Minimum Standards may be denied, revoked or limited only when it is determined that such visits constitute a threat to the safety, security or good order of a facility. Should a determination be made to deny, revoke or limit a II's contact visits, alternative arrangements for affording the II visits shall be made, including but not limited to noncontact visits. Any determination to deny, revoke or limit a II's visitation shall be made by the chief administrative officer in writing, and shall state the specific facts and reasons underlying such determination. A copy of this determination shall be given to any person affected by the determination.

Visitors who require medical devices; oxygen apparatus for breathing, wheelchair, prosthetic devices, or other medical devices or equipment that restrict them from going through a metal detector will require alternative screening. Generally, if someone has a medical excuse not to go through the metal detector they will need to provide a medical card showing their exemption. If the visitor is unable to go through the metal detector and subject themselves to a search, and an alternative visit cannot be made, then the Chief Administrative officer shall make a determination and follow section 7008.8(C) of NYS Minimum Standards.

---

**IRB 7051.0 FUNERAL VISITS**                                    **8 JULY 2022**
**NYS Min. Std. 7051.0 Funeral and Death Bed Visits**

**Funeral Visit:**
All IIs may request permission to attend either the funeral of, or to visit the death bed of family members as designated in Minimum Standards section 7051.4. Request the proper form on the Daily Request Form and return it promptly. This application must be legible. The final decision remains with the Sheriff. If you are boarded in you must request permission from your county or supervising agency.

**Definitions:**
For the purposes of this section, the term "Funeral" shall mean attendance at one or more of the following at the discretion of the Sheriff or his designee.

a) The Wake;
b) The Church or other appropriate memorial service held at the grave site or some other location;
c) The Internment.

**Facility policies and procedures**

Any II that requests a Death Bed or a Funeral visit is to be given the proper form, CD-115D. The form will then be filled out and forwarded to the Sheriff.

The Sheriff has the final decision as to this request. His decisions will be based on the requirements of Minimum Standards and Correctional Law section 509, and any other information that may come to his knowledge.

Designated family members shall include:
a) Mother;
b) Father;
c) Guardian/Former Guardian;
d) Child;
e) Brother;
f) Sister;
g) Husband;
h) Wife;
I) Grandparent;
j) Grandchild;
k) Ancestral Aunt/Uncle

---

**IRB 7009.0 MEALS**             **Rev 8 JULY 2022**
**NYS Min. Std. 7009**
**DCSO PPM 7009.9 Meal Serving Procedure**

**7009.1 POLICY**

The Delaware County Jail shall maintain a food service program sufficient to satisfy the daily nutritional needs of all IIs.

MEALS: Each II is served with 3 meals each day that meet dietary standards as to quantity and quality as set forth by the USDA.

MEAL TIMES

        Times: meals will be served daily at approx. times as shown below.

| Breakfast | approx. | 0700 |
| Lunch | approx. | 1100 |
| Dinner | approx. | 1600 |

At least one meal in each scheduled 24-hour period will be served as a hot meal.

Once classified, and not subject to any sanctions, all IIs will sit at the tables. You will be called up for your meal by an Officer, one table at a time, and must respond when called. At the completion of each meal, II's will be called up to dump their trays by an officer, one table at a time, IIs are to clean off the trays of any excess into the garbage container or plastic bag provided in each housing unit. No food will be taken away from the table or given to another II. All trays and items used during the meal must be returned to the Housing Unit Officer. Any violation of this rule may result in disciplinary action.

All meals are prepared from a menu that has been certified by a dietician. If you can not eat certain foods prepared from the menu because of medical or religious reasons, request the proper form from the staff if you did not do so during the booking process. Before any diet or menu is changed for medical reasons all the information on your request must be verified. We will not make special diets for IIs because they just do not like certain foods or just want to choose what they do eat. If the information given cannot be verified in some way, you will be served the same meals as all the other IIs until it can be verified. This can be done through your family physician, a local hospital that you have gone to, or another facility that may have your medical records.

Any item that is served by the facility must be consumed during that specified mealtime. No items are to be kept from the meal to be consumed at a later time or date. There will be no trading of any food items during mealtime. IIs will remain seated until the meal is over. Conversations during mealtime must be kept at a volume level that the Housing Unit Officer cannot hear from the Officer Station. IIs found to be in possession of any items that were served by the facility after a meal will be charged with a contraband charge and will be subject to disciplinary action.

## 7009.2 NUTRITIONAL ADEQUACY

1.)     Each II is served with 3 meals each day that meet dietary standards as to quantity and quality as set forth by the Food and Nutrition Board of the National Academy of Sciences, National Research Council.

2.)     Menus are to be prepared by the kitchen staff in advance and dated. These menus are reviewed at least annually by a certified dietician to ensure that all nutritional        requirements are met.

## 7009.3 MEDICAL DIETS

1.)     Any II that needs a special diet due to medical reasons will be seen by the facility Physician or designee and will verify the diet, and if it is needed. After verifying the diet, the Medical Department will inform the kitchen.

2.)     Any such diet MUST be verified with the II's primary physician, or another correctional facility that the II may have been in. Without this verification, no special medical diet will be made without the authorization of the Jail Physician.

3.) An II may forfeit their right to their medical/food allergy diet if they are caught trading items from their medical/food allergy diet for any items not allowed by their medical/food allergy diet or giving away their food items to another II or receiving any food items from another II.

Example #1: an II who has a low sodium diet is caught trading their food for cookies that another II got from their meal.

Example #2: a diabetic II gives another II any portion of their diabetic meal.

Example #3; a diabetic II is observed eating any food from another II's food tray.

## 7009.4 RELIGIOUS DIETS                           Effective 15 February 2024

1.) Upon admission you have the opportunity to claim a religion of record. This will remain your religion of record for the duration of your stay. N.Y.S. law dictates that as long as an II claims to sincerely believe in any particular religion that the II is to be considered a member of that religion and any diet pertinent to that religion be afforded the II. Upon admission notify staff of your religious dietary needs. No verification is necessary at this time. If your religion and dietary needs change after admission you must follow the procedures outlined in Religious Services.

2.) This section pertains to all religions, some of which are well known to staff. If at any time an II claims to be of a religion that is not well known to staff and makes claims for a special diet for that religion, an Officer will be assigned to research that religion, and its special needs or diets. Documentation of such research must be kept. No diet will be changed solely upon request in this situation until research and verification dictates the need for a special diet and is authorized by the Jail Administrator.

3.) An II shall forfeit their right to their religious diet if they are caught trading items from their religious diet for food items from a non-compliant meal, or for items not allowed by their religious diet, or giving away their food items to another II, or receiving any food items from another II.

Example #1: an II who has a Kosher diet is caught trading his food for pork rinds that another II bought from commissary.

Example #2: a Kosher II gives another II any portion of their kosher meal.

Example #3; a Kosher II is observed eating any food from another II's food tray.

## IRB 7016.0 COMMISSARY                                    8 JULY 2022
## NYS Min. Std. 7016.0 Commissary

Commissary orders can be done throughout the week on the kiosk in your unit. All orders

must be in by 2145 on Monday evenings, unless it is on or around a holiday then you will be instructed by an Officer on what night to have it in. Deliveries will normally be handed out on Thursday evenings. Be sure to inspect your order for damages or shortages upon delivery. Anything reported after that will hold no merit and not be credited.

IIs that are locked in Punitive Segregation are permitted to use the kiosk to order their commissary and check their account balances during their out of cell time. IIs locked in Punitive Segregation are not to use the kiosk to access emails.

Classification IIs may request access to the kiosk in order to check status/order commissary by utilizing a request form.

All money at the time of booking will be deposited in the commissary account.  All incoming funds from any source will be deposited in that account.  Funds can be sent to you several ways.

1.     By telephone: have an outside source call 1-866-394-0490 (Live bilingual agents available)
2.     By internet: have an outside source go to www.smartdeposit.com
3.     Have someone come to the jail and use the kiosk in our lobby.
4.     By mail: have an outside source purchase a money order and send it in filled out completely with your name and theirs.

If calling or using the internet they will need your name and your four (4) digit booking number. All deposits on the phone, internet, and by kiosk are subject to fee based on the deposit amount. (Not to exceed $5.00)

A transfer or deposit of funds from one II to another will not be allowed.

A check will be issued to you upon your release for your remaining balance.

If you placed an order and are released you will have seven (7) days to pick it up upon release.  If you placed an order and are transferred to a different facility you have seven (7) days to have someone pick your order up for you.

The commissary account will not be used for your personal finances.  We do offer a one-time release to be used for whatever purpose.  Your account may be placed on "hold" as a disciplinary sanction or as provided by law.  See "Court Surcharges."

Weekly orders are limited to $75.00 per week. IIs on punitive segregation, administrative segregation, and classification may have to request to use the kiosk on a request form on Saturday morning if they do not have access to a tablet.  IIs will then be brought to the kiosk escorted by an officer to complete their weekly order.  IIs will be given five (5) minutes to complete their weekly order.

IIs who are on punitive segregation will only be able to order hygiene or writing materials of no more than $45.00 weekly. When an II is put on punitive segregation, any commissary items other than hygiene or writing materials may be removed from their cell immediately after the disciplinary sanctions are imposed.

IIs are allowed to order $75.00 a week in commissary and are limited to retaining a total value $110.00 of commissary (including hygiene, food etc.)  in their cells (not including religious articles).

Commissary items, within reason, will fit neatly on the shelf in each II's cell.  All commissary items will be handed out to IIs on Thursday evenings between the hours of 1700 and 2200.

All food commissary items must be marked with the IIs Criminal History Number (CHN).  This will be done prior to it being given to you.  If you receive an item that is not marked, notify the officer that issued it to you so that they may rectify the situation.  If a food item from commissary is found in your cell through cell inspections/searches that does not have a CHN number; or has another IIs CHN number you may be subject to disciplinary action.

If an II is found in possession of more than $110.00 of commissary items, (not including religious items), the officer will remove as evidence, a sufficient quantity of food items that will reduce the II's total possession of commissary to no more than $110.00. It is the officer's discretion as to what is removed. Any items removed will be handled as evidence to support stock piling charges in the disciplinary process. Do not attempt to run a "store".

Quantity of allowed commissary items in an II's cell:
Soap: 2 bars
Deodorant: 1
Shampoo: 1
Conditioner: 1
Lotion: 1
Hair food: 1
Pen, Blue: 2
Comb: 1
Brush, hair: 1
Brush, tooth: 1
Bowl, food: 1
Paper, drawing pad, white: 1
Paper, writing, white, lined: 1
Cards, playing, deck of 52: 1
Envelopes, with printed postage: 10
Religious items are not included in the above quantities.
Food items purchased from commissary and marked with CHN (combined with above items, not to exceed $110.00 in total value)

**NOTE:** Incoming bank checks and money orders will be deposited in the IIs account but will have a 10-day hold placed on each instrument deposited to ensure sufficient funds are available.
**Commissary Restrictions:**
IIs who are on medical, or special diets will have limited commissary access.

Medical Diets: low sodium, gluten free, diabetic etc. IIs on these diets will be limited to nonfood commissary items only.

Any II on a special diet who is observed borrowing, trading, eating, trading any food items from any other source, including but not limited to IIs, commissary etc.  will have their special diet revoked, in accordance with consultation with the facility physician, for the duration of their stay at the Delaware County Jail.

IIs who have declared a religious affiliation requiring special dietary restrictions; Kosher, Halal, etc. will be limited to only those items on the kiosk that the commissary contractor has

designated as being allowed by the II's religious dietary restrictions.

Any II on a religious diet who is observed borrowing, trading, eating, trading any food items from any other source, including but not limited to IIs, commissary etc. will have their religious diet revoked for the duration of their stay at the Delaware County Jail.

**Commissary Prohibitions/Restrictions**

Any II who is on a dietary or medical restriction is limited to nonfood commissary item ordering only.

Any II who is on a religious diet (Kosher, Halal etc.) will be limited to non-kosher/Halal food items on commissary.

Any II caught violating these conditions will be removed from their religious diet.

---

**IRB 8002.0 COURT SURCHARGES                8 JULY 2022**
**NYS Min. Std. NA**

Section 60.35(5) of the N.Y. State Penal Law requires this facility to collect money from your commissary account to pay any outstanding surcharge that may have been imposed by the Court to the State Comptroller's office. In order to fulfill this mandate, your commissary account may be put on "Hold" until this matter has been rectified.

---

**IRB 7010.0 HEALTH CARE                8 JULY 2022**
**NYS Min. Std. 7010 Health Services General**

Health care is available to all IIs once your initial assessment and physical are completed. The nursing staff will ensure that any previous medical conditions continue to receive appropriate care during your stay, that any significant new medical problems which arise are dealt with and to see that the jail is kept free from contagious diseases. All IIs will be tested for Tuberculosis during their classification period. If at any time you need to see the Nurse or the Doctor, fill out a sick call slip and put it in the medical box at the Housing Unit Officer's station.

**WHAT WE WILL DO:**
1. Interview you upon booking to ascertain your medical needs, if any.
2. All IIs are subject to physical examination by the medical staff within the required period of time.
3. Be available to manage new conditions as they arise.

**WHAT WE WILL NOT DO:**
Begin extensive workups or start long term therapy for chronic conditions. However, we will treat conditions deemed medical emergencies.
If you are taking any medications, make this known to the Officers right away if you have

not already done so at booking. Any II requiring medical attention will report their illness immediately to the Officer in charge of their housing unit.

All medications must be consumed in the presence of the nurse or the Officer distributing the medications. You must present yourself to the housing unit Officers station at the proper time. Bring a cup of water with you. You will not take the medication back to the cell to take it. You may have to sign for the medication given.  If you do not respond after being called, it will be marked down as a refusal. Only medications prescribed or authorized by the medical staff will be given. Some medication may be crushed.  If you show a pattern of refusing medications, they will be discontinued until your medical file and charts can be reviewed by the Jail Physician. All creams issued during med pass will be used immediately after being issued. No creams will be kept in your cell.

The Jail Physician will come to the jail weekly. We are sincerely interested in legitimate problems but not in manipulative attempts to obtain drugs, etc.  Cuts, colds, etc. can be dealt with by the nursing staff or Officers on duty.

If you wish to see your own physician, they may come here with the approval of the Jail Physician. You will not be taken to their office. They may consult with the Jail Physician, and remember that the Jail Physician has the final say in all treatment.

This facility may offer Medically Assisted Treatment (MAT) for IIs that the Jail Physician deems necessary. Keep in mind that a person must meet all of the requirements necessary, as well as sign an agreement of treatment. Verification for MAT does take time, and may be dependent upon other agencies getting the correct information back to our medical staff. We have no control over their response time. If you believe that you are eligible for MAT request to speak with medical staff on a sick call request form, and request to speak with the Alcohol and Drug Abuse Services (ADAS) Counselor who is available most Mondays on a ADAS request form.

---

**IRB 7013.0 CLASSIFICATION                                      7 JULY 2022**
**NYS Min. Std. 7013 Classification**

In order to provide for the effective management of II populations and facility housing units in a safe and secure correctional environment, the chief administrative officer of each correctional facility shall establish, implement and maintain a formal and objective system for the consistent classification of all IIs. Compliance with this Part shall ensure that each facility develops and implements a classification system that provides a mechanism for II screening, assessment and classification review to identify the special needs and security and supervision requirements of IIs in order to determine appropriate housing assignments.

9 CRR-NY 7013.1

All incoming IIs will be initially housed in the classification area where you will remain until our classification officers have reviewed your information, and completed your classification. No matter how many times you may have been booked into our facility, all IIs will be housed in classification prior to a housing unit/cell assignment by the Classification Officers. The booking process for your current incarceration must be complete to gain an accurate classification. An immediate decision concerning the disposition of each II shall be made on the basis of information gathered during initial screening and risk assessment. Such disposition may

include, but is not limited to, referrals to outside medical and mental health service providers.

Classification will be based on information received during booking, subject to verifications, and all other available information we receive from other sources. This process will assist classification officers in determining the level of custody required, special handling, appropriate program activities and proper housing assignments while you are in custody. Prior incarceration does not exclude you from this classification process. This classification will be subject to change. You have the right to appeal your classification by placing a request with your housing unit officer. Classification pertains to your criminal history and all information received.

IIs will remain in Classification, locked in pending clearance. Placement in such housing areas shall be temporary pending completion of the classification process, including the determination of appropriate housing. This process shall be completed within five business days of each II's admission to the facility. The chief administrative officer may extend the time to complete the classification process for a particular II up to an additional 10 business days if he concludes that additional time is necessary to make a determination of appropriate housing. 9 CRR-NY 7013.8 TB shots are mandatory and necessary to obtain that clearance, but are only part of the process. All stages of the classification process must be complete before you will be permitted out of your cell.

IIs will remain in Classification until a full background check can be obtained. Cell assignments are based on adjustment to incarceration, medical and mental health issues and protective custody needs. You will be assigned to a housing unit based on all the above and the availability of a cell. Although you can appeal your classification, you cannot appeal your cell assignment. You may request to be moved to another housing unit but not sooner than 7 days after your last assignment. Your request will be reviewed by a Classification Officer and a decision will be made based on your behavior, medical and mental health issues and protective custody needs.  This may take up to 7 days to approve or disapprove.

Facility needs may cause you to be assigned to a different cell or housing unit, or to be double bunked. This facility has the final say in any housing unit or cell assignment and has the right to move any II at any time as we see fit.

---

**IRB 7019.0 GIFTS AND GRATUITIES                     08 JULY 2022**
**NYS Min. Std. 7019 Gifts and Gratuities**

No Sheriff, Warden, Superintendent, officer in charge, or staff person shall receive a gift of any nature whatsoever from any II. Nor shall any person in charge or any employee be permitted to give anything whatsoever to an II, or to buy anything from or sell anything to an II, or to extend to an II any favor of diet, clothing or of any other nature not common to all. These same prohibitions apply to relatives or friends of IIs or to any other person acting on behalf of an II.

Any trading or bartering with IIs by any person associated with the operation of the County Jail or a county penitentiary is strictly prohibited.

---

**IRB 7023.0    ACCESS TO MEDIA**                                          **08 JULY 2022**
**NYS Min. Std. 7023  Access to Media**

As used in this Part, the term media shall mean any printed or electronic means of conveying information to any portion of the public, and shall include, but is not limited to, newspapers, magazines, books or other publications, and licensed radio and television stations.

Consistent with the requirements of this Part, IIs are entitled to present their views to the public through the media. All IIs have the right to write to any newspaper company, television station, publication company or any other form of the media.

The chief administrative officer may, in his discretion, restrict or prohibit the use of cameras and recording devices by the media.

Phone calls may be made to any of the above mentioned, but all calls are subject to our policies regarding such.  The only phones available to IIs are those in the housing units. Only collect calls can be made.

No II will be taken out of the housing unit to use the phones in any other part of the building. Incoming messages from any media source will not be taken.

Visitation of the media with any II is subject to all rules set forth in section IRB 7008.0 of this manual. The "media" does not hold any special privileges in reference to interviews of IIs. Cameras and/or recording devices may be used ONLY with the direct authorization of the Sheriff or his designee. These devices will only be used with the consent of the II involved.

**TELEVISION**

Television is provided in all housing areas. Viewing will start at the Housing Unit Officer's discretion in each housing unit, and last until 2145. No II is to touch the television. Televisions are turned off for meals, shift change and incident calls or any other time deemed appropriate or necessary by the Housing Unit Officer. Access to media does not mean you have the right to watch TV.

---

**IRB 7024.0 RELIGIOUS SERVICES**                                          **02 February 2024**

**NYS Min. Std. 7024.0 Religion**

The jail has one head Chaplain who visits weekly as well as other volunteer religious advisors. Religious services for IIs are scheduled on Fridays.  You may request a visit with your own religious advisor or with a religious advisor of your faith. Any religious advisor that has a member of their congregation in this facility may visit that II with the approval from our jail Chaplain. They must first contact the jail Chaplain (who will verify for the Administration their ecclesiastical credentials) and they must also address a short letter on their official letter head to the Administration stating who they would like to visit and that the II they wish to visit is a member of their congregation. The letter is to be given to the Jail Administrator. That letter will be placed in your file for future reference. This only has to be done the first time.  After that, your religious advisor just has to call and make arrangements with the Jail Administrator. The

term religious advisor used in this section is meant to cover and include the proper title of a religious advisor's counterpart in other religions.

**DEFINITION OF MINISTER:**  A person who has received ecclesiastical endorsement from the appropriate religious authority.  There are no restrictions placed on IIs concerning their religious beliefs and no person shall be permitted to attempt to convert another II without their consent.

**CELEBRATION OF RELIGIOUS HOLIDAYS OR FESTIVALS**
Consistent with the requirements of section 7024.1(b) of this Part, IIs shall be permitted to celebrate religious holidays or festivals on an individual or congregate basis.
NOTE: No religious service, holiday or festival shall interfere with the normal day to day operation of this facility including morning cleanup routine.

**RELIGIOUS ARTICLES**
Consistent with the requirements of section 7024.1(b) of this Part, IIs shall be entitled to wear and possess religious medals or other religious articles.

**NOTE**: Religious medals may be kept in the II's cell after verification from your minister and/or the Jail Chaplain. A chain IS NOT a religious medal. If any religious item, medallion or talisman that is more than 1 ½ inches in size will not be allowed. Medals/talismans with stones are not allowed. Other religious articles allowed but not limited to are: Prayer rug, Kufi, Bible, Quran. No head cover of any kind will be worn outside of your own cell without the approval of the jail administration. Religious items must remain in your cell at all times and are not permitted out of the cell unless required for religious worship at times of religious worship.

**CHANGE OF RELIGION**
The religion stated upon booking shall be noted as your religion of record and shall remain unless changed through the proper procedures. If at any time you wish to change your religion, you must contact a religious advisor as defined in Minimum Standards section 7024.3. This religious advisor must decide whether you fulfill the obligations of belief required by them. This must relay whether the belief is deeply and sincerely held by the you per minimum standards 7024.10(b)(4). Upon review of the change of faith, it shall be submitted to the CAO. This shall be your obligation to facilitate your change in religion and provide supporting documentation.

---

**IRB 7028.0 EXERCISE**                                            **8 JULY 2022**
**NYS Min. Std. 7028.0 Exercise**

Each housing unit has its own exercise yard.  There will be no loud or boisterous noise or behavior. There will be no climbing on or jumping against the walls, windows or anything in the exercise yard at any time. This will be cause for being removed from the exercise area and disciplinary action may be taken. Exercise is normally conducted in the exercise yard.
Basketball will be limited to shooting games only. There will be no grabbing or hanging on to the basketball rim. There will be no running, one on one competition, no blocking, no

contact games of any kind. Exercise times may be changed to an alternative time through disciplinary action. It is not this department's desire to take or to limit normal exercise times for any II, but that alternative is there.

All IIs will go to and from the exercise area in a quiet and orderly manner. Nothing is to be brought out into the exercise area including personal items such as books. No articles of clothing will be taken off and left on the exercise floor. If you are taken out of the exercise area for disrupting the program in any way either on the way to, during, or on the way from the area, you will be written up on an incident report.

Passive games inside the housing area such as Chess, Checkers, Scrabble, and Monopoly are provided. Some of these items are available upon request through the housing unit officer.

**EXERCISE**

1.) The Exercise period will be held in each housing unit exercise yard, except in inclement weather.

2.) All IIs will be entitled to participate in exercise except when restricted due to administrative sanctions. In this case the II must still be afforded two hours of exercise per day per section 7075 of minimum standards, out of their cell at a time determined by the Housing Unit Officer.

3.) Exercise will be Monday through Friday for the duration of one and a half hours with the times dependent on the housing unit officer. All IIs in disciplinary housing must be given an exercise period. Any II confined to their own cell (excluding classification cells) must be given the opportunity to have that exercise period two hours per day seven days a week in lieu of 1.5 hours per day five days a week. This will be done either individually, or with other exercise period times, at times designated by the housing unit officer.

4.) All exercise equipment is to be kept in good working order and is to be repaired or replaced when necessary. It is each Housing Unit Officer's responsibility to see that the IIs take care of all equipment and it is returned to its proper place at the end of the exercise period.

5.) Self termination of exercise period. IIs may request to return to their cells or housing unit prior to the end of the exercise period. IIs who self-terminate prior to the completion of the exercise period waive any further exercise period for that day.

6.) IIs on PUN/SEG or AD/SEG pending hearing who are offered an exercise period and decline the period of exercise when offered will not be given another opportunity that day for exercise.

---

**IRB 7031.0 LEGAL SERVICES & REFERENCES                    8 JULY 2022**
**NYS Min. Std. 7031.0 LEGAL SERVICES**

You are entitled to legal services and access to legal counsel with respect to any civil or criminal action, at times not unduly disruptive to the facility routine.

Any request to speak to an investigator or a Deputy will be done in writing via United States Postal Service. We will not contact them for you. A notary public is available upon request on business days.

If you are represented by a private attorney or an assigned attorney, you may call them when the phone is available. The phones are generally available from 0800 each day until 2145. They may be shut off during meals. Abuse of the phone in any way may be cause for disciplinary action.

If you have an assigned attorney, keep in mind that they are a private attorney that has been assigned to your case by the presiding Judge or through the public defender's office. This department has no control over their actions. If you have a complaint with your attorney, take it up with them or direct it in the form of a letter and send it to the Judge or public defender's office. We can do nothing for you in this matter.

All New York State Commission of Corrections mandated legal materials are made available through the use of the Lexis Nexus system on the kiosks. An index of legal reference materials is provided on the Kiosk and tables, and listed at the end of this handbook.

A copy of the II rules and Regulations is located in each housing unit on the kiosk and is available during the kiosk hours of operation.

IIs are permitted to discuss and/or offer advice to each other regarding legal matters. Request for legal visits with other IIs must be submitted on Sundays. However, pursuant to section 7031.3(b) of the Minimum Standards, no II shall receive payment, benefit or consideration in any form from a II for providing such II legal assistance. Any violation of the provisions of this section may result in disciplinary action.

Where the Minimum Standards talks about "copies", they are referring to copies of legal reference materials which we must supply to indigent IIs at no cost to them. These copies are available in digital format on the kiosks.   No II is charged for copies of legal reference materials as they are available on the kiosks. We do not make photocopies of your papers you are sending back and forth to your lawyer and the courts. This service MAY be provided at your own expense.  Any photocopies that the facility may make for you will be at the discretion of the Jail Administrator. You must be indigent, and Pro Se, verified through the courts, for the case(s) you are being incarcerated for; put in a request to have this done. We will not make indigent photocopies of "Legal Papers" for civil matters.

---

## IRB 7032.0 GRIEVANCE PROCEDURE                    8 JULY 2022
## NYS Min. Std. 7032.0 Grievance Program

This system is not designed as a forum for you to air your displeasure at being incarcerated. It is designed to assist you with legitimate complaints. The grievance procedure is not to be used to obtain decisions that are available through other means. Grievance forms are available on the daily request forms. If you need a grievance, request a form and one will be provided to you. Forms are to be completed in the proper manner. Any crossing out, writing or defacing in any way on any part of the form or writing in any area designated for someone else's response will be cause for it to be invalidated.

Process for resolving grievances you can pursue in the jail.
1. Informal Grievance: you may, but are not obligated to, bring an issue to the attention of a CO and try to resolve it with the CO. If the CO is unable to resolve the issue, you may request a grievance form on a Daily Inmate Request Form within 5 business days of the occurrence of the issue giving rise to the grievance.
2. Formal Grievance: Request a grievance form on your Daily Inmate Request Form in the morning, upon receipt of your request for a grievance form, grievance form SCOC 7032-1 shall be issued to you to fill out with a black pen. You will receive the Formal Grievance form to fill out within a reasonable amount of time, no longer than 24 hours. The formal grievance will go to the Grievance Coordinator.

Facility staff shall make forms readily available so that an II may file a grievance. You may request a grievance form on the request forms provided to you each morning. An II must file a grievance within five days of the date of the act or occurrence giving rise to the grievance.

The chief administrative officer of each local correctional facility shall designate a staff member(s) to act as grievance coordinator(s).

The chief administrative officer or his designee shall ensure that each grievance is investigated to the fullest extent necessary by an impartial person who was not personally involved in the circumstances giving rise to the grievance; provided, however, that a grievance that is too vague to understand or fails to set forth supporting evidence or information may be returned to the II. Failure to supply sufficient information or evidence within two days shall be cause to deny the grievance.

At a minimum, each investigation of an II grievance shall include gathering and assessing the following information:
(1) a description of the facts and issues underlying the circumstances of the grievance;
(2) summaries of all interviews held with the grievant and with all parties involved in the grievance;
(3) copies of pertinent documents; and
(4) any additional relevant information.

Grievances regarding dispositions or sanctions from disciplinary hearings, administrative segregation housing decisions, issues that are outside the authority of the chief administrative officer's control, or complaints pertaining to an II other than the II actually filing the grievance are not grievable and may be returned to the II by the grievance coordinator. Such grievances may not be appealed to the chief administrative officer or the Citizens' Policy and Complaint Review Council.

Within five business days of the receipt of a grievance, the grievance coordinator shall issue a written determination. Such determination shall specify the facts and reasons underlying the coordinator's determination. A copy of such determination shall be provided to the grievant.

Within two business days after receipt of the grievance coordinator's written determination, the grievant may appeal to the chief administrative officer or his designee.

Within five business days after receipt of a grievance appeal, the chief administrative officer shall issue a determination on the grievance appeal and provide a copy of such determination to the grievant.

If the chief administrative officer finds merit in a grievance, he/she shall direct in writing that appropriate remedies or meaningful relief be provided to the grievant and for all others similarly situated.

Some examples of valid complaints are:
1. Any situation or condition that is a violation of II's rights.
2. Any unfair treatment of IIs by facility staff or by other IIs.
3. Any condition that jeopardizes the safety, security or good order of the jail.

It was never the intent of the law to allow IIs to flood the system with frivolous and unwarranted complaints or grievances. All complaints and/or grievance will be addressed in order so that IIs receive a timely response at all steps. This does not limit the number of grievances that an II may have in the process. There will be no reprisals against IIs for the filing of an informal or formal grievance.

**IRB 7006.8AP DAYS ALLOTTED TO PROCESS INCARCERATED
INDIVIDUAL PAPERWORK, GRIEVANCES, ETC.
NYS Min. Std.7006.0**                                    **REV 7 JULY 2022**

In order to clarify and standardize the definitions of "days to process" or "days to render a decision" and similar conditions pertaining to form submissions, the Delaware County Jail will establish clearly defined timelines to avoid confusion when processing forms, grievances, etc.

**DEFINITIONS, STANDARDS, REQUIREMENTS**

1. Business day: defined as Monday through Friday of the week, hours 9AM-5PM; excluding the following public holidays;

    The term public holiday includes the following days in each year:  the first day of January, known as New Year's day;  the third Monday of January known as Dr. Martin Luther King, Jr. day;  the twelfth day of February, known as Lincoln's birthday;  the third Monday in February, known as Washington's birthday;  the last Monday in May, known as Memorial day;  the second Sunday in June, known as Flag day;  the fourth day of July, known as Independence day;  the first Monday in September, known as Labor day;  the second Monday in October, known as Columbus day;  the eleventh day of November, known as Veterans' day;  the fourth Thursday in November, known as Thanksgiving day; and the twenty-fifth day of December, known as Christmas day, *and if any of such days except Flag day is Sunday, the next day thereafter*;  each general election day, and each day appointed by the president of the United States or by the governor of this state as a day of general thanksgiving, general fasting and prayer, or other general religious observances.

    (From General Construction Law § 24. Public holidays; half-holidays Current through L.2004, chapters 4 to 38, 40 to 49, 52,61 to 77, 79 to 93, 96, 98 to 101 and 104.)

2. Day of submission: considered a Zero (0) day.

3. The first business day after Zero Day starts the clock for processing

    **Example #1**:  II Jones submits a grievance on Saturday. That is his Zero Day.  For processing a grievance, the Grievance Coordinator has 5 business days to render a decision. The first business day would be the Monday after the submission. Therefore, the grievance coordinator would have until close of business on the 5th business day; Friday of that week, to render a decision.

    **Example** #2: Example: II Jones is appealing his disciplinary hearing decision. II Jones submits his appeal on Wed. (Zero Day) Friday is a contractual holiday. The Jail Administrator has 5 days to process the IIs appeal. The JA must render and          return a decision by close of business on Thursday of the next week.

4. If an II is required/offered/authorized to respond to an administrative action, the day the II receives notification is considered a Zero Day.

    **Example:** II Jones is notified of an Appeal decision on Wednesday and he is required to submit his response to the decision to the Jail administrator within 2 business days. The day he gets the notice is his Zero Day and he has until close of business the second business day after the Zero day to have the paperwork turned in. II Jones must submit his response by close of business on that Friday following his Zero Day.

**IRB 7039 FIRE SAFETY**                                                    **8 JULY 2022**
**NYS Min. Std. 7039.0 Fire Prevention and Safety**

Any person who willfully misuses any fire detection, control, and/or protection equipment, or uses such equipment in any manner contrary to law, may be subject to disciplinary action and criminal prosecution for such acts.

**Housing Unit Evacuation**
1. In case of an emergency evacuation, unless otherwise directed, you will immediately move to your cell to lock in for accountability.
2. You will be given instructions from the Housing Unit Officer on the process and steps you will take in order to safely evacuate your housing unit.
3. During an evacuation, you are to follow the Officer's directions explicitly. You are to bring nothing with you.
4. You are to remain silent unless asked a question by an Officer.
5. Do not engage in any behavior that will interfere with the safe and secure evacuation of the housing unit.

**IRB 7064.0 Human Immunodeficiency Virus and AIDS Related**
**Information/Confidentiality**                                             **8 JULY 2022**
**HIV/AIDS**
**NYS Min. Std. 7064.0        Human Immunodeficiency Virus and AIDS Related**
**Information/Confidentiality**

Recognizing that maximum confidentiality protection for information related to human immunodeficiency virus (HIV) infection and acquired immune deficiency syndrome (AIDS) is an essential public health measure. HIV infection and AIDS issues are of particular concern to correctional professionals, and in order to retain the full trust and confidence of persons at risk, each correctional facility shall ensure that HIV-related information is not improperly disclosed. The Jail shall establish clear and certain rules for the disclosure of such information, and provide safeguards to prevent discrimination, abuse, or other adverse actions directed toward protected individuals.

Any II who has any concerns, questions, issues or problems related to Human Immunodeficiency Virus (HIV) and AIDS or other blood borne diseases may request to speak with the Jail Nurse during Sick Call.

**IRB 7070.0    EDUCATIONAL SERVICES**                                      **8 JULY 2022**
**NYS Min. Std. 7070.0 Educational Services for Youth**
Anyone under the age of 21 has the right to attend the Educational Services Program. If you have neither a high school diploma nor a GED, and are under the age of 21, you may request to attend the Educational Services Program offered in the jail. If you have not received the proper forms to apply, request them from the Housing Unit Officer.

Your attendance is required each day classes are scheduled unless you are sick or have another valid reason. You will not be able to attend just when you feel like it; you must attend all sessions.  The teacher assigned to this facility will set the actual schedule of days and time. Instructional time will be scheduled for 3 hours a day.

Upon your release and upon your request, this facility will send a letter to your school district in reference to your desire to continue your education.

If you are attending these services and no longer wish to, make it known to the Housing Unit Officer. You will then be required to sign a statement to this effect. Once you have either quit this program or have been pulled out due to unacceptable behavior, your return to the program will be at the discretion of the Administration.

---

**IRB 8003.0 HOSTAGE POLICY**                                    **8 JULY 2022**
**NYS Min. Std. NA**

This facility has a "No Hostage" policy. Under no circumstances shall an II be released from custody in exchange for the safety or release of hostages. Jail staff DO NOT carry keys that will allow you to reach outside the facility.

---

**IRB 8004.0 HUMAN SERVICES**                                    **8 JULY 2022**
**NYS Min. Std. NA**

While you are in the Delaware County Jail, there are groups that concern themselves with any unusual needs or problems you may have. If you want to meet with them and they do not accept collect calls, then you will have to write them a letter at the proper address.  We do not make calls for you.

Department of Social Services
111 Main St.
Delhi, New York 13753
607 832-5300

These organizations will assist you during your stay concerning education, counseling, family problems, personal problems and may assist you prior to your release from jail if you have concerns of lack of clothing, a place to stay, work applications, etc. These organizations will not intercede in any dispute you may have with members of the jail staff, arrange for free telephone calls, make telephone calls on your behalf or pass messages into or out of the facility. If your problems involve alcohol, drugs, mental outlooks, or public assistance, write to the following agencies.

Delaware County Drug Abuse Services        Delaware County Probation
Human Resources Building                   280 Phoebe Lane Suite #2
Hamden, New York 13782                      Delhi, New York 13753
607-865-4213 or 607-832-5890

| | |
|---|---|
| Delaware County Mental Health | NY State Division of Parole |
| Hospital Road | 44 Hawley St. |
| Walton, New York 13856 | Binghamton, New York 13901 |
| 607-865-6522 | |
| Delaware County Alcohol Abuse | State Commission of Correction |
| Human Resources Building | 80 S. Swan Street, 12th Floor |
| Hamden, New York 13782 | Albany, New York 12210-8001 |
| 607-865-7656 | |
| Southern Tier Aids Program | Soldier On Program - |
| 122 Baldwin Street | Mark Stupak |
| Johnson City, New York 13790 | 431-588-2081 |
| 607-798-1706 | |

A representative from Delaware County Mental Health contacts us weekly. If you wish to speak to someone, you must request a mental health slip on your daily request form. If you have any questions, ask your Housing Unit Officer. This facility has restricted A-A meetings. Check with 1500-2300 hr. staff as to days and times.

If you have a release date and do not have any living arrangements you may contact adult protective services for temporary living arrangements in Delaware County.

Write a letter explaining your circumstances to:

Department of Social Services
Attn: Adult Protective Services
111 Main Street
Delhi, New York 13753

Be sure to give enough time for the letter to reach the recipient and for the social workers to do something with your request. Typically, 2 weeks ahead of time should be sufficient.

In emergency situations where you are released unexpectedly and have no living arrangements, notify the shift supervisor. They may contact the on-call Social Worker on your behalf. This will not be done until after you are released and verified that you have no active warrants.

_____

If you are interested in applying for employment or training (High School Equivalency Diploma) when you are released you may contact The Department of Labor's CDO Workforce:

CDO Workforce
1 Courthouse Square Suite 1
Delhi, New York 13753

You will need a copy of your Social Security Card, Birth Certificate, 4 References with addresses and phone numbers, and an expected address upon release. If unknown see above information.

This will require some work on your part. After you gather this information you will need to fill out one of their resumes and a supplemental form.

---

If you need Alcohol and Drug Abuse Services, a Counselor will be coming in every week. As there is only one counselor, and potentially multiple requests, they will be prioritizing and selecting who they see. You may request a referral form on your daily request form. You will need to fill out a new form every week. You may also write:

Delaware County Alcohol and Drug Abuse Services
243 Delaware St.
Walton, New York 13856

Friends of Recovery of Delaware and Otsego Counties (FORDO)
84 Main Street
Delhi, New York 13753

---

**IRB 8005.0 INCARCERATED INDIVIDUAL WORKER PROGRAM**
**NYS Min. Std. NA**                                         **8 JULY 2022**

The Delaware County Jail has an II Worker program. Activities in our II worker program may include but are not limited to laundry room, kitchen, general cleaning inside the facility and outside work details. If you are a sentenced II and classified general custody you will be assigned different jobs which may include working outside the facility. If you are non-sentenced or close custody II, you will not be assigned to the kitchen or any outside work details.

---

**IRB 8009.0   PROGRAMS, AA, BIBLE STUDY**              **7 JULY 2022**
**NYS Min. Std. NA**

**PROCEDURE FOR ALCOHOLICS ANONYMOUS**

1.)     Any II wanting to participate in the program will be allowed to request to attend Alcoholics Anonymous on a daily request form. IIs in Classification or PUNSEG/ADSEG status are not allowed to attend AA.

2.)     Alcoholics Anonymous meetings may be held once a week per housing unit.  Days and times for meetings will be established and promulgated by the AA Officer.

3.)     At the first sign of a behavior problem from any II in the program, the II will be removed from the program and will be prohibited from further attendance until reviewed by the Jail Administrator.

4.)    No matter what an II's classification is, the facility reserves the right to deny attendance based upon an II's disciplinary record and/or their overall behavior and adjustment to incarceration. No one has the absolute right to attend Alcoholics Anonymous.

5.)    The Courts and agencies; Probation or Parole, can recommend that Alcoholics Anonymous, or other counseling if available. These directives DO NOT override our policies on attendance at the Alcoholics Anonymous meetings. The decision of the facility is final.

6)    IIs will clean of the program area after each meeting.

7.)    A Correction Officer will be present during AA meetings to observe behavior and ensure the safety of the presenter and IIs.

8.)    AA Meetings will be held in the Visitation Room.

**PROCEDURE FOR BIBLE STUDY**

The Delaware County Correctional facility also offers a bible study program from time to time. If you are interested, talk with the Jail Chaplin about signing up.
Eligibility requirements are:
1.    You must be medically cleared and classified.
2.    You cannot be locked in **administrative segregation**. If you are Ad/Seg full restraints you must request an alternative attendance. We cannot safely put you in a room full of other individuals while you are restrained.
3.    You must attend every session once you are signed up.

---

**IRB 8011.0 SEX OFFENDER REGISTRATION                          8 JULY 2022**
**NYS Min. Std.  NA**

If you have been convicted of a specified sex crime you are required by law to register your address with the local police agency. You are also required to register a change of address when you are committed to jail and again upon your release. Although a hearing to determine your level of classification may not take place until your incarceration period has ended, you are still required to comply with all aspects of Correction Law section 168. The Delaware County Sheriff's Department is the police agency that handles all sex offender issues within the jail. You may request to see an Officer in regards to the registration act via an II request form available from the housing unit Officer.

If you have been convicted of any DNA Designated Offenses as shown in section 995C of the NYS Executive Law, you are required by law to submit to DNA testing. Through your court proceedings and your attorney, you should already be aware of your legal obligation in this matter if it pertains to you, but if you are unsure place a request with your Housing Unit Officer to get a copy of that section of law or request to speak to a Sergeant.

Failure to comply with providing a DNA specimen as required by law shall result in notification to the New York State Division of Criminal Justice and the Court of Jurisdiction and further action will be taken. Further information is available and can be found in Executive Law section 49B and Correction Law section 168ce.

**IRB 8012.0 TELEPHONE SERVICES**                                    **8 JULY 2022**
**NYS CoC Min. Std. NA**

    The only phones available to IIs are located in each housing unit. They are all "Collect Only" systems. If your family or attorney does not accept this type of call, you will then be limited to written correspondence. No II will be permitted to use our office phones with the exception of one call upon admission.

    If you have any problems with the phone company, have a family member or friend call the phone company Global Tel Link (GTL) to resolve your issue utilizing the phone company number listed in the housing unit.  1 (877) 650-4249

  1.  The phones are a privilege. Violations of the rules or abuse of the phones may result in the loss of phone privileges.

  2.  Phones can be used at any time they are on as long as it does not interfere with our daily routine.  They are normally on from 0800 through 2145 but may be shut off at different times throughout the day based on operational requirements of the housing unit.

  3.  A time limit may be programed into the system to ensure its availability to all IIs. If you call the same number too often within a 24-hour period, the phone company may block that number.

  4.  If it appears to the phone company that you make numerous calls to the same number, they may require the receiver to put down a certain amount of money towards the bill. If no money is put down, the number will be blocked until it is paid.

  5.  We do not supply phone directories nor are we here to look up phone numbers for you.

  6.  All calls on jail telephones are recorded and may be monitored. Attorney's known to us have this feature blocked so calls to them are not recorded. If you have an attorney that is not from the area you must let us know who the attorney is and their phone number so that the recording feature programed into the system can be blocked for that number.

  7.  All phone calls will be terminated when the housing unit Officer calls IIs to the table for meals or any other time you are directed by any Officer.

  8.  Upon admission, indigent IIs will be allowed to make the number of calls, at facility expense, necessary to retain counsel for their criminal case.

  9.  If you call your family/significant other and instruct them to call the facility on your behalf, the information we can release is limited. We can confirm you are here, and we can give them charge/bail information. We cannot talk about your medical diagnosis/treatments (HIPPA). For court dates and times, you or your attorney must relay information they need.

**NOTES:**

    If your attorney's office refuses your call, keep in mind that they may be busy or not even in the office. It would make no sense for their staff to accept calls at that time. Wait a while, then call back.

**IRB 8025.0 Tablet Usage**                                    **12 JULY 2022**
**NYS Min. Std. NA**

1. No visiting party will engage in any lewd act or conduct of a sexual nature, verbally or physically, implied or simulated. No Visiting party will expose any intimate body parts of a sexual nature during visit. Violation of any part of these rules will cause for termination of the visitor's video chat privileges and may cause a visitor account to be suspended until the infraction can be reviewed by Jail Administrator or designee.

2 Any act that violates any NYS Penal Law, violates any order of protections or violates any facility rule/regulation will cause for termination of the visitor's video chat privileges and may cause a visitor account to be suspended until reviewed by Jail Administrator or designee.

3. Threatening and menacing behavior and language is prohibited.

4. All conversations will be held at a level that is consistent with a normal volume and tone. If the conversation can be heard from outside the program room, it is too loud.

5. Video Chat times will not exceed twenty (20) minutes in length.

6. No sharing of any account or tablet use of any kind with another II.

7. IIs will be held responsible and accountable to full tablet reimbursement price for any damage caused to the tablet.

8. It is the II's responsibility to notify their visitor of these rules.

9. The tablet must be used either in the cell that has been assigned to you, or in the program room for video visits.

10. Any violation of these rules may result in tablet privilege loss and/or disciplinary action. It is the responsibility of the II to protect all of their pin numbers (Phone, Kiosk, and Tablet), failure to do so may result in others accessing the accounts and funds without account holder's permission and DCSO will not be held responsible if this occurs.

---

### IRB 8013.0 PREA (Prison Rape Elimination Act)                    8 JULY 2022

**NYS Min. Std.  NA**

      An II may report any sexual misconduct or sexual harassment to any staff member. This may be done for yourself confidentially, verbally, in writing, or through a third party. You may also report any sexual misconduct or sexual harassment on behalf of another II confidentially, verbally, in writing, or through a third party. All reports will be investigated. There will be no retaliation for reporting an incident that has been made in good faith. If it is determined that a claim has been submitted with malicious intent; or in retaliation for, or in an attempt to negotiate a better outcome for an incident report issued, then disciplinary actions up to and including legal action may be utilized. Any investigation that determines that PREA guidelines, facility rules, or NYS law have been violated; by any involved individuals, will result in disciplinary action.

## PREA BROCHURE  (1 of 2)

**Avoiding Sexual Abuse**

Here are some things you can do to protect yourself against sexual abuse:

1. Do not permit your emotions (fear/anxiety) to be obvious to others.

2. Do not accept gifts or favors from others.  Most gifts or favors come with strings attached.

3. Do not accept an offer from another inmate to be your protector.

4. Find a staff member with whom you feel comfortable discussing your fears and concerns.

5. Be alert!  Do not use contraband substances such as drugs or alcohol. These can weaken your ability to stay alert and make good judgments.

6. Be direct and firm if others ask you to do something you don't want to do. Do not give mixed messages to other inmates regarding your wishes for sexual activity.

7. Stay in assigned areas of the facility.

8. Choose your associates wisely.

9. Trust your instincts.  If you sense that a situation is dangerous, it probably is. If you fear for your safety, report your concerns to staff.

10. Follow the inmate rules.

**Confidentiality**

Information concerning the identity of an inmate victim reporting a sexual assault or abuse and the facts of the report itself shall be limited to those involved in the reporting, investigation, discipline and treatment process or as otherwise required by law.  All records associated with allegations of sexual abuse are confidential in accordance with Civil Rights Law § 50-b.

**Office of the Delaware County Sheriff**
**280 Phoebe Lane**

**Delhi, New York 13753**



**Thomas Mills**                    **Craig DuMund**
**Sheriff**                            **Undersheriff**

**November  2016**

# The Prevention of Sexual Abuse in Jail

## *An Overview for Offenders*



The Delaware County Correctional Facility has a **ZERO TOLERANCE** Policy for Sexual Abuse

# PREA BROCHURE (2 of 2)

## Policy

The agency will not tolerate sexual abuse. **All sexual conduct, including sexual contact, is against the agency's rules.** All allegations of sexual abuse or of retaliation in connection with an incident of sexual abuse will be thoroughly investigated and any sexual predator will be disciplined and/or prosecuted.

## Definitions

Inmate-on-inmate sexual abuse is when one or more inmates engage in sexual conduct, including sexual contact, with another inmate **against his or her will or by use of threats, intimidation or other coercive actions.**

Staff-on-inmate sexual abuse is when an employee, volunteer, intern or outside contractor engages in sexual conduct, including sexual contact with an inmate.

## About Your Safety

**You have the right to be safe from sexual abuse.** No one has the right to pressure you to engage in sexual acts. You do not have to tolerate sexual abuse or pressure to engage in unwanted sexual behaviors. If you are being pressured, threatened, or extorted for sex, you should report this to staff. You should also report any retaliation you believe occurred due to reporting an incident of sexual abuse or for participating in an investigation of an allegation of sexual abuse.

**What to do if you are assaulted.** If you become a victim of sexual abuse, you should report it immediately to staff, who will offer you immediate protection from the assailant and will refer you for a medical examination and clinical assessment. Assistance will be provided regardless of whether or not you name the responsible inmates or staff members, however, specific information may make it easier for staff to help you.

Even though you may want to clean up after the assault, it is important to see medical staff BEFORE you shower, wash, drink, eat, change clothing or use the bathroom. Medical staff will examine you for injuries which may or may not be readily apparent to you. They can also check you for sexually transmitted diseases and gather physical evidence of assault.

The individual or individuals responsible for sexually abusing or assaulting inmates can only be disciplined and/or prosecuted if the abuse is reported.

## Reporting

**How do you report an incident of sexual abuse?**

It is important that you begin by telling a staff member if you have been sexually abused. **You can tell any security staff member, counselor, medical practitioner or any other employee.** Staff are instructed to keep the reported information confidential and only discuss it with the appropriate officials on a need to know basis. You may also discuss your concerns with Mental Health.

If you choose to first report the abuse or threats in writing, you may write to a member of the administrative staff, medical staff, or a security supervisor. Be aware that any delay in reporting an incident of sexual abuse will make investigating the incident far more difficult.

An inmate who feels that he or she has been the victim of sexual abuse should report such occurrence immediately. Reporting an incident of sexual abuse is not a substitute for filing an inmate grievance.

**What happens when you report an incident of sexual abuse?**

All allegations of sexual abuse and retaliation for reporting an incident of sexual abuse will be thoroughly investigated and may also be reported to appropriate law enforcement officials by the administrative staff. No reprisals of any kind shall be taken against an inmate for good faith reporting of sexual abuse or sexual threats.

However, if an investigation discloses that a person who knew that the information was false made the allegation intentionally or with malice, he or she may be disciplined or charged with falsely reporting an incident and/or may be subject to disciplinary action (Penal Law § 240.50).

# Rights Under NYS Corrections Law 611

If you are a woman known to be pregnant by Corrections Personnel, or up to eight (8) weeks after delivery, or pregnancy outcome, absent extraordinary circumstances you have the following rights:

1. No restraints of any kind shall be used during transport of such woman;

2. No restraints of any kind shall be used when such woman is in labor, admitted to a hospital, institution or clinic for delivery, or recovering after giving birth;

3. The woman shall be permitted to have at least one support person, not in custody, of her choosing accompany her in the delivery room and when such woman is in labor and recovering after birth.

   a. This request must be made in writing to the Chief Administrative Officer.
   b. Any denial of a support person shall be made in writing and returned to the requestor within 5 business days.

4. A support person shall be immediately notified when such woman goes into labor or immediately after a caesarian or termination is scheduled.

5. A doula or midwife or other birthing support specialist may also assist during labor and delivery.

   a. This birthing support specialist may be in addition to designated support person.

6. No correctional staff shall be present in the delivery room during the birth of a baby unless requested by the medical staff supervising such delivery or by the woman giving birth;

7. As soon after the birth of her child as the state of her health will permit as determined by the medical professional responsible for the care of such woman.   If such woman is confined in a local correctional facility, the expense of such accommodation, maintenance and medical care shall be paid by such woman or her relatives or from any available funds of the local correctional facility and if not available from such sources, shall be a charge upon the county, city or town in which is located the court from which such inmate was committed to such local correctional facility;

8. A child so born may be returned with its mother to the correctional institution in which the mother is confined unless the chief medical officer of the correctional institution shall certify that the mother is physically unfit to care for the child, in which case the statement of the said medical officer shall be final.   A child may remain in the correctional institution with its mother for such period as seems desirable for the welfare of such child, but not after it is one year of age;

9. If any woman, committed to any such correctional institution at the time of such commitment is the mother of a nursing child in her care under one year of age, such child may accompany her to such institution if she is physically fit to have the care of such child;

10. If a woman is pregnant or has a child under the age of 18 months while incarcerated at a local correctional facility shall be able to apply to any nursery program run by the department. (currently no program is run by DCSO)

11. If a woman is pregnant, said woman may participate in pregnancy counseling services, and also has the right to abortion services allowed by state law.

**Law Library Index**

**Available on Lexis Nexus on the Kiosks and Tablets in digital format. If Lexis Nexus is not available on the Kiosks or Tablets, reference the case law you are looking for to the Shift Supervisor via request form, and they will print out a photocopy of the case law you are referencing for use. Legal reference material photocopied at the Delaware County Jail's expense will be retained by the Delaware County Jail. Refer to pages 46 and 47, Legal Services.**

- **New York**
    - **Primary Law**
        - **Cases**
            - NY Court of Appeals Cases from 1794
            - NY Supreme Court Cases - Appellate Division from 1875
        - **Codes and Legislation**
            - NY - New York Consolidated Laws Service|
            - NY - New York Constitution|
        - **Court Rules**
            - NY - New York State & Federal Court Rules|
    - **Secondary Sources**
        - Constitutional Rights of Prisoners, Ninth Edition|
        - Federal Habeas Corpus Practice and Procedure|
        - Ballentine's Law Dictionary, 3rd Edition
        - Bender's Federal Practice Forms|
        - Bender's Forms for the Civil Practice|
        - Bender's Forms for the Consolidated Laws of New York|
        - Civil Rights Actions|
        - New York Criminal Practice|
        - Police Civil Liability|
        - Weinstein, Korn and Miller CPLR Manual|
    - **Administrative Materials**
        - NY - New York Codes, Rules and Regulations|
- **Federal**
    - **Primary Law**
        - **Cases**
            - U.S. Supreme Court Cases, Lawyers' Edition

- 2nd Circuit - US Court of Appeals Cases
- 2nd Circuit - US District Court Cases
- 2nd Circuit - US Bankruptcy Cases
- All Federal Cases
  - **Statutes & Legislation**
    - USCS - United States Code Service - Titles 1 through 54 |
    - USCS - Constitution of the United States |
  - **Court Rules**
    - USCS - Federal Rules Annotated |

**New York Consolidated Laws Service**

- Abandoned Property Law (Arts. I — XV)
- Agriculture And Markets Law (Arts. 1 — 30)
- Alcoholic Beverage Control Law (Arts. 1 — 11)
- Alternative County Government Law (Arts. 1 — 15)
- Arts And Cultural Affairs Law (Titles A — W)
- Banking Law (Arts. I — XVI)
- Benevolent Orders Law (Arts. 1 — 3)
- Business Corporation Law (Arts. 1 — 20)
- Canal Law (Arts. 1 — 14)
- Cannabis Law (Arts. 1 — 6)
- Civil Practice Law And Rules (Arts. 1 — 100)
- Civil Rights Law (Arts. 1 — 10)
- Civil Service Law (Arts. I — XIV)
- Cooperative Corporations Law (Arts. 1 — 8)
- Correction Law (Arts. 1 — 35)
- County Law (Arts. 1 — 25)

- Criminal Procedure Law (Pts. ONE — THREE)
- Debtor And Creditor Law (Arts. 1 — 11)
- Domestic Relations Law (Arts. 1 — 15)
- Economic Development Law (Arts. 1 — 27)
- Education Law (Titles 1 — IX)
- Elder Law (Arts. I — III)
- Election Law (Arts. 1 — 17)
- Eminent Domain Procedure Law (Arts. 1 — 7)
- Employers' Liability Law (Arts. 1 — 3)
- Energy Law (Arts. 1 — 21)
- Environmental Conservation Law (Arts. 1 — 75)
- Estates, Powers And Trusts Law (Arts. 1 — 14)
- Executive Law (Arts. 1 — 50)
- Financial Services Law (Arts. 1 — 8)
- General Associations Law (Arts. 1 — 5)
- General Business Law (§§ 1 — 1601)
- General City Law (Arts. 1 — 12)
- General Construction Law (Arts. 1 — 8)
- General Municipal Law (Arts. 1 — 20)
- General Obligations Law (Arts. 1 — 19)
- Highway Law (Arts. I — XIII)
- Indian Law (Arts. 1 — 15)
- Insurance Law (Arts. 1 — 99)
- Judiciary Law (Arts. 1 — 23)
- Labor Law (Arts. 1 — 40)
- Legislative Law (Arts. 1 — 7)
- Lien Law (Arts. 1 — 11)
- Limited Liability Company Law (Arts. I — XIV)
- Local Finance Law (Arts. 1 — 3)

- Mental Hygiene Law (Titles A — E)
- Military Law (Arts. 1 — 13)
- Multiple Dwelling Law (Arts. 1 — 11)
- Multiple Residence Law (Arts. 1 — 9)
- Municipal Home Rule Law (Arts. 1 — 6)
- Navigation Law (Arts. 1 — 13)
- Not-For-Profit Corporation Law (Arts. 1 — 16)
- Parks, Recreation And Historic Preservation Law (Titles A — G)
- Partnership Law (Arts. 1 — 9)
- Penal Law (Pts. ONE — FOUR)
- Personal Property Law (Arts. 1 — 12)
- Private Housing Finance Law (Arts. 1 — 32)
- Public Authorities Law (Arts. 1 — 11)
- Public Buildings Law (Arts. 1 — 15)
- Public Health Law (Arts. I — 50)
- Public Housing Law (Arts. I — XV)
- Public Lands Law (Arts. 1 — 17)
- Public Officers Law (Arts. 1 — 8)
- Public Service Law (Arts. 1 — 11)
- Racing, Pari-Mutuel Wagering And Breeding Law (Arts. I — 14)
- Railroad Law (Arts. 1 — 8)
- Rapid Transit Law (Arts. I — IX)
- Real Property Actions And Proceedings Law (Arts. 1 — 21)
- Real Property Law (Arts. 1 — 20)
- Real Property Tax Law (Arts. 1 — 20)
- Religious Corporations Law (Arts. 1 — 24)
- Retirement And Social Security Law (Arts. 1 — 25)
- Rural Electric Cooperative Law (Arts. 1 — 7)
- Second Class Cities Law (Arts. 1 — 17)

- Social Services Law (Arts. 1 — 12)

- Soil And Water Conservation Districts Law (Arts. 1 — 3)

- State Law (Arts. 1 — 10)

- State Administrative Procedure Act (Arts. 1 — 6)

- State Finance Law (Arts. I — 20)

- New York State Printing And Public Documents Law (Arts. 1 — 4)

- State Technology Law (Arts. I — 4)

- Statute of Local Governments (Arts. 1 — 3)

- Surrogate's Court Procedure Act (Arts. 1 — 28)

- Tax Law (Arts. 1 — 41)

- Town Law (Arts. 1 — 19)

- Transportation Law (Arts. 1 — 23)

- Transportation Corporations Law (Arts. 1 — 10)

- Uniform Commercial Code (Arts. 1 — 13)

- Vehicle And Traffic Law (Titles I — XII)

- Veterans' Services Law (Arts. 1 — 3)

- Village Law (Arts. 1 — 23)

- Volunteer Ambulance Workers' Benefit Law (Arts. I — V)

- Volunteer Firefighters' Benefit Law (Arts. I — V)

- Workers' Compensation Law (Arts. 1 — 11)

- Court of Claims Act (Arts. I — IV)

- New York City Civil Court Act (Arts. 1 — 22)

- New York City Criminal Court Act (Arts. I — VII)

- Uniform City Court Act (Arts. 1 — 23)

- Uniform District Court Act (Arts. 1 — 23)

- Uniform Justice Court Act (Arts. 1 — 23)

- Family Court Act (Arts. 1 — 12)

- UNCONSOLIDATED LAWS

**Constitutional Rights of Prisoners, Tenth Edition**

- FRONT MATTER

- PART I- CORRECTIONAL LAW

  - Chapter 1: An Overview of the Judicial System and Correctional Law

  - Chapter 2: Religion in Prison

  - Chapter 3: Searches, Seizures, and Privacy

  - Chapter 4: Rights to Visitation and Association

  - Chapter 5: Rights to Use of Mail, Internet, and Telephone

  - Chapter 6: Rights to Rehabilitation Programs and Medical Care

  - Chapter 7: Prisoner Legal Services

  - Chapter 8: Additional Constitutional Issues

  - Chapter 9: Isolated Confinement--"The Hole" and Administrative Segregation

  - Chapter 10: Prisoner Disciplinary Proceedings

  - Chapter 11: Use of Force

  - Chapter 12: The Death Penalty

  - Chapter 13: Parole and Probation

  - Chapter 14: Juvenile and Youthful Offenders

  - Chapter 15: Legal Remedies Available to Prisoners

  - Chapter 16: Selected Federal Statutes Affecting Prisoners


- PART II- SUPREME COURT DECISIONS RELATING TO PART I

  - Cases Relating to Chapter 2: Religion in Prison

  - Cases Relating to Chapter 3: Searches, Seizures, and Privacy

  - Cases Relating to Chapter 4: Rights to Visitation and Association

  - Cases Relating to Chapter 5: Rights to Use of Mail, Internet, and Telephone

  - Cases Relating to Chapter 6: Rights to Rehabilitation Programs and Medical Care

  - Cases Relating to Chapter 7: Prisoner Legal Services

- o  Cases Relating to Chapter 8: Additional Constitutional Issues

- o  Cases Relating to Chapter 9: Isolated Confinement-"The Hole" and Administrative Segregation

- o  Cases Relating to Chapter 10: Prisoner Disciplinary Proceedings

- o  Cases Relating to Chapter 11: Use of Force

- o  Cases Relating to Chapter 12: The Death Penalty

- o  Cases Relating to Chapter 13: Parole and Probation

- o  Cases Relating to Chapter 14: Juvenile and Youthful Offenders

- o  Cases Relating to Chapter 15: Legal Remedies Available to Prisoners

- o  Cases Relating to Chapter 16: Selected Federal Statutes Affecting Prisoners

- PART III- APPENDICES

- o  Appendix I: Amendments To The United States Constitution

- o  Appendix II: Selected Federal Statutes

**Federal Habeas Corpus**

- Publication Information

- What's New

- PART I INTRODUCTION

- PART II TIMING OF A FEDERAL HABEAS CORPUS PETITION; STATE REMEDIES

- PART III HABEAS CORPUS JURISDICTION

- PART IV ANCILLARY AND SUMMARY PROCEEDINGS UPON FILING

- PART V MAGISTRATE JUDGE PRACTICE AND FACT-DEVELOPMENT PROCEDURES

- PART VI PROCEDURAL DEFENSES

- PART VII ADJUDICATION OF THE MERITS

- PART VIII POSTJUDGMENT PROCEEDINGS; APPEALS

- PART IX FEDERAL PRISONERS AND DETAINEES

- APPENDIX A FEDERAL POSTCONVICTION STATUTES AS AMENDED BY THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996 (AEDPA) AND FURTHER AMENDED BY THE USA PATRIOT IMPROVEMENT AND REAUTHORIZATION ACT OF 2005

- APPENDIX B FEDERAL POSTCONVICTION RULES

- APPENDIX C ANTI-DRUG ABUSE ACT OF 1988'S PROVISIONS FOR APPOINTMENT OF COUNSEL AND OTHER SERVICES IN CAPITAL HABEAS CORPUS PROCEEDINGS (AS SUBSEQUENTLY AMENDED BY AEDPA AND THEREAFTER RECODIFIED BY THE USA PATRIOT IMPROVEMENT AND REAUTHORIZATION ACT OF 2005)

- APPENDIX D    PRESIDENT'S STATEMENT UPON SIGNING THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

**Bender's Federal Practice Forms**

- FEDERAL RULES OF CIVIL PROCEDURE

- THREE-JUDGE DISTRICT COURTS

- CHANGE OF VENUE

- CIVIL CONTEMPT

- ARBITRATION

- REMOVAL AND REMAND

- ADMIRALTY

- SPECIAL ALERT

- RULES OF PRACTICE AND PROCEDURE UNITED STATES TAX COURT

- SPECIAL ALERT

- OFFICIAL TAX COURT FORMS

- FEDERAL RULES OF BANKRUPTCY PROCEDURE

- OFFICIAL BANKRUPTCY FORMS

- UNITED STATES COURT OF FEDERAL CLAIMS

- RULES OF THE UNITED STATES COURT OF INTERNATIONAL TRADE

- SPECIAL ALERT

- LOCAL RULES, FORMS, AND ATTORNEY DISCIPLINE RULES OF THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

- FEDERAL RULES OF CRIMINAL PROCEDURE

- SPECIAL ALERT TO CRIMINAL RULE 56

- FEDERAL RULES OF CRIMINAL PROCEDURE

- POSTCONVICTION REMEDIES

- FEDERAL RULES OF APPELLATE PROCEDURE

- FEDERAL RULES OF EVIDENCE

- SPECIAL ALERT TO SUPREME COURT RULES

- RULES OF THE SUPREME COURT

**Bender's Forms for the Consolidated Laws of New York**

- V1A thru V1B BUSINESS CORPORATION LAW

- V1C CIVIL RIGHTS LAW TO CIVIL SERVICE LAW

- V1D COOPERATIVE CORPORATIONS LAW TO DEBTOR AND CREDITOR LAW

- V1E thru V1F DOMESTIC RELATIONS LAW

- V1G thru V1H ESTATES, POWERS AND TRUSTS LAW

- V1I thru V2P1 EDUCATION LAW

- V1P1 ABANDONED PROPERTY LAW TO AGRICULTURE AND MARKETS LAW

- V1P2 ALCOHOLIC BEVERAGE CONTROL LAW

- V1P3 ARTS AND CULTURAL AFFAIRS LAW TO BENEVOLENT ORDERS LAW

- V2A GENERAL CONSTRUCTION LAW TO GENERAL MUNICIPAL LAW

- V2B thru V2C GENERAL OBLIGATIONS LAW

- V2P1 EDUCATION LAW

- V2P2 ELECTION LAW TO ENVIRONMENTAL CONSERVATION LAW

- V2P3 EXECUTIVE LAW TO GENERAL CITY LAW

- LABOR LAW

- V3B LIEN LAW

- V3BP2 LIMITED LIABILITY COMPANY LAW

- V3C LOCAL FINANCE LAW

- V3P1 thru V3P3 HIGHWAY LAW TO JUDICIARY LAW

- V4AP1 thru V4AP2 MENTAL HYGIENE LAW

- V4BP1 MILITARY LAW TO MULTIPLE RESIDENCE LAW

- V4BP2 MUNICIPAL HOME RULE LAW TO PARKS, RECREATION AND HISTORIC PRESERVATION LAW

- V4BP3 PARTNERSHIP LAW

- V4C thru V4D NOT-FOR-PROFIT CORPORATION LAW

- V5P1A PENAL LAW

- V5P2 thru V5P3 CRIMINAL PROCEDURE LAW

- V5A PERSONAL PROPERTY LAW TO PUBLIC HEALTH LAW § 2806

- V5B PUBLIC HEALTH LAW § 2853 to PUBLIC SERVICE LAW

- V6 thru V6D REAL PROPERTY LAW

- V6E REAL PROPERTY TAX LAW

- V7 RAILROAD LAW TO RETIREMENT AND SOCIAL SECURITY LAW

- V7A RURAL ELECTRIC COOPERATIVE LAW TO STATE LAW

- V8AP1 TRANSPORTATION LAW TO VEHICLE AND TRAFFIC LAW

- V8AP2 VILLAGE LAW TO WORKERS' COMPENSATION LAW

- V8BP1 thru V8D UNIFORM COMMERCIAL CODE

- V8P1 TAX LAW

- V8P2 TOWN LAW

**Bender's Forms of Pleading**

- PART I FORMAL PARTS OF PLEADING
- PART II COMPLAINTS IN TORT ACTIONS GENERALLY
- PART III COMPLAINTS IN NEGLIGENCE ACTIONS
- PART IV COMPLAINTS IN CONTRACT ACTIONS
- PART V COMPLAINTS IN STATUTORY ACTIONS

- PART VI COMPLAINTS IN EQUITY ACTIONS

- PART VII ANSWERS

- PART VIII PETITIONS FOR USE IN SPECIAL PROCEEDINGS

- PART IX SURROGATE'S COURT PLEADINGS

**Civil Rights Actions**

- I Civil Rights Actions Treatise

- II Civil Rights Actions Practice Guide and Forms

**New York Criminal Practice**

- CHAPTER 1 OVERVIEW OF CRIMINAL PRACTICE IN NEW YORK

- CHAPTER 2 JURISDICTION OF CRIMINAL COURTS

- CHAPTER 3 LOCAL CRIMINAL COURTS

- CHAPTER 4 LOCAL CRIMINAL COURT ACCUSATORY INSTRUMENTS

- Appendix 4A: FORMS

- CHAPTER 5 INDICTMENTS AND SUPERIOR COURT INFORMATIONS

- Appendix 5A: FORMS

- CHAPTER 6 WARRANTS OF ARREST AND SUMMONSES; LOCAL CRIMINAL COURTS AND SUPERIOR COURTS

- Appendix 6A: FORMS

- CHAPTER 7 SECURING ATTENDANCE OF DEFENDANTS FOR ARRAIGNMENT AND PROSECUTION

- Appendix 7A: FORMS

- CHAPTER 8 YOUTHFUL OFFENDER PROCEEDINGS

- Appendix 8A: FORMS

- CHAPTER 9 LOCAL CRIMINAL COURT ARRAIGNMENT AND RELATED ISSUES

- Appendix 9A: FORMS

- CHAPTER 10 PRELIMINARY HEARING
- Appendix 10A: FORMS
- CHAPTER 11 GRAND JURY
- Appendix 11A: FORMS
- CHAPTER 12 SUPERIOR COURT ARRAIGNMENT
- Appendix 12A: FORMS
- CHAPTER 13 BAIL, RECOGNIZANCE AND COMMITMENT
- Appendix 13A: FORMS
- CHAPTER 14 MENTAL DISEASE OR DEFECT PRECLUDING FITNESS TO PROCEED
- Appendix 14A: FORMS
- CHAPTER 15 OMNIBUS MOTIONS
- CHAPTER 16 MOTIONS TO DISMISS INDICTMENT
- Appendix 16A: FORMS
- CHAPTER 17 DISCOVERY
- Appendix 17A: FORMS
- CHAPTER 18 MOTION TO SUPPRESS EVIDENCE
- Appendix 18A: FORMS
- CHAPTER 19 WARRANTLESS ARRESTS
- CHAPTER 20 WARRANTLESS SEARCHES AND SEIZURES
- Appendix 20A: FORMS
- CHAPTER 21 SEARCH WARRANTS
- Appendix 21A: FORMS
- CHAPTER 22 ELECTRONIC AND OTHER ADVANCED SURVEILLANCE TECHNIQUES
- Appendix 22A: FORMS
- CHAPTER 23 CONFESSIONS
- Appendix 23A: FORMS
- CHAPTER 24 IDENTIFICATION EVIDENCE
- Appendix 24A: FORMS
- CHAPTER 25 REMOVAL AND CHANGE OF VENUE

- Appendix 25A: FORMS

- CHAPTER 26 SPEEDY TRIAL

- Appendix 26A: FORMS

- CHAPTER 27 PUBLIC TRIAL

- CHAPTER 28 JURY AND NON-JURY TRIALS

- Appendix 28A: FORMS

- CHAPTER 29 FORMATION AND CONDUCT OF TRIAL JURY

- Appendix 29A: FORMS

- CHAPTER 30 TRIAL STRATEGY

- Appendix 30A: FORM AND MODELS

- CHAPTER 31 SECURING ATTENDANCE OF NON-PRISONER WITNESSES

- Appendix 31A: FORMS

- CHAPTER 32 PRODUCTION AS WITNESSES OF PRISONERS AND PERSONS CONFINED INSIDE AND OUTSIDE NEW YORK STATE

- Appendix 32A: FORMS

- CHAPTER 33 EVIDENCE

- Appendix 33A: FORMS

- CHAPTER 34 PRIVILEGED COMMUNICATIONS

- CHAPTER 35 ADMISSION OF OUT-OF-COURT STATEMENTS UNDER THE CONFRONTATION CLAUSE

- Appendix 35A: FORMS

- CHAPTER 36 TESTIMONY

- Appendix 36A: FORMS

- CHAPTER 37 MISTRIAL AND TRIAL ORDER OF DISMISSAL

- Appendix 37A: FORMS

- CHAPTER 38 JURY INSTRUCTIONS

- Appendix 38A: [RESERVED]

- CHAPTER 39 JURY DELIBERATION AND VERDICT

- CHAPTER 39A ARTICLE 78 PROCEEDINGS

- Appendix 39B: FORMS

- CHAPTER 40 PROCEEDINGS FROM VERDICT TO SENTENCE

- Appendix 40A: FORMS

- CHAPTER 41 PRE-SENTENCE REPORTS AND PROCEEDINGS

- Appendix 41A: FORMS

- CHAPTER 42 CLASSIFICATION OF OFFENSES, AUTHORIZED DISPOSITIONS AND PUNISHMENT

- Appendix 42A: LIST OF VIOLENT FELONY OFFENSES (PENAL LAW § 70.02)

- Appendix 42B: SPECIFIED ELIGIBLE OFFENSES FOR PAROLE SUPERVISION

- Appendix 42C: POSSIBLE SENTENCES FOR FELONY DRUG OFFENDERS

- Appendix 42D: THE SPECIFIED OFFENSES TO WHICH THE HATE CRIME LAW APPLIES (SUBDIVISION 3 OF PENAL LAW § 485.05)

- Appendix 42E: FORMS

- CHAPTER 43 POST-JUDGMENT MOTIONS

- Appendix 43A: FORMS

- CHAPTER 44 APPEALS

- Appendix 44A: FORMS

- CHAPTER 45 FORFEITURE OF PROCEEDS OF CRIME

- CHAPTER 46 PARDON AND RELATED ACTS OF CLEMENCY

- Appendix 46A: FORMS

- CHAPTER 47 STATE HABEAS CORPUS

- Appendix 47A: FORMS

- CHAPTER 48 FEDERAL HABEAS CORPUS

- Appendix 48A FORMS

- CHAPTER 49 CRIMINAL LIABILITY, CULPABILITY AND CAPACITY

- CHAPTER 50 IMMUNITY FROM PROSECUTION AND STATUTE OF LIMITATIONS

- Appendix 50A: FORMS

- CHAPTER 51 ACTING IN CONCERT AND OTHER ISSUES OF JOINT LIABILITY

- CHAPTER 52 GENERAL DEFENSES

- CHAPTER 53 DEFENSES OF MENTAL DISEASE OR DEFECT AND POST-JUDGMENT PROCEDURES

- CHAPTER 54 DEFENSE OF JUSTIFICATION

- CHAPTER 55 DOUBLE JEOPARDY

- Appendix 55A: FORMS

- CHAPTER 56 ATTEMPT, SOLICITATION, CONSPIRACY AND FACILITATION

- CHAPTER 57 ASSAULT AND RELATED OFFENSES

- CHAPTER 58 HOMICIDE AND ABORTION

- CHAPTER 59 SEX OFFENSES AND OFFENSES AGAINST MARRIAGE

- CHAPTER 60 KIDNAPPING, COERCION AND CUSTODIAL INTERFERENCE

- CHAPTER 61 BURGLARY AND CRIMINAL TRESPASS

- CHAPTER 62 CRIMINAL MISCHIEF AND RELATED OFFENSES

- CHAPTER 63 ARSON

- CHAPTER 64 LARCENY

- CHAPTER 65 ROBBERY

- CHAPTER 66 OTHER OFFENSES RELATED TO THEFT, COMPUTER CRIMES AND TRADEMARK COUNTERFEITING

- CHAPTER 67 FORGERY AND FALSE WRITTEN STATEMENTS

- CHAPTER 68 FRAUDULENT SCHEMES AND LOANSHARKING

- CHAPTER 69 BRIBERY NOT INVOLVING PUBLIC SERVANTS AND RELATED OFFENSES

- CHAPTER 70 BRIBERY—PUBLIC SERVANTS

- CHAPTER 71 OFFICIAL MISCONDUCT AND OBSTRUCTION OF GOVERNMENT OPERATIONS

- CHAPTER 72 ESCAPE AND OTHER OFFENSES RELATING TO CUSTODY

- CHAPTER 73 PERJURY AND RELATED OFFENSES

- CHAPTER 74 OFFENSES RELATING TO JUDICIAL AND OTHER PROCEEDINGS

- CHAPTER 75 CONTROLLED SUBSTANCES OFFENSES AND MARIJUANA OFFENSES

- CHAPTER 76 GAMBLING RELATED OFFENSES

- CHAPTER 77 PROSTITUTION AND OFFENSES AGAINST PUBLIC SENSIBILITIES

- CHAPTER 78 OBSCENITY AND DISSEMINATING INDECENT MATERIALS TO MINORS

- CHAPTER 79 OFFENSES AGAINST THE RIGHT TO PRIVACY

- CHAPTER 80 OFFENSES AGAINST PUBLIC ORDER

- CHAPTER 81 OFFENSES SPECIFICALLY RELATING TO CHILDREN AND INCOMPETENTS

- CHAPTER 82 FIREARMS AND OTHER DANGEROUS WEAPONS OFFENSES

- CHAPTER 83 FIREWORKS AND OTHER OFFENSES RELATING TO PUBLIC SAFETY

- CHAPTER 84 ENTERPRISE CORRUPTION, MONEY LAUNDERING, INSURANCE FRAUD AND MARTIN ACT

- CHAPTER 85 VEHICLE AND TRAFFIC LAW OFFENSES

- CHAPTER 86 PROFESSIONAL RESPONSIBILITY

- CHAPTER 87 OTHER SELECTED OFFENSES

- CHAPTER 88 LESSER INCLUDED OFFENSES

- CHAPTER 89 HATE CRIMES

**Police Civil Liability**

- Publication Information
- What's New
- CHAPTER 1 Principles of Tort Liability
- CHAPTER 2 General Police Duties and Authority
- CHAPTER 3 Negligence During Police Emergencies
- CHAPTER 4 False Arrest or Imprisonment
- CHAPTER 5 Liability for Misuse of Weapons
- CHAPTER 6 Assault and Battery
- CHAPTER 7 Malicious Prosecution
- CHAPTER 8 Section 1983 and Other Federal Civil Rights Actions
- CHAPTER 8A Specific Constitutional Rights and Section 1983
- CHAPTER 9 Duty to Protect
- Appendix A State Emergency Vehicle Statutes
- APPENDIX B [RESERVED]
- APPENDIX C [RESERVED]
- Appendix D Immunity in Federal Civil Rights Actions
- Appendix E Factual Synopses of Entrapment Cases by Court
- Appendix F Brady Claims
- Forms

**Weinstein, Korn & Miller CPLR Manual**

- CHAPTER 1 Organization of Civil Practice and the Courts

- CHAPTER 2 Statutes of Limitation

- CHAPTER 3 Jurisdiction, Service and Appearance

- CHAPTER 4 Special Proceedings

- CHAPTER 5 Venue

- CHAPTER 6 Joinder of Claims, Consolidation and Severance

- CHAPTER 7 Parties

- CHAPTER 8 Poor Persons

- CHAPTER 9 Infants and Incompetents

- CHAPTER 10 Contribution

- CHAPTER 11 Comparative Negligence

- CHAPTER 12 Actions Against Persons Jointly Liable

- CHAPTER 13 Mistakes, Defects, Irregularities and Extensions of Time

- CHAPTER 14 Form and Service of Legal Papers; Form of Stipulations

- CHAPTER 15 Motions, Orders and Stays

- CHAPTER 16 Subpoenas, Oaths and Affirmations

- CHAPTER 17 Undertakings

- CHAPTER 18 Property Paid Into Court or Transferred During Litigation

- CHAPTER 19 Remedies and Pleading

- CHAPTER 20 Disclosure

- CHAPTER 21 Accelerated Judgment

- CHAPTER 22 Calendar Practice and Trial Preference

- CHAPTER 23 Trials and Trial Motions

- CHAPTER 24 Judgments

- CHAPTER 25 Former Adjudication (Res Judicata and Collateral Estoppel)

- CHAPTER 26 Appeals

- CHAPTER 27 Enforcement of Judgments

- CHAPTER 28 Provisional Remedies

- CHAPTER 29 Habeas Corpus

- CHAPTER 30 Recovery of Chattel

- CHAPTER 31 Arbitration

- CHAPTER 32 Proceeding Against Body or Officer

- CHAPTER 33 Fees, Costs, Disbursements and Allowances

- CHAPTER 34 Records of Court Clerks and Sealing of Court Records

- CHAPTER 35 Actions Against Villages

- CHAPTER 36 Civil Forfeiture

**NY - New York Codes, Rules and Regulations**

- TITLE 1. DEPARTMENT OF AGRICULTURE AND MARKET

- TITLE 2. DEPARTMENT OF AUDIT AND CONTROL

- TITLE 3. BANKING DEPARTMENT

- TITLE 4. DEPARTMENT OF CIVIL SERVICE

- TITLE 5. DEPARTMENT OF ECONOMIC DEVELOPMENT

- TITLE 6. DEPARTMENT OF ENVIRONMENTAL CONSERVATION

- TITLE 7. DEPARTMENT OF CORRECTIONAL SERVICES

- TITLE 8. EDUCATION DEPARTMENT

- TITLE 9. EXECUTIVE DEPARTMENT

- TITLE 10. DEPARTMENT OF HEALTH

- TITLE 11. INSURANCE DEPARTMENT

- TITLE 12. DEPARTMENT OF LABOR

- TITLE 13. DEPARTMENT OF LAW

- TITLE 14. DEPARTMENT OF MENTAL HYGIENE

- TITLE 15. DEPARTMENT OF MOTOR VEHICLES

- TITLE 16. DEPARTMENT OF PUBLIC SERVICE

- TITLE 17. DEPARTMENT OF TRANSPORTATION

- TITLE 18. DEPARTMENT OF SOCIAL SERVICES

- TITLE 19. DEPARTMENT OF STATE

- TITLE 20. DEPARTMENT OF TAXATION AND FINANCE

- TITLE 21. MISCELLANEOUS

- TITLE 22. JUDICIARY

- TITLE 23. DEPARTMENT OF FINANCIAL SERVICES

**United States Code Service**

- TITLE 1. GENERAL PROVISIONS (§§ 1 — 213)

- TITLE 2. THE CONGRESS (Chs. 1 — 65)

- TITLE 3. THE PRESIDENT (§§ 1 — 471)

- TITLE 4. FLAG AND SEAL, SEAT OF GOVERNMENT, AND THE STATES (§§ 1 — 146)

- TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES (§§ 101 — 13146)

- TITLE 6. DOMESTIC SECURITY (§§ 101 — 1534)

- TITLE 7. AGRICULTURE (Chs. 1 — 116)

- TITLE 8. ALIENS AND NATIONALITY (Chs. 1 — 15)

- TITLE 9. ARBITRATION (§§ 1 — 402)

- TITLE 10. ARMED FORCES (§§ 101 — 20605)

- TITLE 11. BANKRUPTCY (§§ 101 — 1532)

- TITLE 12. BANKS AND BANKING (Chs. 1 — 55)

- TITLE 13. CENSUS (§§ 1 — 402)

- TITLE 14. COAST GUARD (§§ 101 — 5115)

- TITLE 15. COMMERCE AND TRADE (Chs. 1 — 123)

- TITLE 16. CONSERVATION (Chs. 1 — 101)

- TITLE 17. COPYRIGHTS (§§ 101 — 1511)

- TITLE 18. CRIMES AND CRIMINAL PROCEDURE (§§ 1 — 6005)

- TITLE 19. CUSTOMS DUTIES (Chs. 1 — 29)

- TITLE 20. EDUCATION (§§ 1 — 10013)

- TITLE 21. FOOD AND DRUGS (§§ 1 — 2404)

- TITLE 22. FOREIGN RELATIONS AND INTERCOURSE (Chs. 1 — 112)

- TITLE 23. HIGHWAYS (§§ 101 — 611)

- TITLE 24. HOSPITALS AND ASYLUMS (Chs. 1 — 10)

- TITLE 25. INDIANS (Chs. 1 — 50)

- TITLE 26. INTERNAL REVENUE CODE (§§ 1 — 9834)

- TITLE 27. INTOXICATING LIQUORS (§§ 1 — 228)

- TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE (§§ 1 — 5001)

- TITLE 29. LABOR (Chs. 1 — 32)

- TITLE 30. MINERAL LANDS AND MINING (Chs. 1 — 32)

- TITLE 31. MONEY AND FINANCE (§§ 101 — 9705)

- TITLE 32. NATIONAL GUARD (§§ 101 — 908)

- TITLE 33. NAVIGATION AND NAVIGABLE WATERS (Chs. 1 — 55)

- TITLE 34. CRIME CONTROL AND LAW ENFORCEMENT (§§ 10101 — 60912)

- TITLE 35. PATENTS (§§ 1 — 390)

- TITLE 36. PATRIOTIC AND NATIONAL OBSERVANCES, CEREMONIES, AND ORGANIZATIONS (§§ 101 — 300113)

- TITLE 37. PAY AND ALLOWANCES OF THE UNIFORMED SERVICES (§§ 101 — 1015)

- TITLE 38. VETERANS' BENEFITS (§§ 101 — 8528)

- TITLE 39. POSTAL SERVICE (§§ 101 — 5605)

- TITLE 40. PUBLIC BUILDINGS, PROPERTY, AND WORKS (§§ 101 — 18304)

- TITLE 41. PUBLIC CONTRACTS (§§ 101 — 8707)

- TITLE 42. THE PUBLIC HEALTH AND WELFARE (Chs. 1 — 164)

- TITLE 43. PUBLIC LANDS (Chs. 1 — 50)

- TITLE 44. PUBLIC PRINTING AND DOCUMENTS (§§ 101 — 4104)

- TITLE 45. RAILROADS (Chs. 1 — 22)

- TITLE 46. SHIPPING (§§ 101 — 80509)

- TITLE 47. TELECOMMUNICATIONS (Chs. 1 — 16)

- TITLE 48. TERRITORIES AND INSULAR POSSESSIONS (Chs. 1 — 20)

- TITLE 49. TRANSPORTATION (§§ 101 — 80504)

- TITLE 50. WAR AND NATIONAL DEFENSE (§§ 1 — 4852)
- TITLE 51. NATIONAL AND COMMERCIAL SPACE PROGRAMS (§§ 10101 — 71302)
- TITLE 52. VOTING AND ELECTIONS (Subts. I — III)
- TITLE 53. Reserved
- TITLE 54. NATIONAL PARK SERVICE AND RELATED PROGRAMS (§§ 100101 — 320303)

**INCARCERATED INDIVIDUAL RULE BOOK**

**BACK**

**THIS PAGE INTENTIONALLY
LEFT BLANK**

2009 WL 3672105
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Walter RUSYNIAK; and Anthony Rusyniak, Plaintiffs,
v.
Ena Paola GENSINI; Gunilla De Montaigu;
and Concha Futura, S.A., Defendants.

No. 5:07–CV–0279 (GTS/GHL).
|
Oct. 30, 2009.

**Attorneys and Law Firms**

Costello, Cooney & Fearon, PLLC, Robert M. Smith, Esq.,
Kristen L. Pickard, Esq., of Counsel, Syracuse, NY, for
Plaintiffs.

Hiscock & Barclay, LLP, Robert A. Barrer, Esq., of Counsel,
Syracuse, NY, for Defendants Gunilla De Montaigu and
Concha Futura, S.A.

Greene, Hershdorfer & Sharpe, Victor J. Hershdorfer, Esq., of
Counsel, Syracuse, NY, for Defendant Ena Paola Gensini.

***MEMORANDUM DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently pending before the Court in the above-
captioned action is a motion by Defendants containing two
alternative requests for relief: (1) a request for reconsideration
of Part III.D.5 of the Court's Decision and Order of May
5, 2009, denying Defendants' request for dismissal of all of
Plaintiffs' claims due to the doctrine of *forum non conveniens;*
and (2) a request for dismissal of the First Cause of Action
of Plaintiffs' Third Amended Complaint (asserting a claim of
violation of Panama law) as barred by the three-year statute of
limitations set forth in the certified translation of Article 1652
of the Panamanian Code. (Dkt. No. 61.) For the reasons set
forth below, Defendants' motion is granted in part, and denied
in part.

**I. REQUEST FOR RECONSIDERATION**
To the extent that Defendants' motion requests
reconsideration of the Court's decision to denying their

request for dismissal of all of Plaintiffs' claims due to the
doctrine of *forum non conveniens,* that motion is untimely.

Defendants' motion was filed on June 8, 2009. (Dkt. No.
61.) The Order of which reconsideration was sought was
entered on May 5, 2009. (Dkt. No. 56.) *See* N.D.N.Y.
L.R. 7.1(g) (setting ten-day deadline for motions for
reconsideration). Defendants' attempt to characterize the
Order of which reconsideration is sought as being the Court's
Text Order of May 29, 2009, is unconvincing. That Text
Order merely indicates the extent to which Plaintiffs' signed
Third Amended Complaint fails to comport with the Court's
Decision and Order of May 5, 2009 (and was issued in
response to Plaintiffs' request for guidance). Even liberally
construed, Defendants' motion for reconsideration expressly
and repeatedly challenges the substance of the Court's Order
of May 5, 2009 (specifically, Part III.D.5. thereof), and only
that Order. (*See, e.g.,* Dkt. No. 61, Part 2, ¶ 4; Dkt. No. 61,
Part 4, Points II and III.)

In any event, even if the Court were to consider the
merits of Defendants' motion for reconsideration, the Court
would deny that motion as without cause: there has been
no intervening change of controlling law, no previously
unavailable evidence, and there exists no clear error of law or
manifest injustice with regard to the relevant portion of the
prior decision in question.

For these reasons, Defendants' request for reconsideration is
denied.

**II. REQUEST FOR DISMISSAL OF FIRST CAUSE OF
ACTION**
To the extent that Defendants' motion alternatively requests
the dismissal of the First Cause of Action of Plaintiffs'
Third Amended Complaint (asserting a claim of violation of
Panama law) as barred by the three-year statute of limitations
set forth in the certified translation of Article 1652 of the
Panamanian Code, that motion is granted.

Defendants are correct that Plaintiffs failed, in their response
papers, to oppose this request. (*See* Dkt. No. 63.) The closest
that Plaintiffs come to opposing this request is when, in a
supplemental letter request, they (correctly) point out that
Defendants have improperly broadened the target of their
Panamanian-statute-of-limitations argument from Plaintiffs'
First Cause of Action to all of Plaintiffs' causes of action.
(Dkt. No. 66; *see also* Dkt. No. 61, Part 4, at 7–8.) As a
result of Plaintiffs' failure to address Defendants' argument

regarding Plaintiffs' First Cause of Action, Defendants' burden on this motion is somewhat lightened with regard to that cause of action. [1]

**\*2** After carefully reviewing the parties' motion papers, and Plaintiffs' Third Amended Complaint, the Court finds that Defendants have met their lightened burden on their motion to dismiss Plaintiff's First Cause of Action. The Court reaches this conclusion based on substance of the certified translation provided by Defendants (i.e., the certified translation of Article 1652 of the Commercial Code of the Republic of Panama). (Dkt. No. 61, Part 3.) The Court reaches this conclusion also based on the reasons stated in Part III.D.7.a. of the Court's Order of May 5, 2009. (*See* Dkt. No. 56, at 44–47.) *See also Rusyniak v. Gensini,* 629 F.Supp.2d 203, 231–33 (N.D.N.Y.2009) (Suddaby, J.).

For these reasons, Defendants' request to dismiss Plaintiff's First Cause of Action is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion (Dkt. No. 61) is **GRANTED in part,** and **DENIED in part,** in accordance with the above Decision and Order; and it is further

**ORDERED** that Defendants' motion for reconsideration of the May 5, 2009 Decision and Order is **DENIED,** however, the First Cause of Action of Plaintiffs' Third Amended Complaint (Dkt. No. 58) is **DISMISSED** as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code; and it is further

**ORDERED** that counsel for all parties are directed to attend an in-person pretrial conference on **NOVEMBER 19, 2009 at 2:00 p.m.** in Judge Suddaby's chambers in Syracuse, New York, at which counsel are directed to appear with settlement authority.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3672105

---

## Footnotes

1    *See Cossey v. David,* 04–CV–1501, 2007 WL 3171819, at \*7 (N.D.N.Y. Oct. 29, 2007) (Lowe, M.J. *adopted by* Scullin, J.) (noting that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are deemed to have consented to defendants' argument, and thus defendants must only satisfy "their modest burden of demonstrating entitlement to the relief requested through that argument"); *Saunders v. Ricks,* 03–CV–598, 2006 WL 3051792, at \*9 (N.D.N.Y. Oct. 18, 2006) (Lowe, M.J. *adopted by* Hurd, J.) ("By failing to respond to Defendants' first argument ... Plaintiff may be deemed to have consented to that argument under Local Rule of Practice 7.1(b)(3). Thus, Plaintiff's claim against those Defendants may be dismissed on that ground alone [provided that] ... Defendants have met their modest threshold burden to demonstrate entitlement to the relief requested in their motion for summary judgment."); *Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at \*27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2473509
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donna ESTE–GREEN, Plaintiff,
v.
Michael J. ASTRUE, Comm'r
of Social Security, Defendant.

No. 5:09–CV–0722 (GTS/GHL).
|
Aug. 7, 2009.

West KeySummary

1    **Social Security** 🔑 Exhaustion of other
remedies

Representative for a social security payee
failed to exhaust her administrative remedies
before filing her claim since there was no
final decision after a hearing. The Social
Security Administration (SSA) garnished the
representative's wages after attempting to work
out a repayment plan since the representative
was overpaid on behalf of the payee. The
representative contacted the SSA to complain
about the garnishment and shortly thereafter, the
representative filed the action with the Small
Claims Court, without having a hearing or final
order from the Commissioner of Social Security.
Social Security Act, § 205(g), 42 U.S.C.A. §
405(g).

29 Cases that cite this headnote

**Attorneys and Law Firms**

Donna Este–Green, Hempstead, NY, pro se.

Hon. Andrew T. Baxter, United States Attorney for the
Northern District of New York, William H. Pease, Esq.,
Assistant U.S. Attorney, of Counsel, Syracuse, NY.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1**  Currently before the Court, in this *pro se* action filed
by Donna Este–Green ("Plaintiff") to recover funds allegedly
owed to her by the Social Security Administration, is a motion
by Michael J. Astrue, Commissioner of Social Security
("Defendant") to dismiss the action pursuant to Fed.R.Civ.P.
12(b)(1) for lack of subject matter jurisdiction due to
Plaintiff's failure to exhaust her administrative remedies
before filing suit. (Dkt. No. 3.) Plaintiff has not opposed the
motion. For the reasons set forth below, Defendant's motion
is granted, and Plaintiff's Complaint is dismissed.

**I. BACKGROUND**

**A. Procedural History**
On or around May 27, 2009, Plaintiff brought this
action in Small Claims Court, City of Ithaca, County
of Tompkins ("Small Claims Court"), naming the Social
Security Administration ("SSA") as Defendant. (Dkt. No. 1,
Part 3.) Liberally construed, Plaintiff's Complaint alleges that
the SSA wrongfully garnished her wages in the amount of
five hundred seventy-one dollars ($571.00). (*Id.*) On June 24,
2009, the United States Attorney's Office for the Northern
District of New York removed this case from the Small
Claims Court, pursuant to the exclusive original jurisdiction
of the District Court under 42 U.S.C. §§ 405(g)-(h) and
1383(c)(3), "because Plaintiff's claim appeared to relate to the
payment of Social Security benefits to her as representative
payee for the account of Albertina King." (Dkt. No. 3.)

**B. Relevant Facts**
In 1999, Plaintiff had been acting as representative payee
for Albertina King, who had been receiving Social Security
benefits under Title II of the Act. (Dkt. No. 3.) In October
1999, the SSA issued an overpayment to Plaintiff on Albertina
King's account. (*Id.*) In March 2001, the SSA and Plaintiff
arranged a repayment plan pursuant to which Plaintiff agreed
to repay the amount due the SSA in fifty-dollar installments
beginning on April 15, 2001. (*Id.*) In October 2007, the
SSA sent a letter to Plaintiff, in which the SSA stated the
following: (1) Plaintiff had been overpaid as representative
payee; (2) Plaintiff had the right to question the decision
about her overpayment and to ask that the SSA not recover

the overpayment; (3) the SSA's past attempts to recover this overpayment had not been successful; (4) there are actions that the SSA can take to recover the money, including wage garnishment; (5) Plaintiff could prevent the wage garnishment by taking certain steps within sixty days of the letter, including repaying the debt, agreeing to a definite repayment plan and repaying the debt according to that plan, asking the SSA to review the finding that she owed the amount stated and that the SSA had the right to collect it, asking the SSA to waive collection of the overpayment, or asking the SSA to review its plan to collect up to fifteen percent of her disposable pay. (*Id.*) In addition, the letter informed Plaintiff of how she could repay the SSA. (*Id.*)

**\*2** Plaintiff returned this letter to the SSA, stating that the overpayment was not her fault. (*Id.*) Plaintiff indicated that she could not afford the amount owed, and that the money that she received was used for the payee's burial. (*Id.*) In March, 2008, Plaintiff spoke with a supervisor of the SSA by telephone and negotiated a repayment plan agreement for installments of twenty dollars ($20). (*Id.*) On April 29, 2008, the SSA sent Plaintiff a billing statement indicating her debt of five hundred seventy-one dollars ($571), and that a minimum payment of twenty dollars ($20) must reach the SSA by May 15, 2008. (*Id.*) On May 6, 2008, documentation issued in connection with the administrative garnishment of Plaintiff's wages was returned to the SSA from Plaintiff's employer, stating that Plaintiff was no longer employed there. (*Id.*)

On April 17, 2009, the SSA issued an order to Plaintiff's employer to garnish her wages. (*Id.*) Plaintiff's employer completed this order and returned it to the SSA. (*Id.*) On May 21, 2009, Plaintiff contacted the SSA to complain about the garnishment. (*Id.*) Shortly thereafter, Plaintiff filed this action with the Small Claims Court, and the Complaint was mailed to the SSA on May 27, 2009.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing Motions to Dismiss for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing Fed.R.Civ.P. 12[b][1] ). With regard to a challenge to a determination by the Social Security Administration, "[a]ny individual may seek judicial review under 42 U.S.C. § 405(g) 'after any final decision of the Commissioner of

Social Security made after a hearing to which he was a party, irrespective of the amount in controversy." *Diagnostic Cardioline Monitoring of New York, Inc. v. Leavitt,* 171 F. App'x. 374, 375 (2d Cir. March 17, 2006) (citing 42 U.S.C. § 405[g] ). "This final-decision-after-a-hearing requirement is critical to the federal court's grant of subject matter jurisdiction over these claims." *Leavitt,* 171 F. App'x. at 375 (citing *Weinberger v. Salfi,* 422 U.S. 749, 763–64 [1975] ). "In the absence of a final decision after a hearing, the federal court lacks subject matter jurisdiction to entertain the claim, and it must be dismissed." *Id.* (citation omitted).

### B. Standard Governing Unopposed Motions

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3). Defendant's motion to dismiss was properly filed, and Plaintiff has failed to oppose them. Therefore, the Court must determine whether Defendant has met her burden to "demonstrate entitlement to the relief requested" under Local Rule 7.1(b)(3). [1] An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [2] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [3]

## III. ANALYSIS

**\*3** After carefully considering the file in this action, including Defendant's motion to dismiss and Plaintiff's Complaint, the Court finds that Defendant has met his lightened burden on his unopposed motion: he has demonstrated entitlement to the relief requested by presenting an argument that is facially meritorious. Even if the Court were to subject Defendant's motion to the more rigorous scrutiny appropriate for contested motions, the Court would find that Defendant has met his burden: Plaintiff failed to exhaust her administrative remedies prior to commencing this action. [4] As a result, the Court lacks subject matter jurisdiction over Plaintiff's claims, and her Complaint is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Complaint is *DISMISSED.* The clerk is directed to enter judgment and close the case.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2473509

---

## Footnotes

1    *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

2    *See, e.g., Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.), *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109–1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96–CV–1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95–CV–989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

3    *See, e.g., Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at *7–8, 2003 WL 22143709(N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05–CV–0380, 2007 U.S. Dist. LEXIS 24356, at *5–6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04–CV–1311, 2007 U.S. Dist. LEXIS 26583, at *28–29 & n. 40, 2007 WL 951447 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03–CV–0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

4    As noted by Defendant in his motion to dismiss, because Plaintiff failed to follow the required SSA regulations before bringing this action, there is no final decision for the Court to review under 42 U.S.C. § 405(g).

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

Case 9:23-cv-01570-LEK-ML    Document 28    Filed 02/20/25    Page 102 of 150

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan MENA, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

 **\*1**  Plaintiff Jonathan Mena, who is currently incarcerated and proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against Correction Officer Benjamin Eason ("Defendant"), alleging violations of the Eighth Amendment. Now before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts [1]

On September 9, 2012, while incarcerated at the Otis Bantum Correctional Center ("OBCC") on Rikers Island, Plaintiff was placed in an intake cell in the OBCC's receiving area, which he shared with two other individuals. (56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell was extremely cold, vermin-infested, and too small to accommodate three men. (See Doc. No. 54-1 ("Compl.") 4, 8.) Plaintiff further alleges that these conditions, coupled with the constant noise made by the two other inmates, prevented him from sleeping for the entire 60-hour period that he was held in the cell. (See id. at 4.) Consequently, he asked Defendant, who was on duty, to

transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.) According to Plaintiff, Defendant responded that there was "nothing he could do" about the situation. (Id. ¶ 9; see also Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC to complain about his experience in the cell. (See Compl. at 7.) The New York City Department of Correction ("DOC") has an administrative grievance procedure, known as the Inmate Grievance and Request Program ("IGRP"), for inmates housed at facilities such as the OBCC. The IGRP, which was available and in effect at all times relevant to this lawsuit, requires that inmates first file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within ten days of the complained-of act. (56.1 Stmt. ¶¶ 11–12; see also Doc. No. 54-3 ("IGRP Directive") § IV(D)(1).) The IGRC then attempts to resolve the grievance informally within five days, and if the grievance is not informally resolved, then the inmate may request a formal hearing before the IGRC. (56.1 Stmt. ¶ 12; see also IGRP Directive §§ IV(G)-(H).) An inmate may appeal the IGRC's decision to the commanding officer, or her designee, and subsequent appeals may be taken to the Central Office Review Committee ("CORC"). (56.1 Stmt. ¶ 13; see also IGRP Directive §§ IV(I)-(J).) The CORC's decision is the final and binding decision of the DOC; if an inmate disputes the decision of the CORC, he may independently appeal to the Board of Correction. (IGRP Directive at 47.) Finally, if an inmate does not receive a timely disposition at any point throughout the grievance process, he has the option of either granting an extension of time to the relevant decisionmaker (i.e., the IGRC, the commanding officer, or the CORC) or appealing and proceeding to the next level of review. (56.1 Stmt. ¶ 14; see also IGRP Directive §§ IV(D)(9)(b), (10).)

 **\*2**  As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (See Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (See Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a number of his substantive allegations against the OBCC staff, but did not state any information relevant to the grievance process. (Id. at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues

Case 9:23-cv-01570-LEK-ML    Document 28    Filed 02/20/25    Page 103 of 150

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

### B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

### II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund,* No.

Case 9:23-cv-01570-LEK-ML     Document 28     Filed 02/20/25     Page 104 of 150

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

03-cv-7421 (KMK), 2005 WL 1026330, at *1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

## III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at *3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at *6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days[,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at *7

(S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at *8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

**\*4** At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question," but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ____, ____, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that

are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858–59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at *4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D)(9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g.*, *Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

Case 9:23-cv-01570-LEK-ML    Document 28    Filed 02/20/25    Page 106 of 150

to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

### IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3948100

---

### Footnotes

1    The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d. Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the record even when" a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

2    Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by  Neural Magic, Inc. v. Meta Platforms, Inc.,    D.Mass.,
March 6, 2023

2004 WL 3691343

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Michael DEVITO, Plaintiff,

v.

SMITHKLINE BEECHAM CORPORATION

d/b/a Glaxosmithkline, Defendant.

No. Civ.A. 02–CV–0745NPM.

|

Nov. 29, 2004.

**Attorneys and Law Firms**

De Lorenzo Law Firm, LLP, Schenectady, New York, for
Plaintiff, Scott Lieberman, of counsel.

Phillips Lytle, LLP, Buffalo, New York, for Defendant, Paul
B. Zuydhoek, of counsel.

King & Spalding, LLP, Atlanta, Georgia, for Defendant,
Chilton D. Varner, of counsel.

*MEMORANDUM–DECISION AND ORDER*

MCCURN, Senior J.

I. Preclusion Motion ................................................................................ 4

A. Standard for Admissibility of Expert Evidence ........................................... 6

1. Deborah L. Sweeney ........................................................................... 9

a. Qualified? ...................................................................................... 9

2. Kevin W. George, M.D. ........................................................................ 10

3. James T. O'Donnell ............................................................................. 13

a. General Causation ............................................................................. 14

i. Qualified? ...................................................................................... 14

ii. Reliability of Testimony? ..................................................................... 17

b. Specific Causation ............................................................................. 19

c. Warnings ........................................................................................ 19

i. Qualified? ...................................................................................... 20

ii. Reliability of Testimony? ..................................................................... 22

II. Summary Judgment Motion................................................................................ 24

Introduction

**\*1** "Between 1987 and 1997, the percentage of Americans being treated for depression more than tripled nationwide[.]" Shankar Vedantam, *Report Shows Big Rise in Treatment for Depression,* WASH. POST,, Jan. 9, 2002, at A01. In December 1996, plaintiff Michael DeVito became one of those Americans. At that time, his primary care physician prescribed Paxil, a selective serotonin reuptake inhibitor ("SSRI"). Mr. DeVito takes Paxil to this day, despite attempts through the years to discontinue. DeVito claims that he cannot discontinue taking Paxil because he has become "dependent" upon it. Affidavit of Robert E. Glanville (Oct. 20, 2003), exh. A thereto (Complaint) at 2, ¶ 9. More specifically, plaintiff alleges that he has been unable to stop taking Paxil due to what he characterizes as "withdrawal reactions" or "dependency/withdrawal syndrome," which according to plaintiff "includ[es], but [is] not limited to, dizziness, nausea, shaking, electrical-like shocks and horrible dreams." *Id.* at 2, ¶¶ 7 and 6.

In this lawsuit plaintiff alleges five causes of action against the manufacturer of Paxil, defendant Smithkline Beecham Corporation d/b/a Glaxo Smithkline ("Glaxo"): (1) fraud; (2) negligence; (3) strict liability; (4) breach of express warranty; and (5) breach of implied warranty. There is a great deal of overlap among these five causes of action. The thrust of plaintiff's complaint is that Glaxo failed to adequately warn of "Paxil's addictive qualities and dependency/withdrawal characteristics[.]" *Id.* at 6, ¶ 19; *see also id.* at 3, ¶ 11b); at 7, ¶ 25; and at 8, ¶ 33. [1]

Discovery is complete and Glaxo is now moving for summary judgment pursuant to Fed.R.Civ.P. 56. Pursuant to Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S .Ct. 2786 (1993), Glaxo is also moving to preclude the testimony of the three witnesses whom plaintiff is proffering as experts. The court will address Glaxo's motion to preclude first because if any or all of the proffered testimony is inadmissible, then that could significantly impact Glaxo's summary judgment motion in terms of the admissible proof before the court. *See Toole v. Toshin Co. Ltd ., No. 00–CV–821S, 2004 WL 2202580, at \*4 (W.D.N.Y. Sept. 29, 2004)* (granting defense motion to preclude testimony

of plaintiff's expert and declining to consider his report on summary judgment motion).

I. Preclusion Motion

Each of the five causes of action which plaintiff alleges requires him to prove causation. "Under settled New York law, whether the action is pleaded in strict products liability, breach of warranty or negligence, the plaintiff in a products liability case bears the burden of establishing that a defect in the product as a substantial factor in causing the injury." *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 434 (W.D.N.Y.2001) (internal quotation marks and citation omitted). Common law fraud likewise "requires a showing of proximate causation, such that the injury is the natural and probable consequence of the defrauder's misrepresentation or ... the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,* 183 F.Supp.2d 559, 580 (E.D.N.Y.2002) (internal quotation marks and citation omitted). To establish causation here, plaintiff DeVito "must offer admissible testimony regarding *both general causation," i.e.* that Paxil can cause the type of symptoms of which plaintiff complains when attempting to discontinue that drug, *"and specific causation," i.e.* that Paxil actually caused DeVito's alleged symptoms upon discontinuation of Paxil. *See Amorgianos v. National Railroad Passenger Corporation,* 303 F.3d 256, 268 (2d Cir.2002) (citation omitted) (emphasis added); *see also Blanchard v. Eli Lilly & Co.,* 207 F.Supp.2d 308, 314 (D . Vt.2002) (citations omitted) ("Plaintiffs ... must prove both general and specific causation in order to prevail on their claim, that is, that Prozac is capable of causing and in fact did cause the deaths in this case."). In the context of Paxil litigation, "the general causation question is limited to whether discontinuation from Paxil is *capable* of causing dizziness, agitation, anxiety, nausea, etc." *In re Paxil Litigation,* 218 F.R.D. 242, 249 (C.D.Cal.2003). Specific causation, on the other hand, focuses on whether a plaintiff can "prove that [his] symptoms came from Paxil, as opposed to, for example, the relapse of the underlying illness or the consumption or discontinuation of other drugs." *Id.*

**\*2** To establish causation, plaintiff DeVito seeks to offer the testimony of three "expert" witnesses: (1) Mr. John T. O'Donnell, a pharmacist with a Master's Degree in nutrition; (2) Dr. Kevin W. George, a former psychiatrist of plaintiff's; and (3) Ms. Deborah Sweeney, plaintiff's treating nurse

*Devito v. Smithkline Beecham Corp., Not Reported in F.Supp.2d (2004)*

practitioner. Glaxo is seeking to "preclude ... [these] experts from offering any opinion that: (I) Paxil causes substance dependence, or is either addictive or habit-forming; or (ii) that plaintiff is addicted to Paxil or has developed substance dependence as a result of taking it." Memorandum of Law in Support of Glaxosmithkline's Motion to Preclude Plaintiff's Experts' Testimony Pursuant to Fed.R.Evid. 702 and *Daubert* ("Def. Preclude Memo.") at 4. In preparation for trial, each of these witnesses has been deposed and Mr. O'Donnell has provided an "expert" report on plaintiff's behalf. Apart from these witnesses, plaintiff proffers no other causation evidence.

To support his theory that Paxil is defective due to an inadequate warning, plaintiff is relying solely upon the deposition testimony and "expert" report of Mr. O'Donnell. Glaxo argues for the preclusion of "[h]is warnings 'opinions' " because O'Donnell is not qualified to testify on that issue and even if he were, "his opinions are neither reliable nor scientific." Def. Preclude Memo. at 24.

A. Standard for Admissibility of Expert Evidence

There is a two-part inquiry in deciding the admissibility of expert evidence. First, in accordance with Fed.R.Evid. 702, "[t]he court should admit specialized expert testimony if the witness is 'qualified as an expert by knowledge, skill, experience, training or education' and his testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' " *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 746 (2d Cir.1998) (quoting Fed.R.Evid. 702); *see also Kass v. West Bend Company,* No. 02–CV–3719, 2004 WL 2475606, at *4 (E.D.N.Y. Nov. 4, 2004) (citation omitted) ("As a threshold matter, the court must examine [the witness'] qualifications to testify about alternative ... designs."). Second, "in the form of an opinion or otherwise," the court must insure that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In other words, whether an expert witness' "opinion is ultimately admissible depend on the reliability and relevance of the proffered testimony." *Kass,* 2004 WL 2475606, at *5.

In this regard, the Supreme Court has instructed the by now oft-cited rule that a district court must act as "a gatekeeper to exclude invalid and unreliable expert testimony." *Bonton v. City of New York,* No. 03 Civ. 2833, 2004 WL 2453603, at *2 (S.D.N.Y. Nov. 3, 2004) (citation omitted). This gatekeeping obligation applies whether the proposed expert testimony is based upon scientific knowledge, "technical," or some other "specialized" knowledge. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999) (citing Fed.R.Evid. 702). As with other types of evidence, the court must also bear in mind that under Rule 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." Fed.R.Evid. 403. In *Daubert* the Supreme Court soundly reasoned that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the *judge* in weighing possible prejudice against probative force under Rule 403 ... *exercises more control over experts* than over lay witnesses." *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2798 (quotation marks and citation omitted) (emphasis added). Finally, it should be noted that "[t]he proponent of expert evidence must establish admissibility under Rule 104(a) of the Federal Rules of Evidence by a preponderance of the proof." *Bonton,* 2004 WL 2453603, at *2 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76 (1987)). This burden is the same regardless of whether the issue is the "qualification[s] of a person to be a witness, ..., or the admissibility of the evidence" itself. Fed.R.Evid. 104(a). In the present case, this requires plaintiff Devito to prove by a preponderance of the evidence that each of the three witnesses whom he is proposing to call as an expert qualify as such; *and* that the proposed testimony of each is admissible.

**\*3** "In assessing expert qualifications, '[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications.' " *Kass,* 2004 WL 2475606, at *4 (quoting *Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222, 227 (N.D.N.Y.1994) *aff'd* 101 F.3d 682 (2d Cir.1996)). "So long as the expert stays within the 'reasonable confines of his subject area,' the expert can fairly be considered to possess the 'specialized knowledge' required by Rule 702." *Id.* (quoting *Lappe,* 857 F.Supp. at 227) (other citation omitted).

"In *Daubert,* the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (1) whether the theory or technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community."

*Id.* (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97). "These factors do not, however, constitute a 'definitive checklist or test.' " *Id.* (quoting *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796). "Rather, they are intended to be applied flexibly, depending on the particular circumstances of the particular case at issue." *Id.* (citing *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

In *Kumho,* the Supreme Court recognized that "when evaluating the admissibility of non-scientific expert testimony, the standard under Rule 702 is a liberal and flexible one, and the factors outlined in *Daubert* are merely guidelines in aiding a court's reliability determination." *Houlihan v. Marriott International, Inc.,* No. 00 Civ. 7439, 2003 WL 22271206, at *3 (S.D.N.Y. Sept. 30, 2003) (citing *Kumho,* 526 U.S. at 151, 119 S.Ct. at 1175). "For example, in some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods." *Id.* (citation omitted). Regardless of which criteria a court applies to assess the admissibility of expert testimony, "the Supreme Court has made clear that the district court has a 'gatekeeping function' under Rule 702—is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " *Amorgianos,* 303 F.3d at 265 (quoting *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786) (other citation omitted). Finally, it should be noted that " 'the gatekeeping inquiry must be tied to the facts of a particular case[.]' " *Id.* at 266 (quoting *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

### 1. Deborah L. Sweeney

#### a. Qualified?

Glaxo's motion to preclude the testimony of Ms. Sweeney[2] requires little if any analysis. Glaxo is moving to preclude her testimony because it does not believe she is qualified to testify as an expert. Additionally, Glaxo contends that "her proposed opinion lacks a reliable scientific foundation." Def. Preclude Memo. at 26. Plaintiff did not bother to respond to this aspect of Glaxo's motion. This lack of response amounts to a concession by plaintiff that the court should exclude Ms. Sweeney's testimony. *Cf. Green v. Doukas,* No. 97 CIV.8288CMGAY, 2001 WL 767069, at *8 (S.D.N.Y. June 22, 2001) (granting motion to preclude expert testimony because "plaintiff's failure to oppose the motion suggests ... it has merit[ ]"). Accordingly, the court grants Glaxo's motion to the extent it is seeking preclusion of Ms. Sweeney's testimony. *See Amaker v. Coombe,* No. 96 Civ. 1622, 2003 WL 21222534, at *6 (S.D .N.Y. May 27, 2003) (granting

motion to preclude where plaintiff defaulted); *see also Martinez v. Sanders,* No. 02 Civ.5624, 2004 WL 1234041, at *3 (S.D.N.Y. June 3, 2004) (because plaintiff did not respond to motion, court granted same on "default" theory) (and cases cited therein).

### 2. Kevin W. George, M.D.

**\*4** Glaxo also seeks to preclude the testimony of Dr. Kevin George. Dr. George is a psychiatrist who saw Mr. DeVito in consultation twice—once on November 2, 2001 and again on December 13, 2001. Glanville Aff., exh. G thereto at 51 and 76.

Glaxo is not challenging Dr. George's qualifications, but rather the nature of his testimony. Glaxo is seeking to exclude Dr. George's testimony because he "has expressly disavowed all of the opinions that plaintiff ascribed to him in plaintiff's expert disclosure." Def. Preclude Memo. at 25. Further, even if Dr. George had not disavowed those opinions, Glaxo argues that his "proposed testimony [is] inadmissible because it lacks any reliable scientific foundation." *Id.*

Plaintiff's response focuses almost exclusively on Dr. George's qualifications, which are not in dispute. As to the opinions which plaintiff attributes to Dr. George, the sum total of plaintiff's response is that any alleged "shortcomings" in that testimony go to weight and credibility, and not to admissibility. Memorandum of Law in Opposition to Defendant's Motion to Preclude Plaintiff's Experts ("Pl. Opp'n Preclude") at 5. The court disagrees. As will be seen, Dr. George's purported opinion testimony does not have simply a few "shortcomings." It has glaring holes in terms of reliability, not the least of which is Dr. George's unequivocal deposition testimony disavowing that he made the opinions which plaintiff claims he did.

In his expert disclosure plaintiff specifically identifies Dr. George as an "expert" whom he intends to call at the time of trial. Glanville Aff., exh. E thereto at 1. According to plaintiff's expert disclosure, Dr. George will testify as follows:

> that in his opinion, within a degree of reasonable medical certainty, ... [1] the plaintiff is experiencing withdrawal reactions from the drug Paxil and that each time the plaintiff attempts to 'wean' himself off of the drug or

to lower the dosage of the drug, the plaintiff experiences said withdrawal; 2) ... the plaintiff's withdrawal signs and symptoms are a result of the plaintiff ingesting Paxil; and 3) ... the plaintiff has sustained injury in that he has been unable to discontinue the use of Paxil and has been caused to suffer the signs and symptoms of the withdrawal syndrome associated with the use and attempted discontinuance of Paxil.

Glanville Aff., exh E thereto. Dr. George is confining his opinions to how Paxil allegedly *effected* plaintiff DeVito—not whether Paxil is *capable generally* of causing the symptoms of which DeVito complains. Therefore, although the plaintiff did not specify the purpose for which he is offering Dr. George's testimony, presumably it is being offered on the issue of specific causation.

As noted earlier, ordinarily once a court finds a witness qualified as an expert, the next issue is the admissibility of that witness' opinion testimony. Here, however, it appears that each of the opinions which plaintiff attributes to Dr. George have been expressly disavowed in his deposition. Dr. George was asked point blank whether he had formed any of the three opinions quoted above, and whether he was prepared to testify to same. Each time he answered no. *See* Glanville Aff., exh. G thereto at 88–91. Obviously, if Dr. George has not formed the opinions which plaintiff is ascribing to him, necessarily he has no foundation, scientific or otherwise, for same. Accordingly, the court excludes the opinion testimony outlined above which plaintiff is attributing to Dr. George.

**\*5** Even if Dr. George had not expressly disavowed the opinions set forth above, the court still must exclude his testimony. The crux of each of these opinions is that plaintiff DeVito has "withdrawal reactions," or "withdrawal signs and symptoms" caused when he attempts to discontinue or taper below a certain dosage of Paxil. Glanville Aff., exh. E thereto. Dr. George's deposition testimony did not so state such. To be sure, Dr. George did testify that he used "Paxil withdrawal" as a *"label* to capture what [DeVito] was describing that he had been experiencing." *Id.,* exh. G thereto at 59 (emphasis added). When later in his deposition Dr. George was pressed as to whether or not he diagnosed plaintiff "as suffering from Paxil withdrawal [,]" he reiterated that he *"applied that label*

to describe the symptoms that [DeVito] reported in relation to tapering Paxil." *Id.* at 102 (emphasis added).

There is an obvious difference between labeling a symptom which a patient describes and actually diagnosing that person. Significantly, Dr. George did *not* diagnosis plaintiff with Paxil withdrawal. Perhaps that is because "Paxil withdrawal is not a formal diagnosis within DMS–IV[.]" *Id.* at 94. ("The DSM–IV is the Diagnostic and Statistical Manual, the fourth revision of it, that psychiatrists generally base their diagnoses on." *Id.*) And, "[t]here is no criteria for diagnosing somebody with Paxil withdrawal." *Id.* at 60. For example, there are no "objective tests or assessments," aside from skin inspection for signs of sweating, "that could have been done to determine whether those reports [by DeVito] were genuine[.]" *Id.* at 62. So, Dr. George simply took plaintiff's description of his symptoms at "face value," and made no attempt to determine whether [DeVito's] report of those symptoms was genuine [.]" *Id.* at 62 and 79.

In light of the foregoing, even if Dr. George were inclined to testify that Paxil specifically caused the symptoms which plaintiff claims it did, there is no foundation for this testimony. What is particularly revealing in this regard is Dr. George's candor when asked: "Have you ever made any determination as to why Mr. DeVito's tapering off of Paxil may be taking longer than some of your other patients?" ' *Id.* at 100. Dr. George replied, "I had *no scientific way,* ..., of explaining why he was having such difficulty tapering off Paxil." *Id.* (emphasis added).

Further, plaintiff DeVito saw Dr. George in the latter's capacity as a treating psychiatrist. Thus, as is plain from Dr. George's deposition, he was concerned primarily with the symptoms of which plaintiff complained, not determining the underlying cause. *See Munafo v. Metropolitan Transportation Authority,* Nos. 98 CV–4572, 00–CV–0134, 2003 WL 21799913, at \*19 (E.D.N.Y. Jan. 22, 2003). Had Dr. George been focusing on the underlying cause, undoubtedly he would have performed a differential diagnosis, which "typically includes a physical examination, clinical tests, and a thorough case history." *Zwillinger v. Garfield Slope Housing Corp .,* No. CV 94–4009, 1998 WL 623589, at \*19 (E.D.N.Y. Aug. 17, 1998) (citations omitted). But, Dr. George did not. Without a differential diagnosis, specific causation cannot be established. *See id.* ("To establish specific causation, other possible causes for the symptoms experienced by plaintiff should be excluded by performing a 'differential diagnosis." ')

3. James T. O'Donnell

**\*6** Glaxo argues that the court must preclude O'Donnell's testimony for two reasons. First, he is not qualified as an expert as to the issues upon which he is being asked to opine—general and specific causation and the adequacy of the Paxil warnings. Second, even if he does qualify as an expert, Glaxo contends that the court should preclude his opinions because they lack the requisite scientific foundation and are otherwise unreliable. Plaintiff responds that O'Donnell's "experience and credentials are impressive [,]" whether the issue is his qualifications to testify as an expert on causation or as an expert on warnings. Pl. Preclude Memo. at 4. Plaintiff further responds that regardless of whether O'Donnell is opining on causation or warnings, any alleged "shortcomings" in that testimony go to "weight and credibility, and not [to] ... admissibility." *Id.* at 5 (citation omitted).

Plaintiff DeVito is offering O'Donnell's testimony on three separate issues, which require different areas of expertise. The court will examine O'Donnell's qualifications as to each.

a. General Causation
Glaxo offers a host of reasons as to why O'Donnell "is not an 'expert' on scientific issues concerning general *or* specific causation" with respect to SSRIs or Paxil. Def. Preclude Memo. at 7 (emphasis added). All of these reasons have merit.

i. Qualified?
This is not the first court to be confronted with the issue of whether Mr. O'Donnell is qualified to give an expert opinion here. In *Newton v. Roche Laboratories, Inc.,* 243 F.Supp.2d 672 (W.D.Tex.2002), the court found that he was *not* qualified to render an opinion on general causation. *Id.* at 679. There, the parents of a 16 year old girl claimed that Accutane, a prescription acne medication manufactured by the defendant, caused or precipitated the onset of their daughter's schizophrenia. In much the same way plaintiff DeVito is offering O'Donnell's testimony here, the plaintiffs in *Newton* offered O'Donnell as an expert "to testify regarding general causation, *i.e.,* that Accutane is pharmacologically capable of causing schizophrenia." *Id.* at 677. After outlining a number of ways in which O'Donnell's qualifications were lacking, the court expressly found that he was not qualified to render such an opinion.

To support that conclusion, the *Newton* court relied upon O'Donnell's deposition testimony, which is substantially similar to his deposition testimony in this case. For example, O'Donnell testified in *Newton,* as he did here, that "he has never earned an M.D., a Ph.D., or any degree in pharmacology." *Id.* at 677; *see also* O'Donnell Dep'n at 24–25 and 53. Yet, he "still holds himself out as a 'doctor' and a pharmacologist[.]" *Id.* As in *Newton,* "O'Donnell ... [continues to] grant[ ] himself the title of 'doctor' in reliance upon his Pharm.D degree, [which] he conceded in his deposition that in the majority of pharmacy schools, th[at] ... degree is 'an entry-level degree' that pharmacists must have to ... even practice pharmacy." *Id.* at 677 n. 2 (citation omitted); *see also* O'Donnell Dep'n at 24–25. In contrast, to obtain a degree in pharmacology usually three or four years of graduate school is required. O'Donnell Dep'n at 25–26. O'Donnell did get a graduate degree, but it was not in pharmacology. O'Donnell's formal education consists of a four year degree in pharmacy and a Master's Degree in clinical nutrition. *Id.* at 27.

**\*7** In addition to questioning O'Donnell's background generally, the *Newton* court pointed out his "lack [of] appropriate pharmacological training relevant to the issues" therein, *i.e.* "Accutane, Vitamin A, schizophrenia, or psychosis[.]" *Id.* at 678. The same may be said here. There is no factual basis upon which this court can find that O'Donnell is an expert regarding SSRIs generally, not to mention Paxil or discontinuation of Paxil. Indeed, as his deposition testimony shows, O'Donnell's asserted expertise on these subjects is non-existent. *See id.* at 21, 24; 38–40; and 45.

Given that SSRIs are a fairly recently developed class of drugs, understandably they were not the subject of O'Donnell's course work as an undergraduate, or when getting his Master's Degree in nutrition. *Id.* at 21 and 24. Since that time, O'Donnell has done nothing to advance his own knowledge as to SSRIs generally or Paxil in particular. When directly asked if he had "done any clinical research whatsoever relating to antidepressants," O'Donnell replied that he had not. *Id.* at 38. He responded the same way when asked if he had "done any scientific research concerning Paxil or SSRI antidepressants[.]" *Id.* at 39. Moreover, O'Donnell conceded that the first time he "review[ed] ... scientific literature in connection with Paxil discontinuation symptoms[ ]" was for this case. *Id.* at 40–41.

This is the sort of "litigation-drive expertise" which courts have eschewed. To illustrate, the court in *Mancuso,* 967

F.Supp. at 1443, reasoned that it could not "help but conclude that [plaintiff's expert] was not in fact an expert ... when he was hired by the plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such be selective review of the relevant literature." This appears to be an apt description of what Mr. O'Donnell attempted to do in the present case.

The court stresses that it is no single factor which is dispositive of whether O'Donnell qualifies as an expert on the issue of general causation. Rather, it is the cumulative effect of the foregoing which convinces the court that O'Donnell lacks the lack of relevant "knowledge, skill, experience, training or education" to testify as an expert on the issue of general causation *vis-a-vis* the discontinuation of Paxil. As he admitted, O'Donnell is *not* a pharmacologist. Therefore, he cannot, as he does in his "expert report," opine to a "reasonable pharmacological certainty," that plaintiff is experiencing "withdrawal toxicity reactions from Paxil[.]" O'Donnell Rep. Clearly, allowing a pharmacist/nutritionist such as O'Donnell to testify in that way would run afoul of the rule that an expert must stay "within the reasonable confines of his subject area[.]" ' *Kass,* 2004 WL 2475606, at *2475606, at *4 (internal quotation marks and citations omitted). Simply put, the court agrees with the court's comment in *Newton* that "[p]laintiff's attempts to present O'Donnell as an expert pharmacologist [is] ... an extremely bold stretch." *Newton,* 243 F.Supp.2d at 279. [3]

ii. Reliability of Testimony?

**\*8** O'Donnell's lack of education, training and background as to Paxil becomes even more apparent when viewed in terms of the opinions which he has rendered in this case. That is so because a "court's evaluation of qualifications is not always entirely distinct from the court's evaluation of reliability." *Pearson v. Young,* No. CIV–99–1559–F, 2002 WL 32026157, at *3 (W.D.Okla. Jan. 17, 2002).

O'Donnell's opinion as to causation is that "DeVito is experiencing withdrawal toxicity reactions from Paxil, and indeed, each time he attempts to wean or lower the dosage, he again experiences such infinity [sic]." Glanville Aff., exh. E thereto. O'Donnell states that when plaintiff's dosage of Paxil is lowered, he suffers from the following "withdrawal signs and symptoms [:] anxiety, jitery [sic], agitation, nausea, drowsiness, generalized discomfort and vertigo[.]" O'Donnell Report at 2. "For this opinion to be admissible, O'Donnell must have a *reliable scientific basis* to support not only

(1) a casual relationship between" Paxil and the enumerated side-effects, "but also (2) his assertion that [Paxil] will produce these side-effects." *See Newton,* 243 F.Supp.2d at 679 (emphasis added). O'Donnell's report and deposition testimony are void of a scientific basis to support either of those assertions.

In terms of publications, O'Donnell testified that he was the editor of a non-peer reviewed book entitled "Drug Injury Liability, Analysis and Prevention." *Id.* at 98–99. That book contained a mere six sentences on SSRIs, including the two sentences on Paxil. *Id.* at 99. Given that minimal reference to SSRIs, it is not surprising that that book contains nothing about discontinuation symptoms. *See id.* It further appears that he has performed absolutely no research regarding Paxil, much less its discontinuation. *Id.* at 38–39. What is more, O'Donnell has done no scientific or clinical research of any kind for almost two decades. The last time he did any such research was in he "early '80s as part of a pharmacology lab sabbatical," where he was looking at vitamins and critical care drugs used in Intensive Care Units. *Id.* at 36.

In light of the foregoing, to allow plaintiff to rely upon Mr. O'Donnell's opinions as to general causation clearly would violate *Daubert'* s "requirement that the expert testify to scientific knowledge—conclusions support by good grounds for each step in the analysis[.]" ' *Amorgianos,* 303 F.3d at 267 (citations and quotation marks omitted).

b. Specific Causation

It stands to reason that if Mr. O'Donnell lacks (which he does) the qualifications to testify as to general causation, he lacks the qualifications to testify as to specific causation. His opinion as to specific causation suffers from the same infirmities, detailed above, as to general causation. Accordingly, the court finds that Mr. O'Donnell does not have the requisite qualifications to testify as to specific causation; and even if he did, his opinions in that regard are unreliable.

c. Warnings

**\*9** Glaxo contends that because O'Donnell "lacks any pertinent qualifications[,]" Def. Memo. at 14, he should not be allowed to testify that in his opinion the "lack of ... a precaution and warning about withdrawal risk and the need to taper [when discontinuing Paxil] renders the product defective due to an inadequate warning. *See* O'Donnell Report at 3. Plaintiff did not directly respond to this argument. Included in the list of highlighted credentials in plaintiff's

memorandum of law is that Mr. O'Donnell "is currently involved in the teaching of New Drug Development and Regulations [.]" Pl. Opp'n Memo. at 2. However, plaintiff does not explain, or cite to any portion of O'Donnell's deposition explaining, how or why this position qualifies him to testify as an expert on warnings.

As with the other issues upon which plaintiff intends to offer O'Donnell's testimony, plaintiff baldly retorts that O'Donnell's "extensive experience qualifies as specialized knowledge gained through experience, training, or education[.]" Pl. Memo. at 4 (internal quotation marks and citations omitted). And, once again, he relies upon the argument that Glaxo's reasons to preclude O'Donnell's testimony regarding warnings should be saved for trial, *i.e.* they should be used to attack O'Donnell's credibility and the weight which the jury might give to his opinions regarding Paxil warnings.

### i. Qualified?

O'Donnell "claim[s] to be an expert in drug labeling[.]" O'Donnell Dep'n at 90. Presumably he is including drug warnings within the province of this supposed expertise. In any event, to qualify as an expert it is not enough for a witness to simply declare that he is one. Federal Rule of Evidence 702 requires more. As plaintiff acknowledged, a witness must satisfy the court that he has a certain amount of "knowledge, skill, experience, training or education [ ]" in the relevant field before he can be deemed an expert. *See Nora Beverages,* 164 F.3d at 746 (internal quotation marks and citation omitted). Close examination of O'Donnell's deposition testimony reveals that he is lacking in each of those areas when it comes to the subject of the adequacy of prescription drug warnings.

O'Donnell's claimed expertise admittedly is "through experience," not through formal education. O'Donnell Deposition at 90–92. His experience consists primarily of having attended continuing education ("CE") programs, where drug labeling was a topic. *Id.* Those CE programs were to satisfy his pharmaceutical and nutritionist CE requirements, however; and he was unable to elaborate on the substance of same. *See id.* Furthermore, O'Donnell has not consulted with any pharmaceutical company "concerning the labeling for any antidepressant[.]" *Id.* at 96. O'Donnell agrees "that the FDA [Food and Drug Administration] is the highest authority on how drugs are labeled in this country[,]" but he has also never consulted with them "concerning the labeling for any antidepressant. *Id.* For that matter, O'Donnell has not worked for or consulted with the FDA in any capacity. *See*

Glanville Aff. at 9, ¶ 39. Thus, O'Donnell's experience in this area is extremely limited.

**\*10** Moreover, O'Donnell made two especially damaging concessions which seriously undermine the suggestion that he is an expert as to the adequacy of prescription drug warnings. O'Donnell readily agreed "that in assessing the adequacy of a label for a prescription drug, the expert rendering the opinion generally should be familiar with the clinical trials data on the drug as it relates to the side effect concerning which he is opining[.]" *Id.* at 192. Yet, O'Donnell frankly admitted that he had not reviewed any of the Paxil clinical trials data. *See id.* Similarly, O'Donnell conceded that "generally to reach a conclusion regarding the adequacy of a label for a prescription drug, the expert rendering the opinion should be familiar with at least a majority of the available medical literature on the drug as it relates to the side effect on which he is opining[.]" *Id.* at 193. Despite the foregoing, O'Donnell went on to testify that he has "not read the specific literature [ ]" relating to discontinuation symptoms of Paxil. *Id.* 193 and 45. In fact, he has only read "abstracts" of articles. *Id.* at 46–47. Finally, Mr. O'Donnell has not lectured on, or written anything (peer reviewed or not) about, "Paxil discontinuation symptoms apart from [his] export [sic] report in this case[.]" *Id.* at 45. As the foregoing clearly shows, Mr. O'Donnell does not "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[,]" which here is the adequacy of prescription drug warnings and Paxil in particular. *See Kumho Tire,* 526 U .S. at 152, 119 S.Ct. at 1176.

Mr. O'Donnell may qualify as an expert in the fields of pharmacy or nutrition, but that is not the purpose for which his testimony is being offered here. Instead, his testimony is being offered on the adequacy of Paxil warnings. O'Donnell has never been drafter or been asked to draft a warning for any antidepressant, let alone for Paxil. Likewise, he has not done any research or written any publications on prescription drug warnings. Thus, whether judged in terms of his education or experience, does not rise to the level of "expertise ... that the jury would expect from a bona fide warnings expert." *See Robertson v. Norton,* 148 F.3d 905, 907 (8 [th] Cir.1998) (internal quotation marks omitted).

In sum, O'Donnell is being called upon to testify regarding the adequacy of the Paxil warning, an issue which clearly is outside the "reasonable confine [s] of his subject area[s,]" which are pharmacy and nutrition. *See Kass,* 2004 WL 2475606, at *4 (internal quotation marks and citations

omitted). Therefore, because O'Donnell does *not* "possess the specialized knowledge required by Rule 702[,]" the court finds that he is not qualified as an expert on the issue of the adequacy of the Paxil warning. *See id.*

ii. Reliability of Testimony?

**\*11**  Given the nature of the claims which plaintiff is alleging in this case, plainly there is a close relationship between excluding the causation opinion and excluding the warning opinions which are being offered by O'Donnell. *Miller v. Pfizer, Inc.,* 196 F.Supp.2d 1062 (D.Kan.2002), *aff'd on other grounds,* 356 F.3d 1326 (10th Cir.2004), *cert. denied,* 125 S.Ct. 40 (Oct. 4, 2004), provides a good example of how a decision to preclude causation "expert" testimony impacts upon a decision to also preclude warning testimony. The plaintiff parents in *Miller* were suing the manufacturer of Zoloft, another SSRI, alleging that it caused their son to commit suicide. Similar to the present case, the plaintiffs in *Miller* asserted state law claims for strict liability for marketing defects and misrepresentations, and negligence for failure to test and warn. The court held that an "eminent" psychiatrist and neuropsychopharmacologist's proposed testimony regarding general causation, *i.e.* that Zoloft causes suicide, did not satisfy the *Daubert* criteria for admissibility because, in short, "he lack[ed] sufficient expertise on the issue of suicide." *Id.* at 1087 and 1088. The *Miller* court, as is this court, was then confronted with the issue of whether that same doctor could qualify as an expert who would opine "that Zoloft labels do not adequately warn against the danger of SSRI-induced suicide." *Id.* at 1088. After finding that the doctor was not an expert on that issue, the court soundly reasoned, "[i]f the jury will hear no evidence that [Paxil] causes [withdrawal symptoms/addictive], it cannot possibly conclude that [Paxil] labels do not adequately warn against the danger that [Paxil] causes [such condition.]" *Id.* at 1089. That reasoning applies with equal force here. Even if O'Donnell qualifies as a prescription drug warning expert, because neither O'Donnell nor Dr. George (plaintiff's only proof as to causation) qualify to testify about causation, the former's warning testimony "would essentially be irrelevant to any larger issues in the case." *See id.* Accordingly, there is no need to analyze whether O'Donnell's opinions as to warnings pass muster under *Daubert.*

In short, plaintiff DeVito has not sustained his burden of proving by a preponderance of the evidence that Mr. O'Donnell is qualified to render an opinion as to general

causation, specific causation, or the adequacy of Paxil warnings. Even if O'Donnell could somehow be deemed to have the requisite "specialized knowledge" to testify as to any or all of those issues, "courts do not have to credit opinion evidence connected to data 'only by the *ipse dixit* of the expert.' " *Prohaska,* 138 F.Supp.2d at 438 (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. (1997)). That is all O'Donnell has to rely upon; simply because he offers an opinion which he claims to be valid, plaintiff assumes it is so. This court will not, however.

**\*12**  For the reasons set forth above, the court grants in its entirety Glaxo's motion to preclude the testimony of Mr. O'Donnell; Dr. George; and Ms. Sweeney.

II. Summary Judgment Motion

The court assumes familiarity with the Supreme Court's trilogy of cases clarifying the governing legal standards on summary judgment motions, and sees no need to repeat those standards herein. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)

It is an understatement to say that the wholesale exclusion of the testimony of O'Donnell, George and Sweeney significantly impacts plaintiff DeVito's case. As discussed at the outset causation is a necessary element of each of the five causes of action which plaintiff is alleging herein. Because plaintiff's only causation evidence has been excluded, it necessarily follows that Glaxo is entitled to summary judgment in its favor. *See Kass,* 2004 WL 2475606 (after granting motion to exclude testimony of plaintiff's claimed expert regarding the feasibility of alternative designs, court granted defense summary judgment motion because plaintiff could not satisfy the critical element of a design defect cause of action); and *Zwillinger,* 1998 WL 623589 (where plaintiff claimed that her exposure to defendants' carpeting causes her to develop immunotoxicity syndrome, court granted summary judgment in defendants' favor after excluding the of doctor's testimony, which was plaintiff's only causation evidence).

To conclude, the court hereby GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline, to preclude the testimony of James O'Donnell; Dr. Kevin George; and Ms. Deborah Sweeney. The court further GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline for summary judgment pursuant to

Fed.R.Civ.P. 56 dismissing all of plaintiff Michael DeVito's claims as against it.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 3691343

---

## Footnotes

1    The present action, which has been referred to as a "tag-along action," is one of a number throughout the country wherein plaintiffs are alleging that Glaxo knew of the hazardous side effects of Paxil and either concealed, misrepresented or failed to warn of them. *See In re Paxil Products Liability Litigation, 296 F.Supp.2d 1374* (Judicial Panel on Multidistrict Litigation 2003). In mid-February 2004, this court was advised that the Judicial Panel on Multidistrict Litigation ("the Panel") had conditionally transferred this action to the United States District Court fo the Central District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407." Glaxo moved to vacate that conditional transfer as it pertained to the present case. When plaintiff did not respond, on June 15, 2004, the Panel vacated that conditional transfer as it relates to Mr. DeVito.

2    During her deposition Ms. Sweeney unequivocally testified, "I'm not a physician. I'm not a nurse practitioner." Glanville Aff ., exh H thereto at 123. She holds an associates' degree in nursing, a bachelor of science degree in health and human services, and a nurse practitioner's degree." *Id.* at 12, 17, 35–36. Thus, to refer to Ms. Sweeney as "Doctor Sweeney, as plaintiff does throughout his expert disclosure, is not only a misstatement but directly contradicts Sweeney's own testimony. Plaintiff's tendency to exaggerate or overstate certain things, as will be seen, is not limited to the qualifications of his experts.

3    O'Donnell's insistence on holding himself out as a pharmacologist, *see* O'Donnell Dep'n at 54, ignores at least one fundamental distinction between pharmacology and pharmacy—a distinction which is critical here. "Pharmacology can be fairly described as the study of the effect of drugs on living organisms. Pharmacy, on the other hand, is the profession of preparing and dispensing drugs." *Newton, 243 F.Supp.2d at 677, n. 1.* It is self-evident that there is a vast difference in the education, experience and skill necessary to obtain degrees in these two different fields.

Apparently O'Donnell recognizes this distinction because in *Newton* he "admitted ... that from approximately 1982 to 1985, he intentionally and falsely advertised that he possessed a doctorate in pharmacology in an attempt to attract more interest from lawyers for his consulting expert business." *Id.* at 677, n .3 (citation omitted). He made that same admission in this deposition herein. O'Donnell Dep'n at 28–31. O'Donnell did change this advertisement because, in his words, it was "incorrect." *Id.* at 29. This court cannot overlook what at best appears to be a serious lapse in judgment, however.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4979409
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Michael VELEZ, Plaintiff,
v.
C.O. LASSITER, Defendant.

No. 23-CV-4758 (CS)
|
Signed December 4, 2024

**Attorneys and Law Firms**

Kimberly Hunt Lee, Sokoloff Stern LLP, Poughkeepsie, New York, Counsel for Defendant.

**OPINION & ORDER**

Seibel, United States District Judge

**\*1** Before the Court is the motion for summary judgment of Defendant Correction Officer ("C.O.") Lassiter. (ECF No. 43.) For the following reasons, the motion is GRANTED.

**I. BACKGROUND**

**A. Facts**

The following facts are taken from Defendant's Local Civil Rule ("L.R.") 56.1 Statement and the supporting exhibits, and are undisputed unless otherwise noted. [1]

On April 10, 2023, Plaintiff Michael Velez was a pre-trial detainee at the Dutchess County Jail, when he got into a fight with Justin Deines, another inmate. (ECF No. 44 ("D's 56.1 Stmt.") ¶¶ 1-3.) Plaintiff admits that as he was passing Deines in a hallway, he punched Deines in the face with a closed fist, and the two continued to throw punches at each other. (P's Depo. at 62:18-64:13; D's 56.1 Stmt. ¶ 6.) Plaintiff and Deines fought for about five seconds before two C.O.s arrived and instructed them to stop fighting, but they did not comply with the officers' instructions. (P's Depo. at 64:18-65:8; D's 56.1 Stmt. ¶ 8.) One of the responding C.O.s grabbed Deines, and as Deines was falling toward the floor, Plaintiff continued to throw punches at him. (P's Depo. at 65:18-66:10; D's 56.1 Stmt. ¶ 9.) Defendant tried to stop Plaintiff by grabbing his shoulder or jumpsuit. (P's Depo. at 66:17-67:16; D's 56.1

Stmt. ¶ 10.) According to Plaintiff, he stopped throwing punches once Deines was on the ground, and at "that split second" Defendant "picked [Plaintiff] up and slammed [him]" to the floor, (P's Depo. at 69:15-20), causing them both to fall, (D's 56.1 Stmt. ¶ 10). Plaintiff sustained a laceration to his head requiring five staples. (P's Depo. at 59:25-60:15.) At a disciplinary hearing, Plaintiff pled guilty to initiating the fight and received a ticket. (*Id.* at 87:21-89:24; D's 56.1 Stmt. ¶ 11.) There were no prior incidents between Plaintiff and Deines, and Plaintiff did not file a formal grievance about the incident. (D's 56.1 Stmt. ¶¶ 12-13.)

**B. Procedural History**

**\*2** Plaintiff commenced this lawsuit pursuant to 42 U.S.C. § 1983 on June 5, 2023. Plaintiff alleges that Defendant violated his constitutional rights by using "unnecessary deadly force" when Defendant lifted him up and slammed him on the ground. (Compl. at 1.) [2]

Defendant answered on August 29, 2023. (ECF No. 12.) On September 27, 2023, the Court held an initial conference and set a discovery schedule. (*See* Minute Entry dated Sept. 27, 2023.) On December 18, 2023, Defendant informed the Court that Plaintiff had not provided any discovery. (ECF No. 20.) The Court held a discovery conference on December 21, 2023, at which the Court extended all discovery deadlines, and instructed Plaintiff to provide his initial disclosures by January 4, 2024. (*See* Minute Entry dated Dec. 21, 2023.) On January 11, 2024, Defendant informed the Court that Plaintiff had not provided his initial disclosures, (ECF No. 22), and the Court ordered Plaintiff to show cause why he should not be sanctioned for failing to comply, (ECF No. 23). In a letter dated January 7, 2024 but docketed on January 16, 2024, Plaintiff asked the Court for time to obtain counsel, (ECF No. 24), and the Court instructed Plaintiff that he would have to proceed without a lawyer until he retains one and granted him one final extension to February 1, 2024 to make the Rule 26 disclosures, (ECF No. 25). On February 9, 2024, Defendant informed the Court that Plaintiff had provided authorization to obtain medical records but had not provided initial disclosures or responded to Defendant's demand for production of documents or interrogatories. (ECF No. 26.) With leave from the Court, Defendant filed a motion for sanctions on February 26, 2024, (*see* ECF Nos. 27, 29-33). Defendant later withdrew the motion for sanctions upon receipt of Plaintiff's discovery responses. (ECF Nos. 37-38.)

On June 14, 2024, Defendant filed a pre-motion letter in anticipation of a motion for summary judgment. (ECF No. 40.) Plaintiff did not appear at the pre-motion conference, (*see* Minute Entry dated July 2, 2024), but the Court mailed Plaintiff a copy of the minute entry and the docket sheet including the briefing schedule for Defendant's motion. The instant motion followed. (*See* ECF No. 43.) Plaintiff has not opposed the motion. [3]

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a). "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255; *see Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) ("When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor."). "In considering a motion for summary judgment, the Court cannot render credibility assessments, which are reserved for the jury." *Jordan v. Gifford*, No. 19-CV-1628, 2022 WL 3106965, at *21 (D. Conn. Aug. 4, 2022).

**\*3** The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials ...." *Fed. R. Civ. P.* 56(c)(1). Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the ... declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). "If a party fails ... to properly address another party's assertion of fact as required by *Rule* 56(c), the court may ... consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." *Fed. R. Civ. P.* 56(e).

In addition, *pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). But "[a] *pro se* party's bald assertion, unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Walker v. Vaughan*, 216 F. Supp. 2d 290, 296-97 (S.D.N.Y. 2002).

"Where, as here, a motion for summary judgment is unopposed by a *pro se* plaintiff, courts may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial, and in doing so, may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement." *Murray v. Dabo*, No. 22-CV-4026, 2024 WL 1421119, at *4 (S.D.N.Y. Feb. 2, 2024), *report and recommendation adopted*, 2024 WL 964599 (S.D.N.Y. Mar. 5, 2024). Thus, the Court "may grant an unopposed motion for summary judgment against a *pro se* plaintiff if: (1) the *pro se* plaintiff has received adequate notice that failure to file a proper opposition may result in dismissal of the case; and (2) the facts as to which there is no genuine dispute show that the moving party is entitled to a judgment as a matter of law." *Id.* "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). Here Defendant served Plaintiff with the required

notice, pursuant to L.R. 56.2, (*see* ECF No. 45), so I turn to whether the facts show no genuine dispute that Defendant is entitled to judgment.

## III. **DISCUSSION**

**\*4**  The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion of available administrative remedies "must be complete prior to commencement of suit" and "[t]he fact that a grievance is filed, or the process is completed, subsequent to commencement of suit will not salvage an otherwise premature filing." *Chalif v. Spitzer*, No. 05-CV-1355, 2008 WL 1848650, at \*13 (N.D.N.Y. Apr. 23, 2008). "The administrative review process requiring exhaustion is defined not by the PLRA, but by the prison grievance process itself – that is, the rules of the particular institution where the inmate is housed govern any assessment of administrative exhaustion." *Rodriguez v. City of N.Y.*, No. 21-CV-1384, 2023 WL 2368985, at \*3 (S.D.N.Y. Mar. 6, 2023).

Although exhaustion is generally mandatory, the Supreme Court has identified three circumstances under which administrative remedies may be deemed "unavailable" to an inmate, such that an inmate is not required to exhaust. *See Ross v. Blake*, 578 U.S. 632, 642 (2016).

An administrative remedy is *de facto* unavailable and, thus, exhaustion is not required: (1) where the process operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) where the process is so opaque that it becomes, practically speaking, incapable of use; and (3) when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Rodriguez*, 2023 WL 2368985, at \*3. "If the defendant has met its burden of establishing the existence and applicability of the grievance policy, the *plaintiff* bears the burden of establishing *de facto* unavailability." *Saeli v. Chautauqua Cnty.*, 36 F.4th 445, 453 (2d Cir. 2022) (emphasis in original).

Defendant argues that Plaintiff's claims should be dismissed because he failed to file a grievance. (ECF No. 57 ("D's Mem.") at 8-9.) Indeed, a sergeant from the Dutchess County Sheriff's Office attests that the Dutchess County Jail has a grievance procedure, that inmates are advised of the procedure when they enter the Jail, and that he searched the Jail's records and found no grievances filed by Plaintiff during his stay at the Jail from March 16, 2023 to August 4, 2023. (ECF No. 49.) Plaintiff does not assert in his complaint or deposition testimony that he filed a grievance. "In light of his *pro se* status," however, "the Court also considers whether Plaintiff's failure to exhaust should be excused under any of the available exceptions." *Dozier v. Genesee Cnty.*, No. 20-CV-6628, 2022 WL 79723, at \*5 (W.D.N.Y. Jan. 7, 2022). Here, Plaintiff has failed to respond to the pending motion, and "there is no information before the Court that could justify the application of an exception." *Id.* Therefore, "summary judgment is proper here because: (1) Defendant[ ] established that Plaintiff failed to exhaust his administrative remedies and, as such, also [his] entitlement to summary judgment on the affirmative defense of Plaintiff's failure to exhaust his administrative remedies as required by the PLRA; and (2) Plaintiff was warned that failure to file an opposition would result in the Court concluding that the motion was unopposed." *Jackson v. Jackson*, No. 16-CV-8516, 2021 WL 981849, at \*5 (S.D.N.Y. Mar. 16, 2021); *see Siler v. Walden*, No. 20-CV-5794, 2023 WL 3871999, at \*5 (S.D.N.Y. June 7, 2023) ("Even while granting Plaintiff – who filed nothing in opposition to this motion – every benefit of the doubt to which a *pro se* litigant is entitled, there is no genuine dispute that Plaintiff failed to exhaust his administrative remedies.... Accordingly, summary judgment is proper here because there is no genuine dispute of material fact that Plaintiff failed to file a grievance."), *reconsideration denied*, No. 20-CV-05794, 2023 WL 5152701 (S.D.N.Y. July 21, 2023).

## IV. **CONCLUSION**

**\*5** For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 43), enter judgment for Defendant, and close the case. [4]

**SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 4979409

---

### Footnotes

1    Plaintiff did not file a responsive Rule 56.1 Statement or any papers in opposition to this motion. L.R. 56.1 requires that the party opposing a motion for summary judgment submit a counterstatement responding to the moving party's statement of material facts, indicating which facts are admitted and which the opposing party contends are in dispute and require trial. L.R. 56.1(b). Under the Local Rule, "[i]f the opposing party ... fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) (citing L.R. 56.1(c)). (Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations. The Court will send Plaintiff copies of all unpublished decisions cited in this Opinion and Order.) *Pro se* litigants are not excused from this requirement. *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 344 n.4 (S.D.N.Y. 2011). As Defendant served Plaintiff with the requisite notice pursuant to L.R. 56.2, (*see* ECF No. 45), I have discretion to consider any properly supported facts in Defendant's L.R. 56.1 Statement admitted. *Vance v. Venettozzi*, No. 18-CV-748, 2021 WL 4145705, at \*3 (N.D.N.Y. Sept. 13, 2021). But granting Plaintiff special solicitude, I have considered his statements in his complaint, (ECF No. 1 ("Compl.")), and his deposition testimony, (ECF No. 46-3 ("P's Depo.")). *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement.").

2    Citations to the Complaint use the pagination generated by the Court's Electronic Case Filing ("ECF") system.

3    On September 16, 2024, Defendant informed the Court that he had sent the motion papers to the wrong address for Plaintiff, and that he had re-served the papers to the correct address. (ECF No. 52.) The Court granted Plaintiff until October 21, 2024 to oppose. (ECF No. 53.) That order was mailed to Plaintiff by the Clerk, and my chambers also sent Plaintiff a copy along with a copy of the docket sheet. The Court thereafter realized that Defendant had neglected to file his memorandum of law on the docket and ordered him to do so. (ECF No. 56.) That order, too, was mailed to Plaintiff by the Clerk, and my chambers also sent Plaintiff a copy along with a copy of the docket sheet. Neither the Court nor Defendant has received any opposition from Plaintiff. (*See* ECF No. 58.)

4    Given my conclusion that summary judgment is proper based on Plaintiff's failure to exhaust, I need not address Defendant's arguments concerning excessive force or qualified immunity. *See Siler*, 2023 WL 3871999, at \*6 n.6 (S.D.N.Y. June 7, 2023); *Johnson v. Koenigsmann*, No. 16-CV-6523, 2018 WL 3145762, at \*1 n.2 (W.D.N.Y. June 27, 2018). I note, however, that this may be one of the rare cases in which summary judgment for the defendant might be proper, given that the officer was justified in using force to get Plaintiff to stop throwing punches and could not reasonably be expected to halt his use of force the "split second" Plaintiff stopped doing so.

---

2024 WL 4979409
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Michael VELEZ, Plaintiff,
v.
C.O. LASSITER, Defendant.

No. 23-CV-4758 (CS)
|
Signed December 4, 2024

**Attorneys and Law Firms**

Kimberly Hunt Lee, Sokoloff Stern LLP, Poughkeepsie, New York, Counsel for Defendant.

**OPINION & ORDER**

Seibel, United States District Judge

**\*1** Before the Court is the motion for summary judgment of Defendant Correction Officer ("C.O.") Lassiter. (ECF No. 43.) For the following reasons, the motion is GRANTED.

**I. BACKGROUND**

**A. Facts**

The following facts are taken from Defendant's Local Civil Rule ("L.R.") 56.1 Statement and the supporting exhibits, and are undisputed unless otherwise noted. [1]

On April 10, 2023, Plaintiff Michael Velez was a pre-trial detainee at the Dutchess County Jail, when he got into a fight with Justin Deines, another inmate. (ECF No. 44 ("D's 56.1 Stmt.") ¶¶ 1-3.) Plaintiff admits that as he was passing Deines in a hallway, he punched Deines in the face with a closed fist, and the two continued to throw punches at each other. (P's Depo. at 62:18-64:13; D's 56.1 Stmt. ¶ 6.) Plaintiff and Deines fought for about five seconds before two C.O.s arrived and instructed them to stop fighting, but they did not comply with the officers' instructions. (P's Depo. at 64:18-65:8; D's 56.1 Stmt. ¶ 8.) One of the responding C.O.s grabbed Deines, and as Deines was falling toward the floor, Plaintiff continued to throw punches at him. (P's Depo. at 65:18-66:10; D's 56.1 Stmt. ¶ 9.) Defendant tried to stop Plaintiff by grabbing his shoulder or jumpsuit. (P's Depo. at 66:17-67:16; D's 56.1

Stmt. ¶ 10.) According to Plaintiff, he stopped throwing punches once Deines was on the ground, and at "that split second" Defendant "picked [Plaintiff up and slammed [him]" to the floor, (P's Depo. at 69:15-20), causing them both to fall, (D's 56.1 Stmt. ¶ 10). Plaintiff sustained a laceration to his head requiring five staples. (P's Depo. at 59:25-60:15.) At a disciplinary hearing, Plaintiff pled guilty to initiating the fight and received a ticket. (Id. at 87:21-89:24; D's 56.1 Stmt. ¶ 11.) There were no prior incidents between Plaintiff and Deines, and Plaintiff did not file a formal grievance about the incident. (D's 56.1 Stmt. ¶¶ 12-13.)

**B. Procedural History**

**\*2** Plaintiff commenced this lawsuit pursuant to 42 U.S.C. § 1983 on June 5, 2023. Plaintiff alleges that Defendant violated his constitutional rights by using "unnecessary deadly force" when Defendant lifted him up and slammed him on the ground. (Compl. at 1.) [2]

Defendant answered on August 29, 2023. (ECF No. 12.) On September 27, 2023, the Court held an initial conference and set a discovery schedule. (See Minute Entry dated Sept. 27, 2023.) On December 18, 2023, Defendant informed the Court that Plaintiff had not provided any discovery. (ECF No. 20.) The Court held a discovery conference on December 21, 2023, at which the Court extended all discovery deadlines, and instructed Plaintiff to provide his initial disclosures by January 4, 2024. (See Minute Entry dated Dec. 21, 2023.) On January 11, 2024, Defendant informed the Court that Plaintiff had not provided his initial disclosures, (ECF No. 22), and the Court ordered Plaintiff to show cause why he should not be sanctioned for failing to comply, (ECF No. 23). In a letter dated January 7, 2024 but docketed on January 16, 2024, Plaintiff asked the Court for time to obtain counsel, (ECF No. 24), and the Court instructed Plaintiff that he would have to proceed without a lawyer until he retains one and granted him one final extension to February 1, 2024 to make the Rule 26 disclosures, (ECF No. 25). On February 9, 2024, Defendant informed the Court that Plaintiff had provided authorization to obtain medical records but had not provided initial disclosures or responded to Defendant's demand for production of documents or interrogatories. (ECF No. 26.) With leave from the Court, Defendant filed a motion for sanctions on February 26, 2024, (see ECF Nos. 27, 29-33). Defendant later withdrew the motion for sanctions upon receipt of Plaintiff's discovery responses. (ECF Nos. 37-38.)

On June 14, 2024, Defendant filed a pre-motion letter in anticipation of a motion for summary judgment. (ECF No. 40.) Plaintiff did not appear at the pre-motion conference, (*see* Minute Entry dated July 2, 2024), but the Court mailed Plaintiff a copy of the minute entry and the docket sheet including the briefing schedule for Defendant's motion. The instant motion followed. (*See* ECF No. 43.) Plaintiff has not opposed the motion. [3]

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255; *see Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) ("When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor."). "In considering a motion for summary judgment, the Court cannot render credibility assessments, which are reserved for the jury." *Jordan v. Gifford*, No. 19-CV-1628, 2022 WL 3106965, at *21 (D. Conn. Aug. 4, 2022).

**\*3** The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials ...." *Fed. R. Civ. P. 56(c)(1).* Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the ... declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). "If a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." *Fed. R. Civ. P. 56(e).*

In addition, *pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). But "[a] *pro se* party's bald assertion, unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Walker v. Vaughan*, 216 F. Supp. 2d 290, 296-97 (S.D.N.Y. 2002).

"Where, as here, a motion for summary judgment is unopposed by a *pro se* plaintiff, courts may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial, and in doing so, may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement." *Murray v. Dabo*, No. 22-CV-4026, 2024 WL 1421119, at *4 (S.D.N.Y. Feb. 2, 2024), *report and recommendation adopted*, 2024 WL 964599 (S.D.N.Y. Mar. 5, 2024). Thus, the Court "may grant an unopposed motion for summary judgment against a *pro se* plaintiff if: (1) the *pro se* plaintiff has received adequate notice that failure to file a proper opposition may result in dismissal of the case; and (2) the facts as to which there is no genuine dispute show that the moving party is entitled to a judgment as a matter of law." *Id.* "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). Here Defendant served Plaintiff with the required

notice, pursuant to L.R. 56.2, (*see* ECF No. 45), so I turn to whether the facts show no genuine dispute that Defendant is entitled to judgment.

### III. DISCUSSION

**\*4** The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion of available administrative remedies "must be complete prior to commencement of suit" and "[t]he fact that a grievance is filed, or the process is completed, subsequent to commencement of suit will not salvage an otherwise premature filing." *Chalif v. Spitzer*, No. 05-CV-1355, 2008 WL 1848650, at \*13 (N.D.N.Y. Apr. 23, 2008). "The administrative review process requiring exhaustion is defined not by the PLRA, but by the prison grievance process itself – that is, the rules of the particular institution where the inmate is housed govern any assessment of administrative exhaustion." *Rodriguez v. City of N.Y.*, No. 21-CV-1384, 2023 WL 2368985, at \*3 (S.D.N.Y. Mar. 6, 2023).

Although exhaustion is generally mandatory, the Supreme Court has identified three circumstances under which administrative remedies may be deemed "unavailable" to an inmate, such that an inmate is not required to exhaust. *See Ross v. Blake*, 578 U.S. 632, 642 (2016).

An administrative remedy is *de facto* unavailable and, thus, exhaustion is not required: (1) where the process operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) where the process is so opaque that it becomes, practically speaking, incapable of use; and (3) when prison administrators thwart inmates from taking advantage of a grievance process through

machination, misrepresentation, or intimidation.

*Rodriguez*, 2023 WL 2368985, at \*3. "If the defendant has met its burden of establishing the existence and applicability of the grievance policy, the *plaintiff* bears the burden of establishing *de facto* unavailability." *Saeli v. Chautauqua Cnty.*, 36 F.4th 445, 453 (2d Cir. 2022) (emphasis in original).

Defendant argues that Plaintiff's claims should be dismissed because he failed to file a grievance. (ECF No. 57 ("D's Mem.") at 8-9.) Indeed, a sergeant from the Dutchess County Sheriff's Office attests that the Dutchess County Jail has a grievance procedure, that inmates are advised of the procedure when they enter the Jail, and that he searched the Jail's records and found no grievances filed by Plaintiff during his stay at the Jail from March 16, 2023 to August 4, 2023. (ECF No. 49.) Plaintiff does not assert in his complaint or deposition testimony that he filed a grievance. "In light of his *pro se* status," however, "the Court also considers whether Plaintiff's failure to exhaust should be excused under any of the available exceptions." *Dozier v. Genesee Cnty.*, No. 20-CV-6628, 2022 WL 79723, at \*5 (W.D.N.Y. Jan. 7, 2022). Here, Plaintiff has failed to respond to the pending motion, and "there is no information before the Court that could justify the application of an exception." *Id.* Therefore, "summary judgment is proper here because: (1) Defendant[ ] established that Plaintiff failed to exhaust his administrative remedies and, as such, also [his] entitlement to summary judgment on the affirmative defense of Plaintiff's failure to exhaust his administrative remedies as required by the PLRA; and (2) Plaintiff was warned that failure to file an opposition would result in the Court concluding that the motion was unopposed." *Jackson v. Jackson*, No. 16-CV-8516, 2021 WL 981849, at \*5 (S.D.N.Y. Mar. 16, 2021); *see Siler v. Walden*, No. 20-CV-5794, 2023 WL 3871999, at \*5 (S.D.N.Y. June 7, 2023) ("Even while granting Plaintiff – who filed nothing in opposition to this motion – every benefit of the doubt to which a *pro se* litigant is entitled, there is no genuine dispute that Plaintiff failed to exhaust his administrative remedies.... Accordingly, summary judgment is proper here because there is no genuine dispute of material fact that Plaintiff failed to file a grievance."), *reconsideration denied*, No. 20-CV-05794, 2023 WL 5152701 (S.D.N.Y. July 21, 2023).

### IV. CONCLUSION

**\*5** For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 43), enter judgment for Defendant, and close the case. [4]

**SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 4979409

---

## Footnotes

1    Plaintiff did not file a responsive Rule 56.1 Statement or any papers in opposition to this motion. L.R. 56.1 requires that the party opposing a motion for summary judgment submit a counterstatement responding to the moving party's statement of material facts, indicating which facts are admitted and which the opposing party contends are in dispute and require trial. L.R. 56.1(b). Under the Local Rule, "[i]f the opposing party ... fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) (citing L.R. 56.1(c)). (Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations. The Court will send Plaintiff copies of all unpublished decisions cited in this Opinion and Order.) *Pro se* litigants are not excused from this requirement. *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 344 n.4 (S.D.N.Y. 2011). As Defendant served Plaintiff with the requisite notice pursuant to L.R. 56.2, (*see* ECF No. 45), I have discretion to consider any properly supported facts in Defendant's L.R. 56.1 Statement admitted. *Vance v. Venettozzi*, No. 18-CV-748, 2021 WL 4145705, at \*3 (N.D.N.Y. Sept. 13, 2021). But granting Plaintiff special solicitude, I have considered his statements in his complaint, (ECF No. 1 ("Compl.")), and his deposition testimony, (ECF No. 46-3 ("P's Depo.")). *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement.").

2    Citations to the Complaint use the pagination generated by the Court's Electronic Case Filing ("ECF") system.

3    On September 16, 2024, Defendant informed the Court that he had sent the motion papers to the wrong address for Plaintiff, and that he had re-served the papers to the correct address. (ECF No. 52.) The Court granted Plaintiff until October 21, 2024 to oppose. (ECF No. 53.) That order was mailed to Plaintiff by the Clerk, and my chambers also sent Plaintiff a copy along with a copy of the docket sheet. The Court thereafter realized that Defendant had neglected to file his memorandum of law on the docket and ordered him to do so. (ECF No. 56.) That order, too, was mailed to Plaintiff by the Clerk, and my chambers also sent Plaintiff a copy along with a copy of the docket sheet. Neither the Court nor Defendant has received any opposition from Plaintiff. (*See* ECF No. 58.)

4    Given my conclusion that summary judgment is proper based on Plaintiff's failure to exhaust, I need not address Defendant's arguments concerning excessive force or qualified immunity. *See Siler*, 2023 WL 3871999, at \*6 n.6 (S.D.N.Y. June 7, 2023); *Johnson v. Koenigsmann*, No. 16-CV-6523, 2018 WL 3145762, at \*1 n.2 (W.D.N.Y. June 27, 2018). I note, however, that this may be one of the rare cases in which summary judgment for the defendant might be proper, given that the officer was justified in using force to get Plaintiff to stop throwing punches and could not reasonably be expected to halt his use of force the "split second" Plaintiff stopped doing so.

---

Case 9:23-cv-01570-LEK-ML    Document 28    Filed 02/20/25    Page 125 of 150

Siler v. Walden, Not Reported in Fed. Supp. (2023)

2023 WL 3871999
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Michael D. SILER, Plaintiff,

v.

Officer J. WALDEN and Officer
Edwin Lopez, Defendants.

20-CV-05794 (PMH)
|
Signed June 7, 2023

**Attorneys and Law Firms**

Michael D. Siler, Marcy, NY, Pro Se.

Janice Powers, Kathryn E. Martin, NYS Office of the Attorney General, White Plains, NY, Helena Ann Lynch, New York State Office of the Attorney General, New York, NY, for Defendant Officer J. Walden.

Janice Powers, Kathryn E. Martin, NYS Office of the Attorney General, White Plains, NY, for Defendant Officer Edwin Lopez.

### OPINION AND ORDER

PHILIP M. HALPERN, United States District Judge:

**\*1** Michael D. Siler ("Plaintiff"), proceeding *pro se* and *in forma pauperis*, initiated this action for various constitutional law violations pursuant to 42 U.S.C. § 1983 on July 24, 2020. (Doc. 2). Plaintiff maintains the Amended Complaint, the operative pleading, that five employees of the New York State Department of Corrections and Community Supervision ("DOCCS")—Officer Pepeto Munroe ("Munroe"), Officer Edwin Lopez ("Lopez"), Officer J. Walden ("Walden"), Superintendent Leroy Fields ("Fields"), and Acting DOCCS Commissioner Anthony J. Annucci ("Annucci," and collectively, "Defendants")—violated his First, Eighth, and Fourteenth Amendment rights during his incarceration in the Special Housing Unit ("SHU") at Fishkill Correctional Facility ("Fishkill") in late 2019 and early 2020. (Doc. 30, "FAC").

The Court, in a December 22, 2021 Memorandum Opinion and Order, granted Defendants' partial motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), dismissing all claims except for "the Eighth Amendment excessive force claims against Lopez and Walden." (Doc. 54). [1] Defendants filed an Answer to the Amended Complaint on January 4, 2022. (Doc. 56). Discovery on the two remaining claims closed on September 2, 2022. (Doc. 71).

Defendants filed and served their motion for summary judgment and supporting papers on October 28, 2022, in accordance with the briefing schedule set by the Court. (Doc. 75; Doc. 80; Doc. 81, "Def. Br."; Doc. 82, "Martin Decl."; Doc. 83, "Seguin Decl."; Doc. 84, "Reams Decl."; Doc. 85, "Lopez Decl."; Doc. 86, "Pickett Decl."; Doc. 87; Doc. 88; Doc. 89, "Walden Decl."). Plaintiff requested, and the Court granted, four extensions of time to file his opposition to Defendants' motion for summary judgment. (Doc. 97; Doc. 98; Doc. 99; Doc. 100; Doc. 101; Doc. 102; Doc. 103; Doc. 104). The Court, in granting Plaintiff's fourth request for an extension of time to file his opposition to April 3, 2023, warned that "[n]o further extensions to the briefing schedule shall be granted." (Doc. 104). Plaintiff sought a fifth extension of time on March 31, 2023, which the Court denied on April 3, 2023. (Doc. 106; Doc. 107). Plaintiff has failed to file any opposition to Defendants' motion for summary judgment. As is clear from the docket, Plaintiff was sent Defendants' moving papers and the Court's Orders notifying him that Defendants had moved for summary judgment dismissing his Amended Complaint. The Court has received no communications from Plaintiff regarding the motion for summary judgment since March 31, 2023 and, as such, considers the motion fully submitted and unopposed. [2]

**\*2** For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

### BACKGROUND

The facts, as recited below, are taken from the Amended Complaint (Doc. 30, "FAC"), Defendants' Local Civil Rule 56.1 Statement (Doc. 73, "56.1 Stmt."), and the admissible evidence submitted by the parties. [3]

Plaintiff is an incarcerated individual in DOCCS' custody. (56.1 Stmt. ¶ 1). Plaintiff's claims arose while he was incarcerated at Fishkill. (FAC ¶¶ 1-5; 56.1 Stmt. ¶ 2). Plaintiff was transferred from Great Meadow Correction Facility to the Fishkill Special Housing Unit ("SHU") on September 10, 2019. (56.1 Stmt. ¶ 3). Plaintiff was transferred again and

Case 9:23-cv-01570-LEK-ML    Document 28    Filed 02/20/25    Page 126 of 150

Siler v. Walden, Not Reported in Fed. Supp. (2023)

is currently housed in the Marcy Correctional Facility. (Doc. 97).

### I. January 30, 2020 Incident

On January 30, 2020, Plaintiff hung a towel from his bunk that obstructed officers' view of Plaintiff, and Plaintiff did not respond to verbal commands to take the towel down. (56.1 Stmt. ¶ 6). Officer Lopez entered Plaintiff's cell with six other officers, at which point Plaintiff tried to run out of the cell. (*Id.* ¶¶ 7-9). Officers forced Plaintiff to the bed and then a non-defendant officer took Plaintiff's right leg and brought him to the ground. (*Id.* ¶ 11). Once Plaintiff was on the ground, Officer Lopez handcuffed Plaintiff. (*Id.* ¶ 12). Officers recovered a homemade weapon from Plaintiff's right hand. (*Id.* ¶ 13). A nurse examined Plaintiff sometime after the incident and noted he had a 3-centimeter laceration to his chin. (Martin Decl., Ex. H). Plaintiff was sent to an outside hospital where he received six stitches to his chin. (*Id.*).

### II. April 11, 2020 Incident

On April 11, 2020, Plaintiff signed up to use a razor, which he received, but he refused to give it back to Officer Walden when requested. (56.1 Stmt. ¶ 20). Plaintiff also covered his cell window with a towel obstructing officers' view of Plaintiff. (*Id.* ¶ 21). A sergeant came to Plaintiff's cell and spoke with him. (Martin Decl., Ex. I). Plaintiff stopped responding to the sergeant and officers had to go into Plaintiff's cell to retrieve the razor. (*Id.*). When Plaintiff's cell door opened, Plaintiff charged at the officers with a pipe that he took off his cell bathroom wall. (*Id.*). The pipe struck the first officer's shield, and Plaintiff charged towards the officers. (*Id.*). Officer Walden used a body hold to subdue Plaintiff while other officers sprayed Plaintiff with chemical agents and eventually wrestled the pipe out of Plaintiff's hands. (*Id.*). Medical records indicate Plaintiff had scrapes and bruises to the right side of his head, his right ear, his wrists and knuckles, and his right chest. (Martin Decl., Ex. K). Plaintiff did not need stitches and did not go to an outside hospital for medical treatment. (56.1 Stmt. ¶ 29).

### III. Grievance Process

**\*3** Plaintiff alleges that he "sent grievances on the dates of 9/30/19, 10/3/19, 10/20/19, and 12/12/19 about officers['] misconduct towards me." (FAC at 4-5). There is no record of Plaintiff grieving either the January 30, 2020 or the April 11, 2020 incidents at the facility level or properly appealing to the

Central Office Review Committee ("CORC"). (*See* Martin Decl., Ex. P; Seguin Decl. ¶¶ 6-7; Reams Decl. ¶ 6).

Defendants move for summary judgment contending, *inter alia*, that Plaintiff failed to exhaust his administrative remedies prior to bringing suit.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). [4] " 'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-05486, 2013 WL 1681261, at \*1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty when determining whether summary judgment is appropriate "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence. The task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007).

"It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). The Court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 442 F. Supp. 3d at 722 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the

Siler v. Walden, Not Reported in Fed. Supp. (2025)

Case 9:23-cv-01570-LEK-ML    Document 28    Filed 02/20/25    Page 127 of 150

true nature of the facts." *Id.* (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, "[i]f there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

**\*4** Should there be no genuine issue of material fact, the movant must also establish its "entitlement to judgment as a matter of law." *In re Davis New York Venture Fund Fee Litig.*, 805 F. App'x 79, 80 (2d Cir. 2020) (quoting *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019)). Stated simply, the movant must establish that the law favors the judgment sought. *Linares v. City of White Plains*, 773 F. Supp. 559, 560 (S.D.N.Y. 1991) (summary judgment appropriate when "the law so favors the moving party that entry of judgment in favor of the movant is proper")

The Court is, of course, mindful that "*pro se* litigants are afforded a special solicitude," which includes reading their filings "to raise the strongest arguments they suggest." *Mortimer v. City of New York*, No. 15-CV-07186, 2018 WL 1605982, at *9 (S.D.N.Y. Mar. 29, 2018). "It is through this lens of leniency towards *pro se* litigants that this Court must consider a defendant's motion for summary judgment against a *pro se* plaintiff." *Adams v. George*, No. 18-CV-02630, 2020 WL 5504472, at *5 (S.D.N.Y. Sept. 8, 2020). This status does not, however, excuse a *pro se* litigant from making the showing required to defeat summary judgment; he or she must offer more than "bald assertions, completely unsupported by evidence" to overcome the motion. *Wisdom v. Loiodice*, No. 17-CV-04837, 2020 WL 4431590, at *4 (S.D.N.Y. July 31, 2020); *see also Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (the mere fact that a litigant is *pro se* "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment").

Where, as here, a summary judgment motion is unopposed, "uncontroverted facts in the moving party's statement pursuant to Local Rule 56.1 are deemed admitted." *Johnson v. City of New York*, No. 15-CV-00403, 2016 WL 7335663, at *2 (citing *Giannullo v. City of New York*, 322 F.3d 139,

140 (2d Cir. 2003)); *see also Fate v. Petranker*, No. 19-CV-05519, 2022 WL 2672317, at *1 (S.D.N.Y. July 8, 2022) ("Statements made by Defendant that are supported by admissible evidence and not refuted by Plaintiff are deemed admitted."). "Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Vermont Teddy Bear*, 373 F.3d at 242. "Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). "And, of course, the court must determine whether the legal theory of the motion is sound." *Id.* A summary judgment motion in a *pro se* case "may be granted as unopposed only if (1) the plaintiff has received adequate notice that failure to file any opposition may result in dismissal of the case; and (2) the Court is satisfied that the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." *Lurch v. Berry*, No. 20-CV-02312, 2021 WL 3668113, at *3 (S.D.N.Y. Aug. 17, 2021).

## ANALYSIS

### I. Administrative Exhaustion

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This provision "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," *Hernández v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009) (quoting *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), and it is " 'mandatory': [a]n inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (citation omitted). "Moreover, the PLRA 'requires proper exhaustion, which means using all steps that the prison grievance system holds out.' " *Ayala-Rosario v. Westchester Cty.*, No. 19-CV-03052, 2020 WL 3618190, at *4 (S.D.N.Y. July 2, 2020) (quoting *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016)). This "means that 'prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process

itself.' " *Gottesfeld v. Anderson*, No. 18-CV-10836, 2020 WL 1082590, at *6 (S.D.N.Y. Mar. 6, 2020) (quoting *Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012)).

**\*5** As an inmate in the custody of DOCCS, Plaintiff was required to follow a three-step process to exhaust the grievance process. *Amador v. Andrews*, 655 F.3d 89, 96-97 (2d Cir. 2011) (outlining DOCCS' three-step grievance process); *Hayes v. Dahlke*, 976 F.3d 259, 264 (2d Cir. 2020) (same). First, a grievance must be submitted to the Inmate Grievance Resolution Committee ("IGRC"), a facility-level body consisting of inmates and facility staff members, within 21 days of the incident. N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, §§ 701.4, 701.5(a)-(b). Second, should the inmate be dissatisfied with the conclusion reached by the IGRC, he may appeal that decision to the superintendent of the facility within seven calendar days of receiving the IGRC's determination. NYCRR § 701.5(c)(1). Third, if the superintendent's conclusions are unfavorable, the inmate may appeal that decision to the Central Office Review Committee ("CORC") within 7 calendar days of receiving the superintendent's determination. NYCRR § 701.5(d)(1)(i). Only after completing all three steps may an inmate initiate suit. *Davis v. Grant*, No. 15-CV-05359, 2019 WL 498277, at *7 (S.D.N.Y. Feb. 8, 2019).

Plaintiff does not allege in the Amended Complaint that he ever filed a grievance to the Fishkill IGRC related to the January 20, 2020 or April 11, 2020 incidents. Defendant submitted a declaration from Sally Reams, the Inmate Grievance Program ("IGP") Supervisor at Fishkill. (Reams Decl. ¶ 1). Reams states that as IGP Supervisor, she is a "custodian of the records maintained by the IGP at Fishkill" and that her officer "retains records of grievances filed, as well as a log of filed grievances, back to 2018." (*Id.* ¶¶ 1, 5). Reams further states that she has "reviewed the Fishkill grievance records and log and there is no record of Plaintiff filing a grievance regarding the January 30, 2020 or April 11, 2020 incidents." (*Id.* ¶ 6).

Defendant also submitted a declaration from Rachael Seguin, the Assistant Director of the IGP for DOCCS. (Seguin Decl. ¶ 1). Seguin states that as Assistant Director, she is a "custodian of the records maintained by the [CORC]" and that "CORC maintains files of grievance appeals received by CORC." (*Id.* ¶¶ 1, 4). Seguin, after reviewing CORC records, relating to Plaintiff, states that "[t]here is no appeal on file pertaining to the alleged incidents on January 30, 2020 or April 11, 2020." (*Id.* ¶ 6). Seguin further states that she understands that Plaintiff "mailed letters directly to CORC in an attempt to appeal [his] grievance regarding the April 11, 2020 incident" but such mailing was ineffective because "CORC does not accept grievances or appeals directly from incarcerated individuals" and that "a letter addressed to Central Office is not a grievance or considered an appeal." (*Id.* ¶ 7). Plaintiff's mailing of a letter directly to the CORC does not satisfy his obligation to exhaust his administrative remedies. *See Ruiz v. Link*, No. 20-CV-00235, 2022 WL 3020254, at *5 (S.D.N.Y. July 29, 2022) (holding that a plaintiff failed to properly follow the grievance procedure when he "tried to mail his appeal directly to the CORC").

Even while granting Plaintiff—who filed nothing in opposition to this motion—every benefit of the doubt to which a *pro se* litigant is entitled, there is no genuine dispute that Plaintiff failed to exhaust his administrative remedies. Plaintiff failed to file a grievance to the Fishkill IGRC within 21 days of either the January 30, 2020 or April 11, 2020 incidents. [5] Accordingly, summary judgment is proper here because there is no genuine dispute of material fact that Plaintiff failed to file a grievance concerning either the January 30, 2020 or April 11, 2020 incidents, and/or thereafter took the necessary appeals as required by the PLRA. As such, Defendants are entitled to judgment as a matter of law.

## CONCLUSION

**\*6** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and Plaintiff's Amended Complaint is dismissed with prejudice. [6]

**SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2023 WL 3871999

Case 9:23-cv-01570-LEK-ML    Document 28    Filed 02/20/25    Page 129 of 150

Siler v. Walden, Not Reported in Fed. Supp. (2023)

---

### Footnotes

1       This decision is available on commercial databases. *See Siler v. Munroe*, No. 20-CV-05794, 2021 WL 6064701 (S.D.N.Y. Dec. 22, 2021).

2       The Court must, as an initial matter, find that Plaintiff has received adequate notice that "failure to file any opposition may result in dismissal of the case." *Lurch v. Berry*, No. 20-CV-02312, 2021 WL 3668113, at *3 (S.D.N.Y. Aug. 17, 2021). Defendants provided to Plaintiff the requisite Notice to Pro Se Litigants Pursuant to Local Civil Rule 56.2, which included, *inter alia*, the text of Federal Rule of Civil Procedure 56 and a forewarning that failure to respond may result in the dismissal of the case. (Doc. 87). Plaintiff was plainly on notice of Defendants' motion for summary judgment and the deadline to file his opposition, as he had been served with the moving papers and subsequently filed five separate requests for extensions time to file opposition to the motion. (Doc. 87; Doc. 88; Doc. 97; Doc. 99; Doc. 101; Doc. 103). Accordingly, the Court finds that Plaintiff received adequate notice that his claims might be dismissed for failure to file an opposition to Defendants' motion for summary judgment. *See Gil-Cabrera v. City of New York*, No. 20-CV-09493, 2023 WL 2601132, at *6 (S.D.N.Y. Mar. 22, 2023) (finding adequate notice where the plaintiff was served with a Local Civil Rule 56.2 notice containing a warning "that failure to respond may result in dismissal of the action"); *Jackson v. Jackson*, No. 16-CV-08516 (PMH), 2021 WL 981849, at *5 (S.D.N.Y. Mar. 16, 2021) (granting summary judgment and dismissing an action where Defendants "established that Plaintiff failed to exhaust his administrative remedies" and "Plaintiff was warned that failure to file an opposition would result in the Court concluding that the motion was unopposed").

3       Defendants submitted six declarations and exhibits thereto in support of their motion for summary judgment: Declaration of Kathryn Martin (Doc. 82, "Martin Decl."), Declaration of Rachael Seguin (Doc. 83, "Seguin Decl."), Declaration of Sally Reams (Doc. 84, "Reams, Decl."), Declaration of Edwin Lopez (Doc. 85, "Lopez Decl."), Declaration of Melissa Pickett (Doc. 86, "Pickett Decl."), and Declaration of Justin Walden (Doc. 89, "Walden Decl.").

4       Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

5       Defendants state, in their opening brief, that "[w]hile Plaintiff produced the alleged grievance he filed regarding the January 30, 2020 incident ... neither the facility nor CORC have any record of the grievance or appeal." (Def. Br. at 9). Plaintiff does not allege that he ever submitted a grievance regarding the January 30, 2022 incident in the Amended Complaint, nor has he submitted this grievance—or indeed any documents—in opposition to Defendants' motion for summary judgment. The only evidence in the record before this Court relevant to the exhaustion inquiry are two uncontroverted declarations submitted by Defendants, both stating that there is no record of Plaintiff ever filing any grievance in connection with either the January 30, 2020 or April 11, 2020 incidents. (*See* Reams Decl. ¶ 6; Seguin Decl. ¶ 6).

6       Given the conclusions reached herein, the Court need not and does not address Defendants' remaining arguments, concerning Plaintiff's extant Eighth Amendment claim, for summary judgment.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:23-cv-01570-LEK-ML    Document 28    Filed 02/20/25    Page 130 of 150

Johnson v. Koenigsmann, Not Reported in Fed. Supp. (2018)

2018 WL 3145762
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Andre A. JOHNSON, Plaintiff,
v.
Carl J. KOENIGSMANN, et al., Defendants.

16-CV-6523 CJS
|
Signed 06/27/2018

**Attorneys and Law Firms**

Andre A. Johnson, Attica, NY, pro se.

Hillel David Deutsch, NYS Attorney General's Office Department of Law, Rochester, NY, for Defendants.

DECISION AND ORDER

CHARLES J. SIRAGUSA, United States District Judge

**\*1  Siragusa, J.** This prisoner civil rights case is before the Court on Defendants' motion for summary judgment. Motion for Summary Judgment, Nov. 21, 2016, ECF No. 10. The defense included an *Irby* [1] notice in its motion papers. ECF No. 10-2. On October 27, 2016, Plaintiff filed a change of address indicating his move to Wyoming Correctional Facility. On November 22, 2016, the Court issued a motion scheduling order directing Plaintiff to file any response by December 20, 2016. ECF No. 11. That order was served on Plaintiff at Wyoming Correctional Facility by U.S. mail. To date, Plaintiff has not responded to the motion.

Defendants move on two grounds, only one of which is addressed here. [2] Defendants contend that Plaintiff failed to exhaust his administrative remedies prior to filing suit. Exhaustion is required with exceptions only in rare circumstances which are not applicable here. 42 U.S.C. § 1997e(a); *Ross v. Blake,* 136 S. Ct. 1850 (2016). The exhibits filed by Defendants show that although Plaintiff grieved the matters underlying this lawsuit, he did not follow through with the appeals process prior to filing suit. To satisfy the exhaustion requirement,

prisoners in New York must ordinarily follow a three-step DOCS [3] grievance process. The first step in that process is the filing of a grievance with the Inmate Grievance Resolution Committee. Next, the inmate may appeal an adverse decision to the prison superintendent. Finally, the inmate may appeal the superintendent's decision to the Central Office Review Committee ("CORC"). *Brownell v. Krom,* 446 F.3d 305, 309 (2d Cir. 2006). In general, it is only upon completion of all three levels of review that a prisoner may seek relief in federal court under § 1983. *Neal v. Goord,* 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516, 122 S. Ct. 983, 152 L.Ed.2d 12 (2002); *Campos v. Correction Officer Smith,* 418 F.Supp.2d 277, 278 (W.D.N.Y. 2006).

*Crenshaw v. Syed,* 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010).

A motion for summary judgment in lieu of answer is appropriate in a case such as this. *See Anderson v. Rochester-Genesee Regional Transp. Authority,* 337 F.3d 201, 202 (2d Cir. 2003) ("defendants moved for summary judgment in lieu of answering the complaint"); *see also Omaro v. Annucci,* 68 F. Supp. 3d 359, 362 (W.D.N.Y. 2014) (granting summary judgment in lieu of an answer on a failure to exhaust defense).

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, ... demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986), and "the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a)

**\*2**  (2015). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving

Johnson v. Koenigsmann, Not Reported in Fed. Supp. (2018)

Case 9:23-cv-01570-LEK-ML    Document 28    Filed 02/20/25    Page 131 of 150

party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (citation omitted).

The burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Id.* at 249. "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(c)(1). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The Court's local rule permits it to adopt an undisputed statement of facts filed by the moving party. Here, Defendants' statement of facts has not been disputed, and the Court adopts it in total. W.D.N.Y. Loc. R. Civ. P. 56(a)

(2). The facts deemed admitted show that Plaintiff failed to comply with the Prison Litigation Reform Act's exhaustion requirement, § 1997e(a). Nothing before the Court shows that administrative remedies were not available in this case. Consequently, Plaintiff was required to utilize those remedies prior to bringing suit. *Ross*, 136 S. Ct. at 1862. *Neal v. Goord*, 267 F.3d 116, 117–18 (2d Cir 2001) ("We hold in this case for the first time that where exhaustion is required, failure to do so must result in dismissal, notwithstanding efforts by the inmate-plaintiff to pursue administrative remedies while simultaneously seeking relief in federal court."); *see also Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("we hold that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.")

Defendants' motion for summary judgment, ECF No. 10, is granted. The complaint is dismissed without prejudice due to Plaintiff's failure to comply with the exhaustion requirement in 42 U.S.C. § 1997e(a). The Clerk is directed to enter judgment and close this case.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3145762

---

**Footnotes**

1    *Irby v. New York City Transit Authority*, 262 F.3d 412 (2d Cir. 2001).

2    Because the Court finds that Plaintiff failed to exhaust administrative remedies and dismisses the complaint on that basis, the Court need not address the other grounds for dismissal.

3    A reference to the New York Department of Corrections, now known as the Department of Correctional and Community Services ("DOCCS").

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:23-cv-01570-LEK-ML    Document 28    Filed 02/20/25    Page 132 of 150

Vidro v. Erfe, Not Reported in Fed. Supp. (2019)

2019 WL 4738896
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Edison VIDRO, Plaintiff,

v.

Scott ERFE and Amonda Hannah, Defendants.

3:18-cv-00567 (CSH)

|

Signed 09/26/2019

**Attorneys and Law Firms**

Edison Vidro, Somers, CT, pro se.

Matthew B. Beizer, Attorney General's Office, Hartford, CT, for Defendants.

<u>**RULING ON CROSS-MOTIONS**</u>
<u>**FOR SUMMARY JUDGMENT**</u>

Haight, Senior District Judge:

**\*1** *Pro se* Plaintiff Edison Vidro ("Plaintiff" or "Vidro"), a convicted prisoner currently incarcerated at the Osborn Correctional Institution in Somers, Connecticut, brings 42 U.S.C. § 1983 action seeking damages from two Connecticut Department of Correction ("DOC") officials: Warden Scott Erfe and Deputy Warden Amonda Hannah ("the Defendants"). Doc. 1 ("Compl."). Vidro alleges that the Defendants violated his federal constitutional and statutory rights by denying him adequate winter clothing during his outdoor smudging rituals for the winter seasons of 2016 to 2017 and 2017 to 2018. *Id.* at ¶¶ 9-14. On July 5, 2018, this Court issued its Initial Review Order permitting Vidro's First Amendment free exercise of religion claim to proceed against the Defendants in their individual capacities for damages. Doc. 11 ("IRO") at 10. The Defendants answered the complaint on January 18, 2019. Doc. 21 ("Answer"). Among the affirmative defenses asserted, the Defendants claimed that Vidro failed to exhaust his administrative remedies before commencing this action, pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). *Id.* at 4.

Vidro filed a motion for summary judgment on April 2, 2019. *See* Doc. 23 at 1 ("Pl.'s Mot. Summ. J."); Doc. 23 at 3-5 ("Pl.'s Supp. Decl."); Doc. 23 at 8-13 ("Pl.'s Mem."). Vidro contends

that the evidence establishes the Defendants' liability for placing a substantial burden on his ability to practice his Native American religion by denying him adequate winter clothing for outdoor smudging. Pl.'s Mem. in Supp. at 1, 9-13. The Defendants filed their opposition to the motion on April 16, 2019, contending that Vidro's motion "merely restate[s] the conclusory allegations in his Complaint and has not presented sufficient evidence to support his allegations." Doc. 24 ("Defs.' Opp'n"). The Defendants also claim that they are entitled to summary judgment because Vidro failed to exhaust his administrative remedies prior to commencing suit. *Id.* Vidro countered with a reply, asserting that the Defendants merely denied his allegations without presenting any evidence to support their opposition, and that the evidence shows that he exhausted his administrative remedies. Doc. 26 ("Pl.'s Reply").

On May 30, 2019, the Defendants filed their own motion for summary judgment on the ground that Vidro failed to exhaust his administrative remedies under the PLRA. Doc. 28 ("Defs.' Mot. Summ. J."); Doc. 28-1 ("Defs.' Mem."). Specifically, the Defendants contend that Vidro did not administratively challenge the denial of winter clothing for smudging until January 27, 2018, after which DOC officials agreed to provide such clothing for smudging in the Admitting and Processing ("A&P") area at the Cheshire Correctional Institution, where Vidro was confined at the time. Defs.' Mem. at 7-8. Thus, the Defendants argue that they did not have notice of Vidro's alleged constitutional deprivation until approximately two months prior to the commencement of this action. *See id.* Vidro countered in his written opposition that the January 27, 2018 grievance satisfied the exhaustion requirement, and any failure on his part to grieve the matter was the result of his lack of knowledge of the DOC's Administrative Remedy procedure. Doc. 29 ("Pl.'s Opp'n"); Doc. 29-1 ("Pl.'s Opp'n Decl."); Doc. 29-3 ("Pl.'s Mem. in Opp'n").

**\*2** For the reasons set forth below, because Vidro has failed to exhaust his administrative remedies as required by the PLRA, Vidro's motion for summary judgment is DENIED and the Defendants' motion for summary judgment is GRANTED.

**I. <u>STANDARD OF REVIEW</u>**

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Redd v. New York Div. of Parole,*

Vidro v. Erie, Not Reported in Fed. Supp. (2019)

Case 9:23-cv-01570-LEK-ML    Document 28    Filed 02/20/25    Page 133 of 150

678 F.3d 166, 173-74 (2d Cir. 2012). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.*

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the initial burden is satisfied, the burden then shifts to the non-moving party to present "specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir. 2015) (internal quotation marks and citation omitted). While the Court must view the record in the light most favorable to the nonmoving party, and resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505, the non-moving party nevertheless "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the non-movant must support any assertion disputing the veracity of a fact or existence of an alleged dispute with specific citation to the record materials. Fed. R. Civ. P. 56(c)(1). [1]

Because Plaintiff is proceeding pro se, the Court must read his submissions "liberally" and interpret them "to raise the strongest arguments" that they suggest. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). Nonetheless, "[p]roceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (internal quotation marks omitted).

## II. FACTS

Vidro is a devout Native American, who at all times relevant to this matter was incarcerated at Cheshire Correctional Institution ("Cheshire") in Cheshire, Connecticut while the Defendants were employed there as correctional officials. Doc. 28-4 ("Defs.' 56(a)(1) Stmt.") ¶¶ 1-2; Doc. 29-6 ("Pl.'s 56(a)(2) Stmt.") ¶¶ 1-2. Plaintiff participated in all Native American services at Cheshire, including smudging outdoors

every day, as permitted by the DOC's "Native American Smudge Policy." Compl. ¶¶ 6-7; Doc. 1 at 8 ("Pl.'s Ex. A"). Smudging consists of burning sacred herbs and waving smoke over one's body as a cleansing technique. Compl. ¶ 7. The DOC's policy permits inmates to smudge once per day outdoors for up to twenty minutes depending on circumstances as determined by the Unit Manager or another appropriate supervisor. Pl.'s Ex. A.

**\*3** Vidro alleges that, during the winter of 2016-2017, he smudged outdoors daily without winter attire such as jackets and hats because officials at Cheshire did not provide such attire for smudging purposes. Compl. ¶¶ 9-11. He also alleges that he requested a jacket and hat on several occasions during the winter of 2016-2017, but his requests were denied. *Id.* at ¶¶ 12-14. Vidro claims that this situation forced him to choose between practicing an important religious ritual or remaining indoors during the cold winder months. *Id.* at ¶ 11.

Vidro contends that he was never provided any verbal or written instructions regarding the grievance procedure, and only became aware of the grievance process when another inmate informed him of it in spring 2017. Pl.'s 56(a)(2) Stmt. ¶ 3. Consequently, during his confinement at Cheshire, Vidro did not file any administrative grievances until April 24, 2017. *Id.*; Doc. 28-3 ("Aff. of Monica Boyd-Carter") ¶ 5. On that date, Vidro filed a grievance regarding the whereabouts of a personal possession. Aff. of Monica Boyd-Carter ¶ 5; Doc. 28-3 at 5-6 (Inmate Administrative Grievance dated April 24, 2017). [2]

Vidro filed a second grievance while at Cheshire on January 27, 2018, which was received by DOC officials on January 29, 2018. Aff. of Monica Boyd-Carter ¶ 7; Doc. 28-3 at 11-14 (Inmate Administrative Grievance dated January 27, 2018); Doc. 1 at 10 ("Pl.'s Ex. B"). In that written grievance, Vidro stated the following:

> It is winter and extremely cold outdoors at smudge call, which I attend everyday. The thin tans and thermal [are] not warm enough to protect me from the brutal cold. I need a coat and a hat. I've already become sick once and wish not to become sick again. Enfield closed. [T]here must be hundreds of jackets there that could

Case 9:23-cv-01570-LEK-ML   Document 28   Filed 02/20/25   Page 134 of 150

Vidro v. Erfe, Not Reported in Fed. Supp. (2019)

easily be brought here and wouldn't cost anything.

Doc. 28-3 at 11. Vidro requested that Cheshire officials issue him a coat and hat or make them available in the A&P room for smudging. *Id.* He attached to his grievance a letter he had sent to Deputy Warden Hannah on January 14, 2018, requesting that jackets be placed in the A & P room for daily smudging. *Id.* at 13. The letter includes a response at the bottom stating that Cheshire officials do not provide coats and hats for smudging. [3] *Id.* The January 27, 2018 grievance constituted the only grievance Vidro filed regarding his ability to practice smudging at Cheshire. Pl.'s 56(a)(2) Stmt. ¶ 4.

On March 14, 2018, an official at Cheshire responded to Vidro's January 27, 2018 grievance, stating the following: "A review of your level one grievance was conducted and has been compromised. Coats and hats will be provided for Native American smudging in the A[&]P area." Doc. 28-3 at 11. The official checked off a box at the bottom of the document indicating that Vidro had "exhausted DOC's Administrative Remedies." *Id.* Afterward, several jackets and hats were placed in the A&P room at Cheshire for use during smudging. Doc. 29-4 ("Decl. of Marco A. Michalski") ¶ 3.

### III. **ANALYSIS**

#### A. Exhaustion of Administrative Remedies

Because "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court[,]" *Jones v. Bock*, 549 U.S. 199, 211, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), the Court addresses Defendants' motion for summary judgment before turning to Vidro's motion for summary judgment on the merits of his claim, if necessary.

**\*4** In support of their motion for summary judgment, Defendants contend that Vidro failed to exhaust his administrative remedies prior to commencing this action, as required by the PLRA. Defs.' Mem. at 1. Specifically, they argue that Vidro did not file any administrative grievances regarding the denial of adequate winter clothing for smudging at Cheshire until January 27, 2018, after which DOC officials agreed to grant his request for such clothing. *Id.* at 6-7. Thus, any First Amendment claim stemming from the denial of adequate clothing for the winter of 2016-2017 is unexhausted, and his claim for the winter of 2017-2018 was resolved in his

favor. *Id.* Vidro argues that the January 27, 2018 grievance satisfied the exhaustion rule and, alternatively, any failure to exhaust in 2016 or 2017 was the result of his unawareness of the DOC's administrative grievance procedure. Pl.'s Mem. in Opp'n at 2-6.

The Court agrees with the Defendants that there exists no genuine issue of material fact that Vidro failed to properly exhaust his administrative remedies prior to commencing suit. Summary judgment in favor of the Defendants is therefore warranted.

#### 1. Rule of Exhaustion

The PLRA provides in relevant part that "[n]o action shall be brought with respect to prison conditions under [§] 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies are available are exhausted." 42 U.S.C. § 1997e(a). In enacting § 1997e, Congress sought to afford prison officials time and opportunity to address complaints internally and reduce the quantity, and improve the quality, of prisoner suits. *Porter v. Nussle*, 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). "An 'untimely or otherwise procedurally defective administrative grievance' ... does not constitute proper exhaustion." *Snyder v. Whittier*, 428 F. App'x 89, 91 (2d Cir. 2011) (quoting *Woodford v. Ngo*, 548 U.S. 81, 83-84, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). Because "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion [,]" the exhaustion inquiry requires that courts review the relevant state procedure and the prisoner's grievance to determine whether the prisoner has complied with those procedures. *Jones*, 549 U.S. at 218, 127 S.Ct. 910.

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, ––– U.S. ––––, 136 S. Ct. 1850, 1858, 195 L.Ed.2d 117 (2016). More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S.Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]"); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (adopting *Ross*'s "framing [of] the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate"). In the PLRA context, grievance

procedures are "available" if they "are 'capable of use' to obtain 'some relief for the action complained of.' " *Ross*, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). Ultimately, it is the province of the court to determine whether such circumstances exist in a given case. *See, e.g., Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements."); *Messa v. Goord*, 652 F.3d 305, 309 (2d Cir. 2011).

Defendants bear the initial burden of proving that the administrative remedies available to Plaintiff were not exhausted prior to the initiation of this civil action. *See Jones*, 549 U.S. at 216, 127 S.Ct. 910 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). Plaintiff must then establish that the grievance procedure was unavailable to him under *Ross*. *Jones*, 549 U.S. at 216, 127 S.Ct. 910.

## 2. Exhaustion Under DOC Administrative Directive 9.6

**\*5**  In this case, Vidro was required to comply with the grievance procedure set forth in the Connecticut Department of Correction Administrative Directive 9.6 ("Directive 9.6").[4] Specifically, Vidro's claim was grievable using the Inmate Grievance Procedure outlined in section 6 of Directive 9.6. *See* Directive 9.6, § 4(A) ("The Inmate Grievance Procedure provides an administrative remedy for all matters subject to the Commissioner's authority that are not specifically identified in Sections 4(B) through 4(I) of this Directive.").

Prior to filing an inmate grievance, the Inmate Grievance Procedure requires that the inmate seek informal resolution, first by attempting to resolve the issue verbally and then by submitting a written Inmate Request Form, CN 9601. Directive 9.6, § 6(A). If the inmate is not satisfied with the informal resolution offered, or if the official fails to respond to the Inmate Request Form within fifteen business days, he may then submit a Level-1 grievance. *Id.* at § 6(C). The Level-1 grievance must be submitted within thirty calendar days "of the occurrence or discovery of the cause of the grievance." *Id.* The inmate must also "attach CN 9601, the Inmate Request Form," to the Level-1 grievance, or, if there is a "valid reason" that the Inmate Request Form is not available, "include an explanation indicating why CN 9601, Inmate Request Form, is not attached." *Id.* If the inmate is not satisfied with the

response to his Level-1 grievance or does not receive a timely response, he may then file an appeal. *Id.* at § 6(K)-(M).

### 3. Vidro's Efforts to Exhaust

Defendants argue that Vidro's January 27, 2018 grievance does not satisfy the exhaustion requirement because it was untimely with respect to his claims for the winter of 2016-2017, and was resolved in Vidro's favor with respect to the winter of 2017-2018. Vidro counters that his verbal complaints to prison officials coupled with his January 27, 2018 grievance suffice to establish exhaustion.

Insofar as Vidro argues that he exhausted his administrative remedies based on his verbal complaints to prison officials, "[t]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA." *Timmons v. Schriro*, No. 14-CV-6606, 2015 WL 3901637, at \*3 (S.D.N.Y. June 23, 2015) (citation omitted); *see also, e.g., Rawls v. Rosenfield*, No. 916CV0582LEKCFH, 2017 WL 7050648, at \*7 (N.D.N.Y. Nov. 28, 2017) ("It is well-established in the Second Circuit that any informal resolution or relief outside of the administrative procedures does not satisfy exhaustion requirements."), *report and recommendation adopted*, No. 916CV0582LEKCFH, 2018 WL 542249 (N.D.N.Y. Jan. 23, 2018); *Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (holding that regardless whether prison officials know of the plaintiff's complaints in a "substantive sense," procedural exhaustion of remedies must still occur); *Day v. Chaplin*, 354 Fed.Appx. 472, 474 (2d Cir. 2009) (summary order) (noting that informal letters sent to prison officials "do not conform to the proper administrative remedy procedures.").

Even if the verbal complaints had put prison officials on notice of the subject matter of Plaintiff's grievance, notice, in and of itself, cannot satisfy the exhaustion requirement. *See Macias*, 495 F.3d at 44. In *Macias*, the Second Circuit analyzed how the Supreme Court's decision in *Woodford v. Ngo*, 548 U.S. 811 (2006) affected Second Circuit precedent that had allowed inmates "to procedurally exhaust their claims by taking enough informal steps to put prison officials on notice of their concerns, regardless of whether they utilize the prison's formal grievance procedures." *Id.* (quoting *Braham v. Clancy*, 425 F.3d 177, 183 (2d Cir. 2005)) (internal quotation marks and citation omitted). The Second Circuit held that "after *Woodford*, notice alone is insufficient because '[t]he

benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance' and '[t]he prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules.' " *Id.* (quoting *Woodford*, 548 U.S. at 95, 126 S.Ct. 2378). The *Macias* court determined that the plaintiff did not satisfy the exhaustion requirement by submitting inmate request forms and complaining informally to prison officials. *Id.* Similarly here, Vidro's informal communications outside of the proper regulatory channels do not satisfy PLRA's exhaustion requirement because even if they alerted prison officials to the substance of Vidro's complaints, notice alone does not satisfy the exhaustion requirement. *See Macias*, 495 F.3d at 44. Indeed, the outcome in this case illustrates the rationale underlying the proper exhaustion requirement: when Vidro followed the appropriate administrative channels by filing a grievance in January 2018, the grievance was resolved in his favor with the arrangement that coats and hats be provided for smudging in the AP area. [5]

**\*6** Turning, then, to Vidro's Level-1 grievance, the Court finds that Vidro failed to properly exhaust his administrative remedies. In *Woodford v. Ngo*, 548 U.S. 81, 93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), the United States Supreme Court held that exhaustion under the PLRA requires "proper exhaustion," meaning full compliance with all administrative procedures and deadlines. *See also Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006). "An 'untimely or otherwise procedurally defective administrative grievance' ... does not constitute proper exhaustion." *Snyder*, 428 F. App'x at 91 (quoting *Woodford*, 548 U.S. at 83-84, 126 S.Ct. 2378). To properly exhaust a § 1983 claim in Connecticut, a prisoner must comply with *all* steps set forth in Directive 9.6, including deadlines and utilization of each step of the administrative appeal process. *Id.* (citing *Jones*, 549 U.S. at 218, 127 S.Ct. 910).

It is undisputed that Vidro failed to submit an Inmate Request Form prior to submitting his grievance, as required by Directive 9.6 § 6(A). When Vidro did, in fact, file his Level-1 grievance, he then failed to comply with Directive 9.6 § 6(C): he did not attach "attach CN 9601, the Inmate Request Form," nor did he "include an explanation indicating why CN 9601, Inmate Request Form, is not attached." He therefore failed to "properly" "us[e] all steps that the [prison grievance system] h[eld] out," as required under *Woodford.* 548 U.S. at 90, 126 S.Ct. 2378.

Furthermore, Directive 9.6 prescribes a specific time limit for a prisoner to file a grievance: a Level-1 grievance must be submitted within thirty calendar days "of the occurrence or discovery of the cause of the grievance." Directive 9.6, § 6(c); *Carter v. Revine*, No. 3:14-CV-01553 (VLB), 2017 WL 2111594, at *15 (D. Conn. May 15, 2017) (drawing a "stark contrast" between Directive 9.6, which imposes a "30-day statute of limitations" on the grievance process, and Directive 8.9, which "contains no statute of limitations for the initial filing of a Review of an Administrative Issue"). Vidro acknowledges that the January 27, 2018 grievance constituted the only grievance he filed at Cheshire concerning the denial of adequate winter clothing for outdoor smudging. *See* Pl.'s 56(a)(2) Stmt. ¶¶ 3-4. It is also undisputed that Vidro first requested winter clothing to wear while smudging in the winter of 2016-2017 – approximately a year before filing the January 27, 2018 grievance. Compl. ¶ 12. Vidro's grievance thus fell outside of the 30-day time limit set forth in Directive 9.6, § 6(c). *See, e.g., Osborn v. Williams*, No. 3:14-CV-1386 (VAB), 2017 WL 6731714, at *6 (D. Conn. Dec. 29, 2017) (holding that the plaintiff, who did not file a grievance within 30 days of the incident at suit, "failed to file his grievance in a timely manner, and, thus, he failed to exhaust his administrative remedies" pursuant to Directive 9.6 § 6(C)). [6]

In *Riles v. Buchanan*, 656 F. App'x 577 (2d Cir. 2016), the Second Circuit considered whether a prisoner-plaintiff had exhausted his administrative remedies in a factually analogous § 1983 case. The plaintiff had attempted to exhaust his administrative remedies through verbal complaints, but did not submit an Inmate Request Form prior to submitting his Level-1 grievance or provide an explanation for failing to attach the Inmate Request Form to his Level-1 grievance. *Id.* at 580. The plaintiff also attempted to file a new grievance after being informed of these procedural deficiencies, but filed his renewed grievance months after the thirty-day period set forth in Directive 9.6 had lapsed. *Id.* The Second Circuit affirmed the district court's holding that the plaintiff had failed to "properly exhaust" the administrative remedies available to him before filing suit in the district court. *Id.*

**\*7** The circumstances here are materially indistinguishable: Vidro did not file or explain the absence of an Inmate Request Form with his Level-1 grievance, and his grievance was untimely. The Defendants have therefore satisfied their burden of showing that the administrative remedies available to Plaintiff were not *properly* exhausted prior to the initiation of this civil action. *See Williams*, 829 F.3d at

Case 9:23-cv-01570-LEK-ML   Document 28   Filed 02/20/25   Page 137 of 150

Vidro v. Erfe, Not Reported in Fed. Supp. (2019)

122 ("Proper exhaustion demands compliance with [a prison grievance system's] deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." (internal quotation marks and citation omitted)). [7]

### 4. Availability of Administrative Remedies Under *Ross*

Vidro argues in the alternative that his failure to exhaust should be excused because he requested winter clothing from prison officials on multiple occasions prior to January 2018, but did not file a grievance before that time because he was unaware of the grievance process until April 2017. He emphasizes in particular that he was never given verbal or written information about the grievance procedure: "[e]ven if the grievance process was 'on the books,' it is routinely hidden, or not talked about or made clear to the population." Pl.'s Mem. in Opp'n at 3.

"An inmate may be excused from the exhaustion requirement only if administrative remedies were not in fact available." *Shehan v. Erfe*, No. 3:15-CV-1315 (MPS), 2017 WL 53691, at *6 (D. Conn. Jan. 4, 2017) (citing *Ross*, 136 S. Ct. at 1858). Until recently, courts in this District followed a three-part test established by the Second Circuit in *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004). Under the *Hemphill* test, a plaintiff's failure to exhaust may be excused, *inter alia*, if a plaintiff established that his or her failure to exhaust was justified by "special circumstances." *Id.* at 686. Applying *Hemphill*'s "special circumstances" exception, the Second Circuit subsequently intimated that an inmate may be able to demonstrate that grievance procedures were unavailable to him because "he was not timely provided an inmate handbook" and therefore "was unaware of the grievance procedures contained within it or ... did not understand those procedures." *Ruggiero*, 467 F.3d at 178. In the wake of this suggestion, district courts considered whether an inmate was aware of grievance procedures when adjudicating availability for purposes of PLRA exhaustion. *See, e.g., Angulo v. Nassau Cty.*, 89 F. Supp. 3d 541, 552-53 (E.D.N.Y. 2015) (finding plaintiff had not shown grievance procedure was not "available" because, among other things, plaintiff had not shown that he was unaware of it); *Abdallah v. Ragner*, No. 12 Civ. 8840 (JPO), 2013 WL 7118083, at *3 (S.D.N.Y. Nov. 22, 2013) ("An administrative remedy is not 'available' for purposes of the PLRA if prisoners are not informed that the remedy exists."); *Walker v. Vargas*, No. 11 Civ. 9034 (ER), 2013 WL 4792765, at *5 (S.D.N.Y. Aug. 26, 2013) (same).

**\*8** In *Ross*, however, the Supreme Court limited meaningfully the scope of the availability inquiry. *Ross*, 136 S. Ct. at 1862. A court adjudicating issues of exhaustion under the PLRA may no longer take into account any "special circumstances" that it might believe justify a prisoner's failure to comply with the requirements of the administrative process available to him. *See Ross*, 136 S. Ct. at 1856-58 (abrogating holding of *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), which allowed for special-circumstance consideration); *Williams*, 829 F.3d at 123. ("[A] court may not excuse a failure to exhaust, even to take such circumstances into account."). Instead, a district court is limited to consideration of the PLRA's "textual exception to mandatory exhaustion": whether administrative remedies were "available" to a prisoner. *Id.*

The *Ross* Court provided three examples "of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Ross*, 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859 (citing *Booth v. Churner*, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. [8]

Post-*Ross*, a plaintiff must show more than mere unawareness of an existing grievance procedure; he must show that he was unaware because, for example, prison officials threatened him for use of the grievance system or affirmatively misrepresented the process. *See Ross*, 136 S. Ct. at 1859-60; *see also Briscoe v. D'Agata*, No. 14-cv-7384, 2016 WL 3582121, at *7 (S.D.N.Y. June 28, 2016) (a plaintiff must show "that other factors—for example, threats from correction officers—rendered a nominally available procedure unavailable as a matter of fact").

Case 9:23-cv-01570-LEK-ML    Document 28    Filed 02/20/25    Page 138 of 150

Vidro v. Erfe, Not Reported in Fed. Supp. (2019)

In making his argument, Vidro does not directly invoke any one of *Ross*'s three unavailability examples. Vidro does not allege, for example, that the applicable grievance procedure "operate[d] as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates," or was "so opaque" as to be "practically speaking, incapable of use." *See Ross*, 136 S. Ct. at 1859. Nor does Vidro indicate that "prison administrators thwart[ed] inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.[9] Under these circumstances, Vidro's unawareness of the prison's grievance procedure cannot suffice to show that the procedure was "unavailable" within the meaning of *Ross*. *See, e.g., Porter v. Uhler*, No. 917CV0047MADTWD, 2019 WL 2479000, at *14 (N.D.N.Y. Feb. 19, 2019), *report and recommendation adopted*, No. 9:17-CV-47 (MAD/TWD), 2019 WL 1292226 (N.D.N.Y. Mar. 21, 2019) (rejecting plaintiff's argument that the grievance procedure was unavailable because plaintiff was unaware of it, and had neither been directed to utilize the procedure nor given a copy of the Inmate Handbook); *Galberth v. Washington*, No. 14-CV-0691, 2017 WL 3278921 (S.D.N.Y. Jul, 31, 2017) ("A plaintiff post-*Ross* must show more than mere unawareness of an existing grievance procedure; a plaintiff must show that he was unaware because, for example, officers were unable or unwilling to make him aware, or prevented him from becoming aware 'through machination, misrepresentation, or intimidation.' ").[10]

 **\*9** Finally, Vidro argues that the only reason Cheshire officials granted his request for coats and hats to be made available in the A&P room is because of a § 1983 action filed by another inmate at Cheshire based on the same claim. *See* Pl.'s Mem. in Opp'n at 7-8. In *Michalski v. Semple*, No. 3:16-CV-2039 (DJS), 2018 WL 571848, at *5 (D. Conn. Jan. 28, 2018), the Court permitted another Cheshire inmate's First Amendment free exercise claim to proceed against DOC officials based on the denial of winter clothing in 2016 and 2017. The plaintiff in that case filed a TRO asking that the court order Cheshire provide appropriate winter clothing for smudging, but withdrew the TRO on March 14, 2018, after he was assured by an Assistant Attorney General that winter clothing would be provided. *See* Decl. of Marco A. Michalski.[11] However, the DOC's motivation for providing winter clothing in the A&P room in 2018 has no bearing on Vidro's legal obligation to exhaust his claims under the PLRA. The fact remains that he did not properly notify the Defendants in this case of the nature of his First Amendment claim until January 27, 2018 – more than a year after the

alleged constitutional deprivation occurred – and failed to comply with procedural requirements at that time. Thus, any claim regarding the denial of winter clothing was not properly exhausted, and cannot proceed under the terms of the PLRA.

In light of the foregoing, the Court finds that there is no genuine issue of material fact that Plaintiff failed to exhaust his administrative remedies with respect to his First Amendment claims against the Defendants, and that the failure to exhaust is not excused under *Ross*. Summary judgment for the Defendants is appropriate. Vidro's motion for summary judgment, which is addressed to the merits of the claim, is therefore not reached.

### 5. Dismissal With Prejudice

The granting of summary judgment to the Defendants results in the dismissal of Vidro's Complaint. The Court must consider whether that dismissal should be with or without prejudice.

Dismissal without prejudice on a failure to exhaust administrative remedies grant of summary judgment is appropriate where "a prisoner who brings suit without having exhausted these remedies can cure the defect simply by exhausting them and then reinstituting his suit." *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004). Conversely, dismissal with prejudice is appropriate "where a plaintiff is effectively barred from administrative exhaustion." *McCoy v. Goord*, 255 F. Supp. 2d 233, 252 (S.D.N.Y. 2003); *see also Berry*, 366 F.3d at 88.

Here, Vidro is foreclosed from exhausting his administrative remedies under Directive 9.6: he filed his only grievance after the thirty-day statute of limitations had lapsed, and DOC policies do not contemplate a cure for an untimely filed grievance. Additionally, even if Vidro's grievance had been timely, he failed to submit the requisite Inmate Request Form, and any attempt to do so now would be time-barred. *See* Directive 9.6 § 6(C). Because Vidro's failure to exhaust is at this point incurable, this case will be dismissed with prejudice. *See, e.g., Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 240 (W.D.N.Y. 2010) (dismissing claim with prejudice "[s]ince the time limits for plaintiff to file an administrative appeal have long since passed, administrative remedies are no longer available to him[.]"); *Ramos v. New York*, No. 9:17-CV-0259 (BKS/CFH), 2018 WL 7133696, at *5 (N.D.N.Y. Dec. 27, 2018) (recommending dismissal with prejudice

Vidro v. Erfe, Not Reported in Fed. Supp. (2019)

Case 9:23-cv-01570-LEK-ML    Document 28    Filed 02/20/25    Page 139 of 150

where the plaintiff failed to exhaust his Eighth Amendment conditions of confinement claim and the time to do so "had long since passed"), *report-recommendation adopted, 2019 WL 330869, at *1 (N.D.N.Y. Jan. 25, 2019); Porter v. Uhler, No. 917CV0047MADTWD, 2019 WL 2479000, at *15–16 (N.D.N.Y. Feb. 19, 2019)* (recommending dismissal with prejudice where more than seventeen months had passed since the plaintiff's complaint had been resolved), *report and recommendation adopted, No. 9:17-CV-47 (MAD/TWD), 2019 WL 1292226 (N.D.N.Y. Mar. 21, 2019) cf. Berry, 366 F.3d at 87 (2d Cir. 2004)* ("*If the time permitted for pursuing administrative remedies has not expired,* a prisoner ... can cure the defect by exhausting [the available remedies] and reinstating his suit." (emphasis added)).

## IV. CONCLUSION AND ORDERS

**\*10** Based on the foregoing, Plaintiff's motion for summary judgment [Doc. 23] is DENIED, and the Defendants' motion for summary judgment [Doc. 28] is GRANTED. Plaintiff's claims are DISMISSED WITH PREJUDICE. The Clerk is directed to enter judgment in favor of the Defendants and close this case.

**It is SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4738896

---

## Footnotes

1    This standard applies uniformly where, as here, the Court is presented with cross-motions for summary judgment. *Larsen v. Prudential Ins. Co. of Am.*, 151 F. Supp. 2d 167, 171 (D. Conn. 2001) (citing *Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988)). "The movant's burden does not shift when cross-motions for summary judgment are before the Court. Rather, each motion must be judged on its own merits." *Id.* (citing *Ass'n of Int'l Auto. Mfrs., Inc. v. Abrams*, 84 F.3d 602, 611 (2d Cir. 1996)).

2    Vidro later withdrew that grievance. Doc. 28-3 at 4 (Inmate Administrative Grievance dated April 24, 2017).

3    It is not clear from the exhibit whether Hannah wrote the response denying Vidro's request for winter attire.

4    There is no dispute that this grievance procedure was in place at all relevant times.

5    Vidro contends that his grievance was not resolved in his favor because "[h]ad the grievance in question been resolved in my favor, it would of [sic] been 'upheld,' not 'compromised,' as AD 9.6 defines 'upheld' as 'the application for administrative remedy is granted.' " Pl.'s Mem. in Opp'n at 4. While Plaintiff's rendering of the facts is accurate - the grievance resolution was documented as "compromised" rather than "upheld" - in this case the semantic distinction points to no material difference. Plaintiff's grievance stated that the desired resolution would be to "[i]ssue me a coat and hat, or make them available in the A/P room for use while smudging." Doc. 29-6 at 2. Shortly thereafter, it is undisputed that coats and hats were provided for smudging in the A&P area. Under these circumstances, there is no genuine dispute that the grievance was resolved in Vidro's favor.

6    The briefing by both parties assumes that the Court will treat the winters of 2016-2017 and 2017-2018 as separate "claims" for purposes of exhaustion. Given that the core underlying facts and legal claim are identical for both winters, I see no reason to "restart the clock" each year when assessing the timeliness of Plaintiff's grievance. Even if I were to treat each winter as an independent claim, however, the outcome remains the same: Plaintiff's claim is untimely for winter 2016-2017, and is not cognizable because it was resolved favorably for the winter of 2017-2018, *see* Note 5, *supra.*

7    The fact that a prison official checked a box at the bottom of the January 2018 grievance stating that Vidro "ha[d] exhausted DOC's Administrative Remedies" does not alter this conclusion. Pl.'s Mem. in Opp'n at 3-4. The Court can reasonably infer that the checked box conveyed that Cheshire officials were providing him with the specific remedy he sought - winter clothing for smudging in the A&P room - and consequently that there was no reason for Vidro to appeal the official's decision to the next level under Directive 9.6 because he had received a favorable resolution. Doc. 28-3 at 11. The checked box does not, however, speak to the timeliness of Vidro's request for purposes of filing a civil action for damages.

8    In *Williams*, the Second Circuit noted that, "the three circumstances discussed in Ross do not appear to be exhaustive[.]" 829 F.3d at 123 n.2. The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

9    Additionally, Vidro has not alleged that he was not timely provided with instructions regarding Directive 9.6 because officers were unwilling or unable to provide him with the information he sought out, or prevented him from accessing grievance instructions "through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1859-60. Thus, even if the parties dispute whether Vidro was informed about the grievance procedure, this dispute is not material, and does not prevent the Court from entering summary judgment for Defendants.

10    Indeed, all cases cited by the Plaintiff in his Memorandum of Law were decided prior to *Ross*'s disavowal of the "special circumstances" exception. They are therefore inapposite here.

11    That case ultimately settled out of court and was dismissed in March 2019. *See* Decl. of Marco A. Michalski.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

⚠️ Caution
As of: February 20, 2025 1:25 PM Z

## *Beers v. GMC*

United States District Court for the Northern District of New York

May 17, 1999, Decided ; May 17, 1999, Filed

97-CV-482 (NPM/DNH)

**Reporter**

1999 U.S. Dist. LEXIS 12285 *; 1999 WL 325378

MARK W. BEERS and JANET BEERS, Plaintiffs, - against- GENERAL MOTORS CORPORATION, Defendant.

**Disposition:** [*1] GM's motion to dismiss pursuant to *Fed. R. Civ. P. 37* GRANTED. Defendant's motion for summary judgment GRANTED in entirety.

## Core Terms

fan, flex, spoliation, assembly, summary judgment, discovery, inspection, sanctions, district court, tire, motion to dismiss, lesser sanction, argues, orders, blade, truck, fault, crucial evidence, court order, exemplar, warning, wheel, summary judgment motion, spoliation of evidence, order to show cause, failure to warn, manufacturer, overinflated, exploded, mounting

## Case Summary

### Procedural Posture

Defendant automobile manufacturer moved for dismissal pursuant to *Fed. R. Civ. P. 37(b)(2)* or, alternatively, for summary judgment of plaintiff's product liability case. The motion for dismissal was based on plaintiff's loss of crucial evidence.

### Overview

Plaintiff was injured by a fan installed on a pickup truck that was manufactured by defendant. Plaintiff's expert, in examining it, disassembled and irreparably altered the fan assembly from its condition at the time of the accident and eventually misplaced it. Defendant moved for dismissal of plaintiff's subsequent suit, pursuant to *Fed. R. Civ. P. 37(b)(2)*, after plaintiff failed to comply with numerous court orders to produce the fan for inspection. The court held that plaintiff should be held responsible for both his expert's loss of the crucial

evidence and his counsel's defiance of court orders. Dismissal was proper because the spoliated evidence was not circumstantial; due to the nature of the evidence, effective lesser sanctions would be tantamount to summary judgment; lesser sanctions would not remedy defendant's prejudice because it did not know exactly what inspection of the fan would have revealed as a potential defense; no mitigating factors were present; and plaintiff's counsel's disregard of discovery and other orders of the court supported dismissal as a sanction under *Rule 37* and under the court's inherent power to control litigation before it.

### Outcome

The court dismissed plaintiff's case, first, because it served as a deterrent to plaintiff's counsel, his expert, and non-parties from engaging in spoliation and disobedience of court orders. Second, the risk of an erroneous judgment was thereby placed on the party who lost the critical evidence. Third, it appeared no other sanction would restore defendant to the position it would have been in absent the spoliation.

## LexisNexis® Headnotes

Civil Procedure > ... > Discovery > Methods of Discovery > Inspection & Production Requests

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

*HN1*[⬇] **Methods of Discovery, Inspection & Production Requests**

Spoliation of evidence consists of the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in

1999 U.S. Dist. LEXIS 12285, *1

pending or reasonably foreseeable litigation. A federal court may impose sanctions upon a party who engages in spoliation in derogation of court order. Even in the absence of a discovery order, the court may impose sanctions for spoliation, exercising its inherent power to control litigation.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Civil Procedure > ... > Discovery > Methods of Discovery > Inspection & Production Requests

*HN2*[ ] **Standards of Review, Clearly Erroneous Review**

Sanctions for spoliation, including dismissal, are reviewed by the court for abuse of discretion. The court will reject the district court's factual findings in support of its imposition of sanctions only if they are clearly erroneous.

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

Evidence > Relevance > Preservation of Relevant Evidence > Spoliation

*HN3*[ ] **Discovery, Misconduct During Discovery**

The district court possesses broad discretion in crafting a proper sanction for spoliation but such sanction is to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine. This sanction is fashioned to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

Evidence > Relevance > Preservation of Relevant Evidence > Spoliation

*HN4*[ ] **Discovery, Misconduct During Discovery**

Outright dismissal of a lawsuit as a sanction for spoliation is within the court's discretion. Dismissal is proper if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party. Dismissal is not limited only to matters where the offending party has acted with bad faith or willful intent, but is permitted where there is any fault of the sanctioned party. Negligent wrongs, like intentional wrongs, are proper subjects for general deterrence.

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

Civil Procedure > Discovery & Disclosure > General Overview

*HN5*[ ] **Discovery, Misconduct During Discovery**

The district court possesses the discretion to dismiss for disobedience of discovery orders.

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

*HN6*[ ] **Discovery, Misconduct During Discovery**

Dismissal is a drastic remedy and should be imposed only after consideration of alternative, less drastic sanctions. However, in fashioning a sanction, the district court must take into account the ability of the sanction to restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

Torts > Products Liability > Theories of Liability > Negligence

*HN7*[ ] **Theories of Liability, Negligence**

A manufacturer is not responsible for injuries resulting from substantial alterations or modifications of a product by a third party that render the product defective or otherwise unsafe.

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Waiver & Preservation of Defenses

_HN8_[⬇] **Summary Judgment, Supporting Materials**

Failure to file or serve any papers as required by this rule shall be deemed by the court as consent to the granting or denial of the motion, as the case may be, unless good cause is shown. N.D.N.Y. L.R. 7.1(b)(3).

**Counsel:** For Plaintiff: Diane V. Bruns, Esq., LoPinto, Schlather, Solomon & Salk, Ithaca, New York.

For Defendant: Timothy S. Coon, Esq., Eckert Seamans Cherin & Mellott, LLC, Pittsburgh, Pennsylvania.

For Defendant: Margaret J. Fowler, Esq., Chernin & Gold, LLP, Binghamton, New York.

**Judges:** Neal P. McCurn, Senior United States District Judge.

**Opinion by:** Neal P. McCurn

# Opinion

**MEMORANDUM-DECISION & ORDER**

**INTRODUCTION**

Defendant General Motors ("GM") moves for dismissal pursuant to _Federal Rule of Civil Procedure 37(b)(2)_, [1] **[*2]** or alternatively, for summary judgment. The motion for dismissal is based on plaintiff's loss of crucial

_____

[1] _Fed. R. Civ. P. 37(b)(2)_ states:

> If a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: . . . (C) An order striking out pleadings or parts thereof . . . or dismissing the action or proceeding . . . or rendering a judgment by default against the disobedient party[.]

_Fed. R. Civ. P. 37(b)(2)_.

evidence. Plaintiff opposes the sanction of dismissal, and argues in part that summary judgment is inappropriate. [2] For the reasons that follow, the court grants GM's motion to dismiss, or in the alternative, grants summary judgment.

**BACKGROUND**

Plaintiff Mark Beers was injured in March of 1994 while working on a friend's 1984 GM pickup truck. The truck had a flexible engine cooling fan ("flex fan") installed to cool the engine. It is undisputed that this flex fan did not belong on the truck, and was installed by a third party. [3] At some point, while the engine was running, one of the flex fan blades broke off, penetrated the plastic protective shroud, and struck plaintiff, injuring him.

 **[*3]** Plaintiff retained legal counsel, and the flex fan assembly was obtained from the owner of the truck. Plaintiff's expert, Robert Wehe, then examined the flex fan assembly. _See_ Wehe Dep. at 11. As part of the inspection, he disassembled the flex fan assembly, which irreparably altered it from its condition at the time of the accident. _See_ GM's Supplemental Br. Ex. 1 at P 20, docket no. 62. Moreover, plaintiff's counsel never notified GM that the flex fan was to be taken apart, gave it the opportunity to be present, or allowed it to inspect the flex fan first. _See id._ at PP 21-22. No video or photos were taken at the time of disassembly. _See id._ at P 23. Although Wehe now claims the fan blade broke because of a design defect, he also noted the arm which held that blade was "severely bent." [4] **[*4]** Wehe Dep. at 11. Wehe recognized that this damage could have caused

_____

[2] Although GM moves for summary judgment on all of plaintiff's claims, including failure to warn, _see_ Def. Mem. of Law at 18 n. 7, docket no. 48 and Def. Response at 6-8, docket no. 67, plaintiff fails to oppose summary judgment on the failure to warn claim.

[3] It appears the flex fan was from a 1974 GM truck. Trucks designed with flex fans had metal protective shrouds over the fans. The 1984 type of truck involved in plaintiff's injury was not designed to have a flex fan, and had a plastic protective shroud over the fan.

[4] The possibility that the flex fan failed due to prior damage is a major reason GM moves for dismissal. GM's primary defense theory is that the fan was not defective, but failed because it had been previously damaged. GM argues it is unable to present such a defense because the flex fan, except for a few pieces, is now missing, and thus its expert is not capable of effectively rendering such an opinion.

the blade to come off. [5] See id. at 79-80. In response to the present motion, Wehe now admits that he has misplaced most of the flex fan assembly, and that it is lost. See Wehe Aff. at P 3, docket no. 56.

Plaintiff brought suit against GM in the New York Supreme Court, Cortland County, on March 12, 1997. The action was removed to the United States District Court for the Northern District of New York on the basis of complete diversity.

The file and record in this case are replete with examples of discovery abuse by plaintiff. GM has sought to inspect the flex fan assembly for more than a year. On May 12, 1998, after application by GM, Magistrate Judge Hurd found that plaintiff failed to comply with the pretrial scheduling order (in part to supply the flex fan assembly for inspection), failed to respond in opposition, and failed to participate in a telephone conference with the court. He consequently granted GM permission [*5] to move before this court for dismissal under either _Federal Rule of Civil Procedure 37_ or _56_. See Order of May 12, 1998, docket no. 14. GM then promptly moved for the same.

In opposition to the motion, plaintiff's counsel Diane Bruns filed an affidavit with this court averring that "the fan blades and housing are available for defendant's inspection, should the court [deny GM's motion and] grant plaintiffs' cross motion to reopen and extend the discovery period." Bruns Aff. of June 17, 1998 at P8, docket no. 22. Plaintiff's statement of material facts in opposition to this first motion stated that "the fan belt [sic] assembly, which was in the custody of plaintiffs' expert witness and in storage during his absence, and the housing are now available for defendant's inspection." Pl.'s Statement of Material Facts of June 17, 1998 at P6, docket no. 24. Finally, plaintiff's memorandum in opposition argued that the action should not be dismissed for discovery abuse because "plaintiffs . . . have provided . . . access to the fan blade assembly now that it has become possible to do so." [6]

_____

[5] At a later portion of his deposition, Wehe maintained that he had ruled out the flex fan's failure due to the bent arm. See Wehe Dep. at 81-82. He was unable to explain, however, what basis he had for ruling out the same. See id. GM argues that because its expert has not examined the flex fan assembly, including the bent arm, he is unable to effectively refute Wehe.

[6] The reason plaintiff then claimed inability to comply with the discovery orders was an extended trip by Wehe. See Bruns Aff. of June 17, 1998 at P3. Wehe apparently had the flex fan

Pl.'s Mem. of Law of June 17, 1998 at 5, docket no. 25. On August 18, 1998, this court denied [*6] GM's motion and granted plaintiff's cross-motion to reopen and extend the discovery period because counsel represented that plaintiff was now willing to comply with discovery orders and turn over the flex fan assembly.

Following the court's denial of GM's first motion, plaintiff continuously failed to turn over the flex fan assembly, despite counsel's representations that she would do so. Consequently, on September 14, 1998, GM moved by order to show cause to compel discovery. Judge Hurd granted the order to show cause. See Order to Show Cause [*7] of September 17, 1998, docket no. 35. GM then withdrew the motion to compel when it appeared plaintiff would finally turn over the flex fan assembly. See Coon Letter to Judge Hurd of September 23, 1998, docket no. 37. Plaintiff's cooperation, however, proved short-lived. GM again moved for orders to show cause and compel before Judge Hurd on October 7, 1998. Judge Hurd granted the order to show cause on the same date. See Order to Show Cause of October 7, 1998, docket no. 39. In opposition to the motion to compel, plaintiff's counsel admitted that "defendant's counsel is correct in stating that the complete fan assembly has not yet been provided to defendant's expert." Rather, she stated that Wehe "has moved twice and placed many of his records and files in storage." Thus, although some fan blades had been sent to GM, Wehe had yet to locate the remainder of the fan assembly. See Bruns Aff. of October 7, 1998 at P3-4, docket no. 40.

On October 26, 1998, Judge Hurd granted the motion to compel, and specifically ordered plaintiff to turn over the flex fan assembly for inspection. ("Plaintiffs shall produce the complete engine cooling fan to the attorneys for the defendant [*8] on or before November 6, 1998. Failure to produce shall entitle defendant to make a dispositive motion or preclusion motion to the District Judge."). Order of October 26, 1998, docket no. 42. GM then moved for leave to file a summary judgment motion on the merits of the case on November 3, 1998. On the same day, this court denied the motion without prejudice to renew. Moreover, it stated that "the parties are hereby ORDERED to comply in all respects with the aforementioned order of Magistrate Judge

_____

assembly in storage during his trip. As GM then correctly pointed out, however, "there is no indication . . . that any attempt was made [by plaintiff's counsel] to contact Dr. Wehe during the period of his alleged 'unavailability[.]'" GM Reply of June 30, 1998 at 2, docket no. 27.

Hurd." Order of November 3, 1998, docket no. 44. Plaintiff, as of present, has yet to turn over the flex fan assembly. Pursuant to this court's Order of November 3, 1998, and Judge Hurd's Order of October 26, 1998, GM filed the present motion to dismiss, or alternatively moves for summary judgment. In opposition to this present motion, plaintiff finally admits that the remainder of the flex fan assembly has been lost, and can not be found. See Bruns Aff. of February 1, 1999 at P 4, docket no. 55.

After motion papers were filed, the United States Court of Appeals for the Second Circuit decided the case of _West v. Goodyear Tire and Rubber Co., 167 F.3d 776 (2d Cir. 1999)_, **[*9]** which pertained to spoliation of evidence and the propriety of dismissal as a sanction pursuant to _Federal Rule of Civil Procedure 37_. The court then directed the parties to file supplemental briefs discussing this new case and _Rule 37_, as each related to dismissal for spoliation of evidence.

Oral argument was held in Syracuse, New York on March 24, 1999. There, the court questioned plaintiff's counsel to determine what fault, if any, plaintiff bore for the loss of the flex fan assembly. While the court reserved decision on the motions for dismissal or summary judgment, it did make a finding of fact that counsel and Wehe had been, at minimum, negligent in failing to preserve the crucial evidence.

Aside from arguments as to spoliation of evidence, plaintiff also raised a new theory of liability. [7] Defendant argued that plaintiff should not be permitted to assert a new claim so late in case and only in response to summary judgment.

**[*10]** The court noted that discovery and motions were closed, and that it would not allow plaintiff to amend the complaint. The court did, however, instruct plaintiff to file a statement setting forth his new claim, with any references in the record supporting its existence, within seven days. Thereafter, defendant was ordered to file its opposition within ten days. Finally, the court ordered

---

[7]

"Although the 1984 Chevrolet pick-up was designed with a [safer] clutch fan as original equipment, it was also designed in such a way that the clutch fan could be readily and easily replaced with the more dangerous flex fan, resulting in the hazardous combination of a flex fan with an insufficiently protective plastic shroud, and no warnings concerning the hazards."

Pl.'s Statement of Design Defect at 2, docket no. 66.

plaintiff to file a reply within an additional ten days. [8]

For the reasons that follow, GM's motion to dismiss under _Rule 37_ is granted. Alternatively, the court grants summary judgment for defendant.

## DISCUSSION

### I. Dismissal

GM argues that this matter should be dismissed as a sanction for spoliation of evidence. _HN1_[⬆] Spoliation of evidence, as recently defined by the Second Circuit, consists of "the destruction or significant alteration of evidence, **[*11]** or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." _West, 167 F.3d at 779_ (citation omitted). A federal court may impose sanctions upon a party who engages in spoliation in derogation of court order. See _Fed. R. Civ. P. 37(b)(2)_; _West, 167 F.3d at 779_; _John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir. 1988)_. Even in the absence of a discovery order, the court "may impose sanctions for spoliation, exercising its inherent power to control litigation." _West, 167 F.3d at 779_; accord _Chambers v. NASCO, Inc., 501 U.S. 32, 43-45, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)_; _Sassower v. Field, 973 F.2d 75, 80-81 (2d Cir. 1992)_, cert. denied, _507 U.S. 1043, 113 S. Ct. 1879, 123 L. Ed. 2d 497 (1993)._

_HN2_[⬆] ] Sanctions for spoliation, including dismissal, are reviewed by the Circuit for abuse of discretion. See _West, 167 F.3d at 779_ (citing _Complaint of Consolidation Coal Co., 123 F.3d 126, 131 (3d Cir. 1997)_, cert. denied, _523 U.S. 1054, 118 S. Ct. 1380, 140 L. Ed. 2d 526 (1998))_; **[*12]** _Sieck v. Russo, 869 F.2d 131, 134 (2d Cir. 1989)_. The Circuit "will reject the district court's factual findings in support of its imposition of sanctions only if they are clearly erroneous." _West, 167 F.3d at 779_ (citing _Friends of Animals, Inc. v. United States Surgical Corp., 131 F.3d 332, 334 (2d Cir. 1997)_ (per curiam)).

_HN3_[⬆] ] The district court possesses "broad discretion in crafting a proper sanction for spoliation" but such sanction is to "serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine."

---

[8] Plaintiff filed his statement of the new theory and defendant responded in opposition. Plaintiff, however, then failed to file a reply as directed by the court.

Id. This sanction is fashioned to: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" Id. (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)).

"*HN4*[↑] 'Outright dismissal of a lawsuit . . . is within the court's discretion.'" Id. (quoting *Chambers, 501 U.S. at 45*); see also *Fed. R. Civ. P. 37(b)(2)(C)*. Dismissal **[\*13]** is proper if there is "a showing of willfulness, bad faith, or fault on the part of the sanctioned party." *West, 167 F.3d at 779* (citing *Jones v. NFTA, 836 F.2d 731, 734 (2d Cir. 1987)).* Contrary to plaintiff's arguments, dismissal is not limited only to matters where the offending party has acted with bad faith or willful intent, but is permitted where there is *any* fault of the sanctioned party. See *Bobal v. Rensselaer Polytechnic Institute*, 916 F.2d 759, 764 (2d Cir. 1990). Plaintiff argues that "the court should consider less drastic measures[.]… where there is no evidence of bad faith causing the loss of the evidence, because two of the most important rationales underlying *Rule 37* sanctions are to punish an offending party, and to deter others from acting similarly." Pl.'s Supplemental Brief at 5 (emphasis supplied). Yet, it has been noted that negligent wrongs, like intentional wrongs, are proper subjects for general deterrence. See *Penthouse Int'l, Ltd. v. Playboy Enters., Inc., 663 F.2d 371, 387 (2d Cir. 1981)* (citing G. Calabresi, The Cost of Accidents, 133-173 (1970)). Not only have negligent **[\*14]** wrongs been found proper subjects for deterrence, but federal courts have dismissed under *Rule 37* as punishment for negligence. See *Thiele v. Oddy's Auto and Marine Inc., 906 F. Supp. 158, 162-63 (W.D.N.Y. 1995)* (evidence negligently lost by plaintiff necessitated dismissal under *Fed. R. Civ. P. 37*); *Brancaccio v. Mitsubishi Motors Co., Inc., 1992 U.S. Dist. LEXIS 11022, 1992 WL 189937*, at *2 (S.D.N.Y. 1992) (plaintiff's negligent loss of the defective product, after her expert had examined it, but where defendant had not, necessitated dismissal under *Rule 37*). [9] Hence, even under plaintiff's own

_____

[9] New York State courts also dismiss for negligent spoliation. See *Squitieri v. City of New York, 248 A.D.2d 201, 202-03, 669 N.Y.S.2d 589, 590* (1st Dep't 1998) ("Spoliation sanctions such as [dismissal] are not limited to cases where the evidence was destroyed willfully or in bad faith, since a party's negligent loss of evidence can be just as fatal to the other party's ability to present a defense[.]" [citation omitted]);

interpretation of the purposes of *Rule 37*, quoted above, it is quite clear that courts regard the type of spoliation undertaken by plaintiff as cause for dismissal.

**[\*15]** Plaintiff should be held responsible for both his expert's loss of the crucial evidence, and his counsel's defiance of court orders. This is the type of fault required for dismissal under *Rule 37*; although there has been no allegation that Wehe intentionally discarded the flex fan assembly, as an expert retained to examine the actual defective part, he was grossly negligent in permanently altering, and then even worse, losing the very item this lawsuit is over. "Gross professional incompetence no less than deliberate tactical intransigence may be responsible for the interminable delays and costs that plague modern complex lawsuits." *Penthouse, 663 F.2d at 387*.

Aside from Wehe's loss of the crucial evidence, counsel bears fault for disobeying several orders of both Magistrate Judge Hurd and this court in failing to provide the flex fan assembly, and wasting the scant judicial resources of the court in assuring plaintiff's compliance with mandatory discovery. Until this present motion, counsel never notified the court of her inability to comply with the court's orders, instead engaging in a pattern of delay and avoidance, perhaps waiting for Wehe to return from his **[\*16]** trip, and then hoping Wehe would rediscover the missing evidence. *HN5*[↑] The district court possesses the discretion to dismiss for disobedience of discovery orders. See *Sieck, 869 F.2d at 134* (we . . . prefer to . . . provide the teeth to enforce discovery orders by leaving it to the district court to determine which sanction from among the available range is appropriate.").

_____

*Kirkland v. New York City Housing Auth., 236 A.D.2d 170, 174-75, 666 N.Y.S.2d 609* (1st Dep't 1997) (noting that numerous federal and state courts "have found dismissal warranted when discovery orders were not violated, and even when the evidence was destroyed prior to the action being filed . . . notwithstanding that the destruction was not malicious . . . or in bad faith[.]" [citations omitted]); *Mudge, Rose, Guthrie, Alexander & Ferdon v. Penguin Air Conditioning Corp., 221 A.D.2d 243, 243, 633 N.Y.S.2d 493* (1st Dep't 1995) ("Dismissal of the amended complaint is also warranted because of plaintiff's *negligent loss of a key piece of evidence which defendants never had an opportunity to examine*[.]" [citation omitted]) (emphasis supplied). While this federal court is bound to vindicate the Federal Rules of Civil Procedure, it surely would be an anomaly if plaintiff was permitted to negligently spoliate evidence and have his case survive in a federal diversity action, but have his claim dismissed if the action was in state court.

1999 U.S. Dist. LEXIS 12285, *16

Counsel not only bears fault for disobeying court orders, but responsibility for carefully supervising the expert retained. The fact that plaintiff or counsel themselves did not personally lose the evidence is irrelevant. With full knowledge of the pretrial discovery order, and deadlines to turn over evidence, including the flex fan assembly, counsel continued to retain Wehe despite his trip, and let him keep the very items required to be turned over, which were inaccessible while he was on his trip (and ultimately lost). Even after Wehe returned, despite numerous representations to the court that the complete flex fan assembly would be turned over to defendant, it never was.

Finally, plaintiff sometimes must suffer for the faults of his lawyers and experts, especially when their acts are extremely **[*17]** prejudicial to the opposing party, who otherwise has no effective remedy. See _Link v. Wabash R.R. Co., 370 U.S. 626, 633-34, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962)_ (client freely selected attorney and is bound by acts of lawyer-agent); see also James Wm. Moore, _Moore's Federal Practice § 37.50[2][b]_, at 37-83, and 37-83 n. 42.2 ("the Supreme Court has rejected the notion that dismissal of a plaintiff's complaint because of counsel's unexcused conduct imposes unjust penalty on the client.").

_HN6_[⬆] Dismissal is a drastic remedy and should be imposed only after consideration of alternative, less drastic sanctions. See _West, 167 F.3d at 779_. [10] The Second Circuit has also directed, however, that in fashioning a sanction, the district court must take into account the ability of the sanction to "restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." _Id._ As GM's defense revolves around pre-accident damage to the very item missing, it will be unable to effectively show that the fan blade broke for reasons other than a defect. A lesser sanction is thus inappropriate **[*18]** as it does not cure the prejudice to GM. [11]

---

[10] Another circuit has noted that the district court should not be required "to incant a litany of the available sanctions[.]" _Harmon v. CSX Transp., Inc., 110 F.3d 364, 368 (6th Cir. 1997)_.

[11] Alternatively, if lesser sanctions were imposed, such as evidence preclusion, there is a strong possibility of summary judgment in GM's favor due to plaintiff's inability to make out a prima facie case without evidence of the flex fan or pertinent portions of his expert's testimony.

## A. Distinction Between _West_ and the Present Case

Plaintiff argues that this case is similar to _West_, and consequently should not be dismissed. In _West_, the district court dismissed pursuant to _Rule 37_ after plaintiff spoliated certain evidence which prejudiced defendants. See _West v. Goodyear Tire and Rubber Co., 1998 U.S. Dist. LEXIS 1529, 1998 WL 60942 (S.D.N.Y. 1998)_. The Second Circuit reversed, _167 F.3d 776_, holding that other, less severe **[*19]** sanctions than dismissal should have been utilized. _West_ is clearly distinguishable.

The _West_ plaintiff was injured when a tire he was mounting exploded. Plaintiff had already mounted an identical tire (the "exemplar wheel") which had not exploded. Defendants' theory of defense was that plaintiff grossly overinflated both tires, and the second tire exploded. They planned to show the overinflation by introducing evidence of the overinflated but unexploded exemplar wheel. The exemplar wheel, however, was sent by plaintiff to a lawyer specializing in tire explosion cases. Fearing the tire would explode, that lawyer ordered it deflated. As the Circuit noted, "defendants believe that by deflating the exemplar wheel, West's lawyers deflated their case." _West, 167 F.3d at 780_.

Furthermore, defendants planned to introduce the tire mounting machine and air compressor as circumstantial evidence that the exploded tire was overinflated. As the Circuit itself observed, "the compressor was set at an astronomical pressure of 160 pounds per square inch." _Id. at 778_. Though defendants requested inspection of the compressor and tire mounting machine, and an **[*20]** inspection was scheduled, plaintiff sold the devices before inspection occurred. See id. The devices were later located, but by then had been left outside and their conditions had deteriorated. See id. While defendants' experts were able to examine the devices, and opined that the devices could have malfunctioned and caused overinflation, "because West sold these items and the purchaser left them outside over the winter, defendant's experts had no way to determine the condition of the machines when they were in West's shop at the time of the accident." _Id. at 780_.

Based upon the spoliation of the exemplar wheel, compressor and tire mounting machine, the district court held defendants had been severely prejudiced, and dismissed the case pursuant to _Rule 37_. Reversing, the Circuit held that other less drastic sanctions were available to the district court which would have eliminated the prejudice to defendants without disposing of the case, such as evidence preclusion and inference

charges. See *West, 167 F.3d at 780*.

The present matter is entirely different. Most importantly, the missing or spoliated item, unlike in *West*, is not circumstantial **[*21]** evidence, but the actual part that failed. There can be no adequate lesser sanctions, as they would be tantamount to summary judgment against plaintiff. Cf. *Pesce v. General Motors Corp., 939 F. Supp. 160, 165 (N.D.N.Y. 1996)* (Hurd, M.J.) ("the drastic sanction of preclusion [as to the missing defective item] would be tantamount to dismissal of the action."). Although in a defective design case lesser sanctions may not always prevent the claim, both federal and New York State courts have dismissed defective design cases as a result of plaintiff's spoliation, even where the spoliation occurred negligently. [12]

**[*22]** Even if the court did impose lesser sanctions, they would not likely remedy the wrong GM has suffered. Not only does GM argue that the flex fan was damaged, precipitating its failure, but GM sought inspection of the flex fan assembly to develop other defenses. As GM never examined the complete flex fan assembly, it does not even know what sanctions it wants the court to impose because it will never know of other defenses an inspection may have revealed. See GM Supplemental Brief at 6-7, 10-11.

In *West*, the Circuit Court also observed that the exemplar wheel was allegedly deflated as a purported public safety measure, which was a mitigating factor in the spoliation. There are no mitigating factors in the present matter. Plaintiff's expert lost the crucial evidence in this case. There is no excuse for such conduct, nor has plaintiff attempted to argue such. Furthermore, plaintiff's counsel has utterly failed to explain any efforts on her part to mitigate her failure to comply with the court's orders.

Another notable distinction between *West* and the present case is the type of remedy defendants sought as a sanction for spoliation. In *West*, only one of two defendants **[*23]** moved to dismiss. The other defendant moved only for lesser sanctions. This made clear that alternatives were available other than dismissal. [13] The circumstances here are different: GM, the sole defendant, moves for dismissal and argues that no other sanction will remove the prejudice plaintiff's spoliation has caused. The court agrees.

Finally, as a last distinction, the district court in *West* relied only on plaintiff's spoliation for dismissal. In this matter, **[*24]** the court relies not only upon the spoliation, but counsel's noncompliance with orders of both a Magistrate Judge and a District Judge. Not only does this court have the discretion under *Rule 37* to order dismissal for a plaintiff's noncompliance, see *Fed. R. Civ. P. 37*, but as the Supreme Court has recognized, the district court has the inherent power to regulate and control litigation before it. See *Chambers, 501 U.S. at 43-45*. If parties were allowed to disregard mandatory discovery deadlines and orders of the court, orderly and timely adjudication of cases would be subverted.

In summary, *West* can be distinguished, and the result will not be followed here for several reasons: (1) the evidence spoliated is not circumstantial; (2) due to the nature of the spoliated evidence, effective lesser sanctions may well be tantamount to summary judgment; (3) lesser sanctions may not remedy GM's prejudice because it does not know exactly what a physical inspection of the flex fan would have revealed as a potential defense; (4) no mitigating factors to the spoliation are present; (5) defendant herein actually moves for dismissal and argues only dismissal will protect **[*25]** its interests adequately; (6) plaintiff's counsel's disregard of discovery and other orders of the court support dismissal as a sanction under *Rule 37* and under the court's inherent power to control litigation before it.

---

[12] A defective design claim arguably does not require evidence of the product which actually failed, since all of the same type of product are uniformly defective. However, courts have dismissed for spoliation, even where plaintiff alleged a design defect. See *Brancaccio, 1992 WL 189937*, at *2 (case dismissed for spoliation under *Rule 37* where claim of improper seat belt design was present, when seat belt --and vehicle-- were disposed of through plaintiff's negligence); *Squitieri v. City of New York, 248 A.D.2d 201, 202, 669 N.Y.S.2d 589, 590* (1st Dep't 1998) (dismissal of third party complaint alleging defective design for loss of the defective product).

---

[13] As the Circuit stated, "it is noteworthy that Goodyear did not move for dismissal as a sanction for spoliation; it only sought to have evidence relating to the spoliated materials excluded at trial. Only [the second defendant] moved to dismiss the complaint on the ground of spoliation. *Obviously, Goodyear believed that lesser sanctions, like exclusion of spoliated evidence, would protect its interests, although Goodyear would now benefit from the district court's dismissal.*" *West, 167 F.3d at 780 n. 1* (emphasis supplied).

1999 U.S. Dist. LEXIS 12285, *25

Having carefully examined and considered the alternatives, no other remedy than dismissal appears appropriate. Only dismissal serves the three prongs the West panel enumerated as to the purposes of *Rule 37* and spoliation. [14] First, it will serve as a deterrent to plaintiff's counsel, his expert and non-parties from engaging in spoliation and disobedience of court orders. Second, the risk of an erroneous judgment will be on the party to lose the critical evidence. Third, it appears no other sanction will restore GM to the position it would have been in absent the spoliation.

 [*26]  Accordingly, GM's motion for dismissal is granted. Moreover, as set forth below, the court alternatively grants GM's summary judgment motion.


## II. Summary Judgment

Even if the court did not impose lesser sanctions (which it would if it were not dismissing the case) plaintiff's claims fail as a matter of New York law. [15]

Plaintiff's defective design claims are barred by the subsequent modification doctrine of *Robinson v. Reed-Prentice Div. of Package Mach. Co., 49 N.Y.2d 471, 475, 426 N.Y.S.2d 717, 403 N.E.2d 440 (1980)*. As the New York Court of Appeals recently reiterated, "*HN7*[↑]] a manufacturer is not responsible for injuries [*27] resulting from substantial alterations or modifications of a product by a third party that render the product defective or otherwise unsafe." *Liriano v. Hobart Corp., 92 N.Y.2d 232, 236, 677 N.Y.S.2d 764, 765, 700 N.E.2d 303 (1998)* (citing Robinson).

This present matter is analogous to a recent Appellate Division, Third Department case upholding the subsequent modification doctrine under similar facts. See *Colonial Indem. Ins. Co. v. NYNEX, 260 A.D.2d*

833, 688 N.Y.S.2d 744, 1999 WL 216867*, *2 (3d Dep't 1999). There, the Appellate Division granted summary judgment to defendant manufacturer because the undisputed cause of the damages was a part added by a third party subsequent to the product's manufacture. See id. at *1-2.

In the case at bar, as in Colonial Indemnity, plaintiff seeks to hold the manufacturer, GM, liable for the failure of a part which was added to the truck by a third party subsequent to the truck's manufacture and sale. Despite GM's assertion that New York law mandates summary judgment on these claims, plaintiff fails to oppose this argument in his opposition papers. [16] The court [*28] agrees that the subsequent modification doctrine of Robinson requires the claims to be dismissed. Moreover, plaintiff's failure to oppose GM's argument is deemed by the court as consent to summary judgment on these claims.

 [*29]  Plaintiff also alleges a failure to warn claim in his complaint, and reiterated the same at oral argument. Plaintiff otherwise fails to mention or support his allegation of failure to warn. In its motion for summary judgment, GM argues that "there is no record evidence to establish that a warning would have prevented this action, to whom a warning should have been given, the content of the warning, and all the other elements

---

[16] Plaintiff's sole opposition to summary judgment on his defective design claims is the assertion of the "new" theory of liability, mainly that the truck was defectively designed when it left GM's hands, as it was designed to allow the less safe flex fan to be installed. It is too late for plaintiff to assert this new theory, especially when his purpose is plainly to avoid summary judgment due to the subsequent modification doctrine. To determine whether the claim was indeed new, or had been present all along, as maintained by plaintiff, the court directed plaintiff to file a statement describing this new theory, supplemented with references to the record supporting its previous existence. Contrary to his assertions, none of the citations plaintiff points to disclosed or set forth this new theory. As discovery and motions are closed, the court declines to permit the new liability theory on either defective design or failure to warn.

Notwithstanding the untimeliness of plaintiff's new theory, the court notes and adopts GM's argument that plaintiff's novel theory still has, "at its heart, the issue of whether the flex fan was defective and at the root of that issue lies the question of the cause of the failure; a question that GM cannot adequately defend due to plaintiffs' negligent loss of the fan." Def. Reply at 4 n. 2, docket no. 59. Accordingly, even if the court allowed plaintiff's new theory, it does not alter the court's conclusion that this case must be dismissed for spoliation.

---

[14] "(1) Deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West, 167 F.3d at 779* (internal quotations and citation omitted).

[15] In a diversity action, the court must apply the substantive law of New York. See *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)*; *Caiazzo v. Volkswagenwerk A.G., 647 F.2d 241, 243 (2d Cir. 1981)*; *Paul Revere Life Ins. Co. v. Adelman, 1997 U.S. Dist. LEXIS 19804, 1997 WL 773706 (N.D.N.Y. 1997)* (Munson, S.J.).

necessary to prove this type of claim." Def. Mem. of Law at 18 n. 7, docket no. 48. Plaintiff never responded to or refuted this argument in his opposition papers. After the court ordered supplemental briefing at oral argument, GM again argued the failure to warn claim was unviable. "Plaintiff[] here can point to no evidence or expert opinion in the record that the 1984 truck was defective because it lacked appropriate warnings. In contrast, the record shows that GM did provide information about the proper cooling fan to use on this truck." Def. Response at 8 n. 4, docket no. 67. Despite the court's order at oral argument for plaintiff to reply to GM's Response, plaintiff again not only failed to address GM's argument, but failed to file the reply at all. Thus, **[*30]** plaintiff has never opposed GM's argument for summary judgment on this claim.

This court has dismissed failure to warn claims when plaintiff fails to support the claim at a summary judgment motion. See *June v. Lift-A-Loft Equip., Inc., 1992 U.S. Dist. LEXIS 10064, 1992 WL 168181*, *2-3 (N.D.N.Y. 1992) (McCurn, C.J.). As with the present case, the June plaintiff left the "record[] devoid of any factual basis for concluding that the [product] carried inadequate warnings" and the court therefore granted summary judgment to defendant. Id. at *3. The same result is required here.

*HN8*[⬆] Additionally, Local Rule 7.1(b)(3) states that "failure to file or serve any papers as required by this rule shall be deemed by the court as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y. L.R. 7.1(b)(3). Plaintiff fails to oppose summary judgment on the warning claim although GM specifically argues it is entitled to such. Not only does plaintiff fail to address GM's argument in his opposition papers, but he failed to file a reply addressing similar arguments after the court directed him to file the same. The court considers plaintiff's failures to oppose **[*31]** as consent to GM's motion for summary judgment on the failure to warn claim.

**CONCLUSION**

For the aforementioned reasons, GM's motion to dismiss pursuant to *Fed. R. Civ. P. 37* is GRANTED. Dismissal is granted (a) due to plaintiff's spoliation of the crucial evidence under *Rule 37*; (b) due to counsel's noncompliance with orders of the court, pursuant to *Rule 37*; and (c) under the inherent authority of the court to control litigation before it. Alternatively, defendant's

motion for summary judgment is GRANTED in the entirety.

IT IS SO ORDERED.

Dated: May 17, 1999

Syracuse, New York

Neal P. McCurn

Senior United States District Judge

**JUDGMENT IN A CIVIL CASE** - FILED MAY 18 1999

**Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED: GM's motion to dismiss is GRANTED. Defendant's motion for summary judgment is GRANTED in the entirety.

May 18, 1999

**DATE**

---